**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| YELLOW GROUP LLC; YELLOW CAB AFFILIATION INC.; TAXI AFFILIATION SERVICES LLC; YC1 LLC; 5 STAR FLASH, INC.; CHICAGO MEDALLION ONE LLC; and, YOUR PRIVATE LIMOUSINE, INC.; | ) ) ) ) ) ) | |
| | ) | CIVIL ACTION NO.: 12-cv-7967 |
| Plaintiffs, | ) ) | |
| v. | ) ) | **Jury Trial Demanded** |
| UBER TECHNOLOGIES, INC., | ) ) | |
| Defendant. | ) ) | |

## COMPLAINT

Plaintiffs Yellow Group LLC ("Yellow Group"), Yellow Cab Affiliation, Inc. ("Yellow Affiliation"), Taxi Affiliation Services LLC ("TAS"), YC1 LLC ("YC1"), 5 Star Flash, Inc. ("Flash"), Chicago Medallion One LLC ("CM1") (Yellow Group, Yellow Affiliation, TAS, YC1, Flash, and CM1, are collectively referred to as the "Taxi Plaintiffs"), and Your Private Limousine, Inc. ("YPL" or the "Limo Plaintiff") (all plaintiffs collectively referred to herein as "Plaintiffs") complain against defendant Uber Technologies, Inc. ("Uber") as follows:

### *Nature of the Case*

1.     Uber acts and holds itself out as a transportation company whose business model revolves around a mobile phone application that allows consumers to request service from taxis or livery vehicles (SUVs or sedans often referred to as "Black cars").  Uber's business model requires Uber to bypass the dispatch systems of legally operating taxicab and livery companies, such as Plaintiffs, and contract directly with the drivers of Plaintiffs' vehicles.  By contracting with the drivers directly, without the knowledge or consent of Plaintiffs, Uber acts as a *de facto*

1

transportation company while promoting the false impression to the riding public that when Plaintiffs' vehicles respond to an Uber dispatch call, Plaintiffs are working with Uber.

2. By falsely creating the impression that Uber is associated with Plaintiffs, Uber gains the aura of legitimacy and avoids the costs and time necessitated by compliance with the laws and regulations in the City of Chicago governing established, legitimate transportation companies. At the same time, Uber commits outright violations of the laws and regulations governing legally operating transportation companies. All the while, the riding public is unaware of these legal violations because the Plaintiffs have wrongfully been portrayed as Uber's partner, thereby fraudulently lending the false impression that Uber is a compliant transportation services provider in the City of Chicago.

3. Uber unfairly competes with Plaintiffs by openly rejecting any notion of compliance with the ordinances and rules and regulations governing taxi and livery services in the City of Chicago. Uber expressly violates the City code and ordinances by, among other things, dispatching livery vehicles and taxicabs under the same system and using illegal metering devices. Livery vehicles dispatched by Uber are violating city ordinances, which prohibit liveries from responding to street hails, including electronic street hails, a right reserved for medallion taxicabs. Uber also violates the city's livery ordinances by charging a rate determined by mileage and waiting time, similar to the taxicab rate system, as opposed to the predetermined flat rates required by the ordinances.

4. Uber's unlawful business operations inject uncertainty and confusion into the market as to the source of transportation services by dispatching vehicles under Plaintiffs' colors and trademarks. Uber also violates the established rules and regulations put into place to protect the consumers, and conceals Uber's lack of operational standards, all purportedly in the name of

technological advancement. While technology and innovation have the opportunity to enhance industries, such advancements cannot be made at the expense of consumer confusion and public safety.

5.      Plaintiffs' contracts with drivers require, among other things, that the drivers operate legally while driving Plaintiffs' vehicles. By contracting directly with drivers for services that violate the laws of the State of Illinois and the City of Chicago, Uber tortiously interferes with the contractual relationship between Plaintiffs and the drivers.

6.      Uber's management has been openly critical of any regulation in general. Uber's CEO Travis Kalanick ("Kalanick") has stated publicly "I don't understand regulators ... They are incredibly sensitive to what is in the public view. But if you only follow the rules, they will never let you make the city a better place." Uber attempts to spin any criticism as "anti-technology" and is willing to say whatever it needs to at any given moment to achieve Uber's economic goals. For example, in New York Uber has argued to regulators that its system merely constitutes an advance reservation for livery vehicles, but, when Uber wanted to expand to taxis, it took the inconsistent position that Uber's system is a virtual hail.

7.      In other instances Kalanick has taken to social media outlets such as Twitter to espouse his views on regulators when Uber receives any resistance. In one such "tweet" Kalanick states:



travis kalanick @travisk                                    22 Jun
Cambridge, MA home to Harvard, MIT and some of the most
anti-competitive, corrupt transportation laws in the country
Collapse  ←Reply  ⇄Retweet  ★Favorite

8.      Uber's business practices are in violation of the Federal Lanham Act, the Illinois Deceptive Trade Practices Act, the Illinois Consumer Fraud Act, and Illinois common law.

***Parties and Jurisdiction***

9.      Plaintiff Yellow Group is a limited liability company organized and existing under the laws of the State of Delaware.  Yellow Group has its principal place of business at 2230 S. Michigan Avenue, Chicago, Illinois 60616.

10.     Plaintiff Yellow Affiliation is a corporation organized and existing under the laws of the State of Illinois.  Yellow Affiliation has its principal place of business at 2231 S. Wabash Avenue, Chicago, Illinois 60616.  Yellow Affiliation is a licensed taxi affiliation in the City of Chicago and a wholly owned subsidiary of Yellow Group.

11.     Plaintiff TAS is a limited liability company organized and existing under the laws of the State of Delaware.  TAS has its principal place of business at 2230 S. Michigan Avenue, Chicago, Illinois 60616.  TAS is a wholly owned subsidiary of Yellow Group.

12.     Plaintiff YC1 is a limited liability corporation organized and existing under the laws of the State of Delaware.  YC1 has its principal place of business at 2230 S. Michigan Avenue, Chicago, Illinois 60616.  YC1 is a licensed medallion owner in the City of Chicago and a member of Yellow Affiliation.

13.     Plaintiffs Yellow Group, Yellow Affiliation, and TAS own or are the exclusive licensees of all trademarks, trade dress, and goodwill associated with the operation of the Yellow taxi service in the City of Chicago.  Yellow Group, Yellow Affiliation, and TAS have strong, distinctive, and recognizable trademarks and trade dress associated with their taxi services.

14.     Plaintiff Flash is a corporation organized and existing under the laws of the State of Illinois.  Flash has its principal place of business at 5200 N. Otto Avenue, Chicago, Illinois 60656.

15.     Plaintiff Flash owns or is the exclusive licensee of all trademarks, trade dress, and goodwill associated with the operation of the Flash Cab taxi service in the City of Chicago. Flash Cab has strong, distinctive, and recognizable trademarks and trade dress associated with its taxi services.

16.     Plaintiff YPL is a corporation organized and existing under the laws of the State of Illinois.  YPL has its principal place of business at 355 W. Dundee Road, Suite 213, Buffalo Grove, Illinois 60089.  Plaintiff YPL operates livery services that provide luxury limousine, sedan, and SUV transportation.

17.     Defendant Uber is a corporation organized and existing under the laws of the State of Delaware.  Uber maintains its principal place of business at 800 Market Street in San Francisco, California 94102.  Uber also maintains a local office within this judicial district at 230 W. Superior Street, Chicago, Illinois 60654.

18.     This action arises under the Lanham Act, 15 U.S.C. §§ 1051, *et seq.*, the Illinois Deceptive Trade Practices Act, the Illinois Consumer Fraud and Deceptive Business Practices Act, and Illinois common law.

19.     This Court has subject matter jurisdiction over this action pursuant to 15 U.S.C. § 1121, 28 U.S.C. § 1331, and 28 U.S.C. § 1367.

20.     The Court has personal jurisdiction over Uber because it transacts business in the State of Illinois, maintains a registered agent in Illinois, and has purposefully availed itself of the benefits of doing business in the State of Illinois.

## FACTUAL BACKGROUND
### *Nature of the Public Transportation Industry*

21.     To ensure that the public has access to safe and uniform means of vehicle-for-hire transportation, the City of Chicago has developed a number of ordinances and regulations to

protect the riding public. Taxi and livery companies must abide by these ordinances as well as rules and regulations, promulgated over decades, designed to protect consumers, ensure public safety, safeguard competition, and ensure non-discriminatory services. Taxi and livery companies have invested significant capital and resources to develop systems and infrastructure that ensures regulatory compliance and provides adequate consumer protections.

22.     The City of Chicago issues a finite number of taxi licenses, called taxi medallions, each associated with a unique taxi number. A taxicab may not legally operate in Chicago without such a validly issued taxi medallion license. Taxi affiliations are groups of taxi medallion owners organized and required by law to provide the affiliation members with (1) a uniform trade dress and colors, (2) uniform trademarks, (3) insurance, (4) a dispatch system, (5) a Chicago business address, (6) a registered telephone number, and (7) a registered agent, among other things.

**I.      Uber Misrepresents The Nature Of Its Business And Services In Violation Of Section 42(a) Of The Lanham Act And Illinois State Law.**

**A.      Uber Misrepresents The Nature Of Its Business To The Public.**

23.     Uber markets itself to the public as an elite public transportation company that provides taxicabs and livery vehicles to consumers through the use of a GPS enabled smartphone application. Uber holds itself out to the public as both a taxi service and livery service. Uber misleads consumers into believing that Uber provides the car and the driver, when, in fact, Uber provides neither.

24.     Uber's marketing touts their "Uber fleet," "Uber rides," "Uber Black cars," "UberCab," and "Uber taxis." In reality, Uber has none of these. Nonetheless, Uber is able to act as a transportation company by partnering with Plaintiffs' drivers and using Plaintiffs' vehicles, without the knowledge or consent of Plaintiffs.

6

25.     Uber's business model is built upon deceiving the public, ignoring public safety regulations, circumventing legally established rates and pricing models, dodging taxes and fees imposed on other public transportation providers, and shifting all risks and liability to others.  In fact, Uber's widely stated mission is to "disrupt" the established regulated taxi operations and substitute a mobile-application-based service free of any regulations governing public transportation services.

### B.     Uber Employs Illegal And Deceptive Payment Practices To Overcharge Taxi Customers.

26.     If the Uber driver is driving a taxi, the driver starts the taximeter when the passenger enters the taxi and runs the standard taximeter throughout the ride.  The driver manually enters the metered fare into the Uber driver mobile application.  Uber adds 20% to the amount the driver enters into the Uber driver mobile application as a "gratuity" and charges the passenger's credit card with the total price (driver-entered amount from meter plus 20%).

27.     Chicago, as in most if not all large cities, strictly regulates the rates taxis may charge.  Uber represents to consumers that its taxi fares are "standard taxi rates" for the City of Chicago.  In reality, Uber's rates are different from and exceed the City defined rates by 20%, in violation of Chicago Municipal Code 9-112-600, which states, "It is unlawful for any person to demand or collect any fare which is more than the rates established by ordinance . . . ."

28.     Uber further deceives the public in its marketing material distributed on Uber's website and through social media by representing to its taxi consumers that Uber adds an automatic "20% gratuity" onto the metered fare.  Uber misleads the public and fails to disclose to consumers that only half of such "gratuity" actually goes to the driver.  The remaining half, in fact, goes to Uber.

29.     Moreover, a portion of the 20% "gratuity" that Uber keeps is a credit card processing fee equal to 2% of the base fare.  Under the rules and regulations for all Taxicab Medallion License Holders, Rule TX05-07(c)(2) specifically prohibits a licensee from imposing on a consumer "an extra fee or surcharge for using non-cash electronic forms of payment." Individual drivers are similarly prohibited by City of Chicago Public Chauffeurs Rules and Regulations Rule 11.06 (a) from imposing a surcharge on the consumer for the use of non-cash means of payment.

C.     **Uber Misrepresents That It Is Providing a Premium Service With Better Drivers Than Plaintiffs When, In Fact, Uber Uses The Same Drivers and The Same Vehicles As Plaintiffs.**

30.     Uber markets itself as providing a premium service over traditional providers such as Plaintiffs, yet Uber provides next to no quality or safety measures to ensure that riders are getting licensed drivers and insured vehicles.  Uber, in fact, uses the same drivers and vehicles as Plaintiffs.

31.     Uber makes such marketing claims as "Do you trust your transportation?  You should."  But in reality Uber only checks that drivers are properly licensed at the initial, less than one hour, orientation and, after that, never checks for proper licensure again.

32.     When one user asked the question regarding selection of drivers, Ryan Graves, Uber's Vice President of Operations, responded as follows:



33.     In the taxi context Mr. Graves' statement is false because Uber never checks whether any taxi driver has insurance coverage.  This statement is even further misleading as taxicab drivers do not carry their own insurance—they rely entirely on the taxicab affiliation and/or medallion holders for whom they drive to provide the insurance.

34.     Uber also misleadingly markets itself as a provider of "high quality" taxis. However, in reality, there is absolutely no screening process for the vehicles that would support this statement.  Uber, at best, uses the same taxis and drivers that customers obtain through a street hail or through a taxi affiliation arranged ride.

35.     Individuals who want to drive for Uber fill out a short form on Uber's website. Individuals who complete the online form are invited to attend a brief (less than an hour) orientation to drive for Uber which consists almost entirely of how to use the Uber application on the iPhone provided to each driver.

36.     Uber merely asks taxicab and livery drivers to show their state issued driver's license and their commercial chauffeur's license at or before the orientation.  On information and belief, Uber does not check to ensure that a potential driver's license has been suspended or revoked.  On information and belief, Uber does not regularly check its driver's license status to determine whether an Uber driver has had his or her license suspended or revoked after they started driving for Uber.

37.     Uber's alleged method of insuring its "high quality" rides consists of a five star "rating system" by which Uber riders can provide a rating for their driver immediately after the completion of the ride.  Uber claims that if drivers dip below a certain star rating, they "no longer do business with" the driver.  However, what Uber conceals is that every driver for Uber, taxi or livery, starts with a five star rating.  Therefore it would take, at best, several users to comment on

the lack of "high quality" service a driver provides before he or she is removed from the Uber system.

38.     On the taxicab side, Uber does not evaluate the potential driver's vehicles or ask to see proof that the potential drivers have vehicles that comply with city and state regulations. In fact, Uber has no way to know if its taxicab drivers are carrying passengers in an illegal vehicle.

39.     On the livery side, Uber only inspects the vehicle at the initial orientation and reviews the vehicle's City-mandated "hard card," which discloses the vehicle licensing and insurance information required by the City of Chicago.  But once again, Uber fails to follow through and fails to recheck that any licensing or insurance is maintained.

40.     Instead, in Uber's fine print terms and conditions that users must "click through" at the outset of downloading the application to their phone—Uber disavows any vetting of its drivers or vehicles and expressly disclaims any and all liability, completely contrary to its numerous advertisements about the quality and safety of its services:

THE COMPANY MAY INTRODUCE YOU TO THIRD PARTY TRANSPORTATION PROVIDERS FOR THE PURPOSES OF PROVIDING TRANSPORTATION. WE WILL NOT ASSESS THE SUITABILITY, LEGALITY OR ABILITY OF ANY THIRD PARTY TRANSPORTATION PROVIDERS AND YOU EXPRESSLY WAIVE AND RELEASE THE COMPANY FROM ANY AND ALL ANY LIABILITY, CLAIMS OR DAMAGES ARISING FROM OR IN ANY WAY RELATED TO THE THIRD PARTY TRANSPORTATION PROVIDER. THE COMPANY WILL NOT BE A PARTY TO DISPUTES, NEGOTIATIONS OF DISPUTES BETWEEN YOU AND SUCH THIRD PARTY PROVIDERS. WE CANNOT AND WILL NOT PLAY ANY ROLE IN MANAGING PAYMENTS BETWEEN YOU AND THE THIRD PARTY PROVIDERS. RESPONSIBILITY FOR THE DECISIONS YOU MAKE REGARDING SERVICES OFFERED VIA THE APPLICATION OR SERVICE (WITH ALL ITS IMPLICATIONS) RESTS SOLELY WITH YOU. WE WILL NOT ASSESS THE SUITABILITY, LEGALITY OR ABILITY OF ANY SUCH THIRD PARTIES AND YOU EXPRESSLY WAIVE AND RELEASE THE COMPANY FROM ANY AND ALL LIABILITY, CLAIMS, CAUSES OF ACTION, OR DAMAGES ARISING FROM YOUR USE OF THE APPLICATION OR SERVICE, OR IN ANY WAY RELATED TO THE THIRD PARTIES INTRODUCED TO YOU BY THE APPLICATION OR SERVICE. YOU EXPRESSLY WAIVE AND RELEASE ANY AND ALL RIGHTS AND BENEFITS UNDER SECTION 1542 OF THE CIVIL CODE OF THE STATE OF CALIFORNIA (OR ANY ANALOGOUS LAW OF ANY OTHER STATE), WHICH READS AS FOLLOWS: "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH, IF KNOWN BY HIM, MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR."

THE QUALITY OF THE TRANSPORTATION SERVICES SCHEDULED THROUGH THE USE OF THE SERVICE OR APPLICATION IS ENTIRELY THE RESPONSIBILITY OF THE THIRD PARTY PROVIDER WHO ULTIMATELY PROVIDES SUCH TRANSPORTATION SERVICES TO YOU. YOU UNDERSTAND, THEREFORE, THAT BY USING THE APPLICATION AND THE SERVICE, YOU MAY BE EXPOSED TO TRANSPORTATION THAT IS POTENTIALLY DANGEROUS, OFFENSIVE, HARMFUL TO MINORS, UNSAFE OR OTHERWISE OBJECTIONABLE, AND THAT YOU USE THE APPLICATION AND THE SERVICE AT YOUR OWN RISK.

**II.    Uber Falsely Implies That It Is Associated With, Sponsored, Or Approved By Taxi And Livery Companies In Violation Of Section 43(a) Of The Lanham Act And Illinois State Law.**

**A.    Uber's Business Practices Cause Consumer Confusion In The Marketplace As To The Source Or Affiliation Of Its Services.**

41.    Uber's business practices are likely to cause confusion as to whether Uber is associated with, sponsored by, connected to, or approved by one or more Taxi Plaintiffs.

42.    When a taxi driver that is associated with one of the Taxi Plaintiffs responds to an Uber request, consumers see the Taxi Plaintiffs' trademarks and trade dress on the taxi.  The consumers are likely to be confused as to whether the Taxi Plaintiffs are associated with Uber. Uber does nothing to negate this assumption.  In fact, Uber fosters that incorrect understanding among consumers.  Uber's advertising provides that it works with its "fleet partners" to provide transportation services, when in fact, it does not.  Uber's only partners are the drivers themselves.

43.    Uber repeatedly uses terms such as "fleet partners" to suggest that the taxi companies that own the vehicles Uber uses are associated with or approve of Uber:

How do you select your drivers?


Austin Geidt
posted this on October 26, 2010 10:16

We carefully select which fleet partners we work with and ensure that they have all the proper licensing. We've also implemented a rating system for drivers. If his or her rating goes beneath a certain level, we will no longer do business with them. We're careful to maintain a standard of only doing business with quality, licensed drivers.

When Uber was started it was a service used by us and our friends. We will never allow our friends to be put into an uncomfortable or dangerous situation because of our service.  One of the most important points about Uber service is to get away from those types of situations when looking for transportation around the city.

44.    On the livery side of Uber, consumers are likely to be confused as to whether the livery company which owns the car is associated with, affiliated with, or connected to Uber, or that the livery company sponsors, approves of, or endorses Uber.  Given that trademarks and

trade dress are not as prevalent on the livery side of transportation services, it is likely that consumers will believe that the Black Car that picks them up is an "Uber Car."

45.     In Chicago, under local ordinance, it is unlawful for any person other than a livery licensee or his agent to represent to the public that he renders livery service.  Chi. Muni. Code 9-114-020 (c).  Although it is not a livery licensee or an agent for a livery licensee, Uber holds itself out as a livery service on all its web sites and states that it works with its "fleet partners" to provide service.

**B.      Uber Trades Off Of The Goodwill, Infrastructure, And Investment Of The Taxi And Livery Companies.**

46.     Uber, while acting as a transportation company, evades any responsibility for the risks inherent in the public transportation industry.  Instead, Uber relies on the responsibilities placed squarely on the shoulders of the established public transportation companies, such as Plaintiffs, which are legally required to provide insurance, regularly inspect and evaluate the vehicles, and institute mechanisms to ensure drivers have valid and non-suspended licenses at all times.

47.     Uber relies on the infrastructure established by the taxi and livery companies, while increasing the potential liability to those companies.  By inducing taxi and livery drivers to act in violation of the laws and regulations of Illinois and Chicago, preventing taxi companies from collecting legally mandated data, and encouraging drivers' illegal use of cellular telephones while operating their vehicles, Uber places taxi and livery companies in danger of increased liability and loss of their medallions and/or operating licenses.  Uber's actions also place the drivers associated with the Plaintiffs at risk of losing their chauffeurs' licenses.

48.     Uber shirks the responsibilities accepted by its competitors to provide transportation services to underserved areas and customers with disabilities.  While taxi

companies are legally required to provide dispatch services to <u>all areas of Chicago, including traditionally underserved areas,</u> and to provide priority dispatch for individuals with disabilities using government sponsored vouchers, Uber accepts no such responsibilities.  All Uber dispatches are at the discretion of Uber drivers and, therefore, the drivers control from which parts of the city they accept Uber dispatches.  Uber also has no mechanism by which a passenger with disabilities can use a city or state issued voucher for a portion of a taxicab ride.

### III.    Uber's Illegal Operations Unfairly Compete With Legally Compliant Taxi And Livery Companies In Violation Of Illinois State Law.

49.    Uber competes with Plaintiffs in the vehicle-for-hire industry.  Uber acts as a transportation company providing livery and taxi services.  Uber's business practices, however, violate numerous laws and regulations.  Uber does not compete fairly with legally operated companies in the vehicle-for-hire industry, including Plaintiffs, because Uber, unlike Plaintiffs, does not comply with the consumer protection and public safety laws and regulations.

50.    Uber's pricing structure for livery vehicles mimics the way consumers are charged for taxi services, but at a higher price.  Uber's practice of using an iPhone and mobile application as a meter to determine fares for livery vehicles, in contravention of the laws and regulations governing livery services, essentially transforms livery vehicles into unlicensed taxis.  Uber selectively implements practices from both the livery and taxi industries, but complies with the regulations of neither industry.

51.    The City of Chicago issues only a finite number of taxi medallions.  By operating as a taxi service, but without the costs of purchasing and owning medallions or complying with the regulations imposed on the competing taxi companies, Uber dilutes the taxi market and competes unfairly with legal taxi companies.

**A.     Uber's Business Plan Requires The Illegal Use Of A Meter In Livery Vehicles.**

52.     In Chicago, it is unlawful for a livery vehicle to use any mechanical device that measures the distance traveled and registers a fare based on distance measured.  The Chicago Municipal Code defines "Taximeter" as "a device which records and indicates a charge or fare measured by distance traveled, waiting time, number of passengers, and any extra charges set forth in this chapter."  The Municipal Code requires that "Taximeters must meet specifications set forth by the commissioner in rules and regulations," which mandate that all meters are inspected annually.

53.     For livery services, the Uber driver uses the Uber mobile application and the Uber iPhone's GPS to measure and calculate the fare.  As Uber states on its website, the typical pricing scheme for livery vehicles is as follows:

|  | Black car (sedan) | SUV |
|---|---|---|
| Base Fare | $7.00 | $14.00 |
| Per Mile (at speeds >11 mph) | $3.50 | $4.50 |
| Per Minute (at speeds <11 mph) | $0.85 | $1.05 |
| Minimum Fare | $15.00 | $25.00 |
| Cancellation Fee | $10.00 | $10.00 |

54.     However, likely unbeknownst to the general public, but well-known to anyone in the livery business, "It is unlawful for any person to operate or drive a [livery] vehicle equipped with a meter that registers a charge of any kind."  Chicago Muni. Code 9-114-060.  Uber uses GPS enabled iPhones in livery vehicles to determine distance and fares, a direct violation of various aspects of Chicago law since the GPS devices act as illegal meters.  Uber's GPS devices and software mimic the function of a taximeter by formulating charges based on distance and time traveled.

55.     Furthermore, the illegal meters violate the restrictions that Chicago livery vehicles may only be hired at a charge or fare fixed by agreement in advance.  Chicago Municipal Code 9-114-280.  Uber's fares are not fixed by agreement in advance because Uber charges by distance and per mile (>11 mph) and per minute (<11mph).

56.     The fact that customers do not have access to the meter measurements and calculations for livery charges until after the completion of the ride further inhibits consumers from addressing problems right away.  Rather, Uber's business model is to charge the customer's credit card first and then place the burden upon the consumer to dispute the charges at a later date.

57.     Even if customers had real time information as to the cost of their livery ride and disputed the charge at the time of the ride (an open meter as opposed to the inaccessible one that Uber currently uses), nothing could be done about it at that time.  Uber has no customer service number, rather Uber expects customers to email any complaints after-the-fact in the hope that the overcharge may be reversed at a later point in time.

**B.      Uber Unfairly Competes With Plaintiffs Because Uber Illegally And Fraudulently Obtained Its Dispatch License.**

58.     In Chicago, any company that operates or provides a two-way radio taxicab dispatch system must be licensed by the Department of Business Affairs and Consumer Protection.  Chicago Municipal Code 9-112-550(a).

59.     In August of 2012, after Uber had been illegally operating a two-way radio taxi dispatch service for nearly four months in Chicago, Uber finally obtained a dispatch license.  To secure the dispatch license, however, Uber again had to misrepresent the facts and omit the true nature of its business.

15

60.     A "radio dispatch service" under the Chicago regulatory framework is defined as "an organization which is neither a public passenger vehicle licensee [medallion owner] nor an affiliation but which provides, pursuant to an agreement with ***an affiliation or affiliations and/or individual licensees***, an approved 'two-way radio dispatch system to its subscribers.'" City of Chicago Rules and Regulations for Radio Dispatch Services Rule 1(c) (emphasis added).

61.     Uber failed to disclose on its dispatch license application that it has no agreements with the Taxi Plaintiffs or any other taxi affiliations, as is required by Chicago ordinance; it only listed that it uses certain individual *drivers* associated with the Taxi Plaintiffs or other taxi affiliations.  The Rules and Regulations for Radio Dispatch Services do not provide for drivers/chauffeurs to individually contract with a dispatch service, but this is yet another example of Uber openly ignoring the regulations placed on all other members of the public transportation industry in Chicago.

62.     Additionally, in Chicago, no dispatch service may serve both taxicab and livery license holders.  City of Chicago Rules and Regulations for Radio Dispatch Services Rule No. 3.  The basis for this rule is City of Chicago Municipal Code 9-112-320 which prohibits taxis and liveries being associated with the same affiliation.

63.     The City of Chicago Rules and Regulations also require that a legally licensed dispatch service have its principal place of business within the City of Chicago.  In applying for a dispatch license, Uber fraudulently represented that its principal place of business is in Chicago when, in fact, it is not.  Uber's principal place of business is in San Francisco, California.

64.     Ostensibly, the many rules regulating the number of taxicab licensees which can belong to any affiliation and the separation between taxi and livery associations are meant to

encourage competition and specifically discourage monopoly power.  Uber's dispatch system

eliminates the separations set up by the City and illegally serves both taxis and livery cars.

### C.    Uber Unfairly Competes With The Taxi Plaintiffs By Preventing Taxi Companies From Complying With Chicago Data-Collection Mandates.

65.    Uber also interferes with the ability of taxi companies, including Taxi Plaintiffs,

from complying with new data-collection regulations.  Effective January 1, 2013, all Chicago

medallion licensees must have the capability to collect data from each taxi, including the driver's

name and number, whether the fare was a street hail or a dispatched fare, the meter amount

without any extras or tips, all meter extras, the tip amount, the total amount paid, and the form of

payment.  Taxicab Medallion License Holder Rules and Regulations Rule TX 5.12(a).  Chicago

medallion licensees are required to store this data for a minimum of 12 months and provide the

Department of Business Affairs and Consumer Protection real-time access to the information.

66.    Uber's system bypasses the medallion licensees' data collection systems and

prevents medallion licensees from collecting the data required by law.  Medallion licensees do

not have access to Uber's charges and, therefore, cannot collect and store the mandatory

information.

67.    As of January 1, 2013, Uber's business practices will prevent all medallion

licensees whose drivers also drive for Uber from complying with the Chicago data-collection

regulations despite all efforts by the licensees, such as YC1 and CM1, to comply with the

regulation.

68.    The consequences for a medallion owner not complying with the data collection

mandates and other local rules and regulations include potential substantial fines and penalties,

and even revocation of their medallion license.

**D.** **Uber Unfairly Competes With Plaintiffs Because Uber Illegally Discriminates Against People Without Credit Cards And Smartphones And People With Disabilities.**

69.     While Uber advertises itself as "Everyone's Private Driver"—that is in fact a gross mischaracterization as Uber only chooses to cater to what it perceives as the technologically elite and well-off individuals.  It is obvious that through Uber's marketing it caters to young, hip, urban professionals, which is perfectly reasonable on the livery side.  But using the publicly regulated (and limited number) taxis in order to create a two tier system— "high quality taxis" for the "haves" and the remainder for the "have nots"—runs contrary to the many ordinances enacted in Chicago to ensure non-discriminatory service for everyone in Chicago, not just those "cool" enough to use Uber.

70.     Chicago taxi drivers are required by local regulatory rules and by agreement with Plaintiffs to accept all forms of legal tender including cash, but Uber drivers do not accept cash payments.  *See* City of Chicago Public Chauffeurs Rules and Regulations Rule 11.06 (a).  Uber's credit-card-only payment system prevents lower-income individuals without credit cards or mobile phones from accessing Uber's public transportation services.

71.     Additionally Uber's use of its own credit card processing services also violates the recently updated, July 1, 2012, Taxicab Medallion License Holder Rules and Regulations, specifically Rule TX 5.07(f).  Rule TX 5.07(f) requires that any cabs that are affiliated with entities such as the Taxi Plaintiffs "must process electronic forms of payment through their affiliations or licensed medallion license managers . . . ."

72.     In Chicago, all taxi drivers are required by law and agreement with Taxi Plaintiffs to participate in the Chicago Taxi Access Program (CTAP) which provides passengers with disabilities reduced fare vouchers to use for taxi rides.  Furthermore, pursuant to Dispatch Rules

and Regulations, all dispatchers are to give priority fulfillment of dispatch requests for CTAP

passengers. City of Chicago Rules and Regulations for Radio Dispatch Services Rule 5.1(a).

Uber's dispatch system does not allow for priority dispatch to riders with disabilities using

CTAP and Uber's business model does not provide for the use of CTAP vouchers.

**IV.** **Uber's Operations Tortiously Interfere With The Contractual Relations Between Taxi Affiliations And Medallion Owners, And The Contractual Relations Between Medallion Owners And Their Licensee Drivers.**

    **A.** **Uber Encourages Drivers To Violate Illinois And Local Laws In Breach Of The Drivers' Agreements With Their Affiliations.**

73. Taxi affiliations, such as Yellow Affiliation and Flash, have contractual

agreements with the taxi medallion owners, such as YC1 and CM1, to provide medallion owners

with (i) the limited right to display the affiliations' trademarks and trade dress pursuant to 9-112-

350 of the Chicago Municipal Code, and (ii) dispatch, insurance, cashiering, and other services.

These contractual agreements require the taxi medallion owners to (i) comply with all applicable

laws and regulations and (ii) cause their respective lessee drivers to operate the taxis legally.

74. Drivers who lease a taxi from the taxi medallion owners also agree with the taxi

medallion owners that the drivers will abide by all applicable laws and regulations. Some of the

possible consequences for the affiliations and medallion owners failing to abide by the City

ordinances and rules and regulations promulgated thereunder, are fines, suspension of the right to

do business, and the revocation of a medallion license and, thus, affiliations and medallion

owners have strong incentive to ensure that the lessee drivers operate legally.

75. Uber's business practices encourage drivers to violate the City of Chicago's rules

and regulations. For example, the City of Chicago has imposed upon affiliations, like Yellow

Affiliation and Flash, a number of rules and regulations meant to ensure non-discriminatory taxi

service and dispatching. One of these obligations imposed upon Yellow Affiliation and Flash is

19

to serve passengers with disabilities using CTAP vouchers and to give priority dispatch to such individuals. City of Chicago Rules and Regulations for Radio Dispatch Services Rule 5.1(a). Affiliations also have very strict regulations regarding the handling of dispatch calls as well as maintaining records of calls from the general public to ensure timely response to requests for taxis across all of Chicago, not just select neighborhoods.

76.      Medallion owners, such as YC1 and CM1, also have a host of rules and regulations imposed upon them relating to the use of certain credit card processes, the collection of certain data regarding each taxi ride, all as noted above.

77.      All drivers that are associated with Yellow Affiliation and Flash or who lease a vehicle under YC1 or CM1 medallion licenses agree to abide by the ordinances and rules and regulations promulgated by the City of Chicago. This is a standard condition of any taxi agreement because the City can impose severe penalties upon affiliations or medallion license owners for the failure of drivers to abide by the ordinances as well as rules and regulations.

78.      Uber knows or should know that taxi affiliations and medallion license owners require taxi drivers to abide by the ordinances and rules and regulations of the City of Chicago. Uber knows or should know that Uber's business practices require drivers to violate their agreements with Plaintiffs. If taxi drivers do not abide by the ordinances and rules and regulations of the City of Chicago that substantial penalties, including the revocation of the right to do business, can result to the affiliations and medallion license owners.

**B.      Uber Induces Taxi Drivers To Breach The Terms Of Their Permitted Use Of Affiliation Marks and Trade Dress.**

79.      Uber also knows that businesses that own or license trademarks and trade dress have a proprietary interest in maintaining the integrity of their trademarks and trade dress, and it

knows specifically that drivers for Uber are associated with the Yellow and Flash affiliations, and hence drive vehicles displaying the Taxi Plaintiffs' trademarks and trade dress.

80.     Uber knows that when it uses taxi drivers and vehicles associated with the Taxi Plaintiffs that the vehicles display the Taxi Plaintiffs' trademarks and trade dress.  Uber further knows that the individual drivers do not own the Taxi Plaintiffs' trademarks or trade dress.  Yet, Uber interferes with and induces individual taxi drivers to breach the limited terms of use of the Taxi Plaintiffs' trademarks and trade dress by associating Taxi Plaintiffs' trademarks and trade dress with Uber.

**C.      Uber's System Requires Drivers To Illegally Use Mobile Devices, In Breach Of The Drivers' Agreements With Plaintiffs.**

81.     Chicago taxi drivers are prohibited from using cellular telephones or other electronic devices, whether or not hands-free, while operating a taxicab.  In violation of Chicago city ordinances and agreement with Taxi Plaintiffs, Uber drivers must use a cellular telephone while operating the taxicab to accept dispatches from Uber, arrange pick-up through Uber with the passenger, and provide for payment.  As of January 1, 2012, 625 ILCS 5/6-527 makes it illegal for any Illinois driver to use a hand-held mobile telephone while driving a commercial motor vehicle.

82.     Once drivers attend the Uber orientation and are issued an Uber iPhone, they use the driver mobile application to go "On Duty" for Uber.  When a driver goes "On Duty" for Uber, the driver mobile application relays the driver's GPS location and signals to Uber's network that the driver is available to accept requests for Uber rides.

83.     Consumers use Uber's mobile application to summon a taxi or livery car. Consumers input their location, or allow their iPhone's GPS system to supply the information,

into the passenger-specific mobile application and submit a pickup request for Uber to dispatch the nearest taxi or livery vehicle.

84.     Uber then transmits the consumer's pickup request and location to the nearest Uber driver who is "On Duty" for Uber.  The driver has a very short time, approximately 15 seconds, to accept the pickup request by using the Uber driver mobile application.  Drivers who want to pick up an Uber passenger must quickly accept the pickup request by using the Uber mobile application on the Uber-provided iPhone or the driver will not get the fare.  Furthermore, if drivers fail or refuse to pick up a set number of requests within a two week time frame, or if the drivers fails to go "on duty" at all for Uber within two weeks, the driver is subject to being expelled from working with Uber.

85.     When the driver gets close to the passenger's location, Uber instructs the drivers to call the passenger to facilitate pickup.  The Uber driver must use a separate (non-Uber issued) mobile phone to call the passenger.

## COUNT I
### *Uber's Lanham Act Violations –*
### *False or Misleading Representations of Goods or Services*

86.     Plaintiffs incorporate the allegations of Paragraphs 1-85 of this Complaint by reference into this Count II as though fully set forth herein.

87.     In connection with the marketing and advertising of its services, Uber uses false or misleading descriptions of fact, or false or misleading representations of fact as described herein.

88.     In Uber's commercial advertising or promotion of Uber's services, Uber misrepresents the nature, characteristics, or qualities of its services or commercial activities.

89.     Uber's conduct described herein violates Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B).

90. Unless enjoined by the Court, Uber will continue to do the acts complained of herein and cause damage and injury, all to Plaintiffs' irreparable harm and Uber's unjust enrichment.

## COUNT II
### *Uber's Lanham Act Violations –*
### *False Representation of Affiliation*

91. Plaintiffs incorporate the allegations of Paragraphs 1-85 of this Complaint by reference into this Count I as though fully set forth herein.

92. Plaintiffs are in the business of providing public transportation services to consumers.

93. Plaintiffs are not affiliated with, associated with, or connected to Uber and Plaintiffs do not approve, sponsor, or endorse Uber or Uber's services.

94. Uber specifically represents that it associates with its "fleet partners."

95. Uber's representations and business practices are likely to cause confusion, mistake, or deception as to the source, affiliation, connection, or association of Uber's services with Plaintiffs, or as to the approval, sponsorship, or endorsement of Uber's services by Plaintiffs, all to Plaintiffs' irreparable injury and Uber's unjust enrichment.

96. Uber's conduct described herein violates Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A).

97. Uber willfully trades on the names and reputations of the Plaintiffs.

98. Unless enjoined by the Court, Uber will continue to do the acts complained of herein and cause damage and injury, all to Plaintiffs' irreparable harm and Uber's unjust enrichment.

## COUNT III
### *Illinois Deceptive Trade Practices Act*

99.     Plaintiffs incorporate the allegations of Paragraphs 1-85 of this Complaint by reference into this Count III as though fully set forth herein.

100.     Uber's business practices violate numerous laws and regulations of the State of Illinois and the City of Chicago.

101.     Uber's illegal business practices constitute unfair competition under the Illinois Deceptive Trade Practices Act, 815 ILCS 510/1 *et seq.*

102.     Unless enjoined by the Court, Uber will continue to do the acts complained of herein and cause damage and injury, all to Plaintiffs' irreparable harm and Uber's unjust enrichment.

## COUNT IV
### *Illinois Consumer Fraud and Deceptive Business Practices Act*

103.     Plaintiffs incorporate the allegations of Paragraphs 1-85 of this Complaint by reference into this Count IV as though fully set forth herein.

104.     Uber's false and deceptive descriptions and representations of its business practices have caused confusion, deception, or mistake in the field of public transportation services.

105.     By the acts complained of herein, Uber has used false and deceptive descriptions or representations of Uber's business practices in interstate commerce and to Illinois consumers with the intent that Illinois consumers rely upon those false and deceptive descriptions.

106.     Uber's actions constitute violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS § 505/1 *et seq.*

107.    Unless enjoined by the Court, Uber will continue to do the acts complained of herein and cause damage and injury, all to Plaintiffs' irreparable harm and Uber's unjust enrichment.

### COUNT V
### *Tortious Interference with Contractual Relations*

108.    Plaintiffs incorporate the allegations of Paragraphs 1-85 of this Complaint by reference into this Count V as though fully set forth herein.

109.    Uber has intentionally and knowingly encouraged individual taxi drivers to breach their agreements with Taxi Plaintiffs by providing the taxi drivers the means and incentives to breach the laws and their agreements with Taxi Plaintiffs.

110.    As a result of Uber's interference with Taxi Plaintiffs' agreements with taxi drivers, the Taxi Plaintiffs have been damaged and are likely to be damaged in the future.

111.    Unless enjoined by the Court, Uber will continue to do the acts complained of herein and cause damage and injury, all to Plaintiffs' irreparable harm and Uber's unjust enrichment.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in favor of Plaintiffs and against Uber on Counts I-V of this Complaint, granting the following relief:

(1)    judgment that Uber has violated Section 43(a)(1)(A) of the Lanham Act;

(2)    judgment that Uber has violated Section 43(a)(1)(B) of the Lanham Act;

(3)    judgment that Uber has violated the Illinois Deceptive Trade Practices Act;

(4)    judgment that Uber has violated the Illinois Consumer Fraud and Deceptive Business Practices Act;

(5)     judgment that Uber has intentionally interfered with Plaintiffs' agreements with

their drivers;

(6)     an injunction against Uber, its officers, agents, servants, employees, and all others

in active concert with Uber;

(7)     an award of damages adequate to compensate Plaintiffs for the damage Uber has

caused, or an accounting of Uber's profits, pursuant to 15 U.S.C. § 1117 from

Uber's infringement, unfair competition, and false advertising, together with

prejudgment interests and Plaintiffs' costs;

(8)     an award of increased damages to fully compensate Plaintiffs, including trebling

of damages pursuant to 15 U.S.C. § 1117, and punitive damages for the willful

and wanton nature of Uber's wrongful acts;

(9)     an award of Plaintiffs' costs and reasonable attorneys' fees incurred as a result of

Uber's infringement and unlawful acts; and

(10)    such other relief as this Court deems fair and equitable.

Dated: October 4, 2012                          Respectfully submitted,

*/s/Michael A. Stiegel*
Michael A. Stiegel (ARDC #2735830)
    mastiegel@michaelbest.com
Carrie A. Hall (ARDC #6269884)
    cahall@michaelbest.com
Paul R. Coble (ARDC #6296105)
    pcoble@michaelbest.com
MICHAEL BEST & FRIEDRICH LLP
Two Prudential Plaza
180 N. Stetson Avenue
Suite 2000
Chicago, Illinois  60601

***Attorneys for Plaintiffs***