# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| YELLOW GROUP LLC; YELLOW CAB AFFILIATION INC.; TAXI AFFILIATION SERVICES LLC; YC1 LLC; 5 STAR FLASH, INC.; CHICAGO MEDALLION, ONE, INC.; and, YOUR PRIVATE LIMOUSINE, INC.; ) ) ) ) ) ) ) | CIVIL ACTION NO.: 12-cv-7967 Hon. Sharon J. Coleman Hon. Jeffrey T. Gilbert |
| Plaintiffs, ) ) | |
| v. ) ) | |
| UBER TECHNOLOGIES, INC., ) ) | |
| Defendant. ) | |

## Memorandum In Support of
## Plaintiffs' Motion for Preliminary Injunction

Michael A. Stiegel (ARDC #2735830)
 mastiegel@michaelbest.com
Carrie A. Hall (ARDC #6269884)
 cahall@michaelbest.com
Paul R. Coble (ARDC #6296105)
 pcoble@michaelbest.com
MICHAEL BEST & FRIEDRICH LLP
Two Prudential Plaza
180 N. Stetson Avenue
Suite 2000
Chicago, Illinois 60601

*Attorneys for Plaintiffs*

**TABLE OF CONTENTS**

Introduction ...................................................................................................................................1

Background Facts and Nature of the Case ....................................................................................1

Legal Standard ..............................................................................................................................4

Argument ......................................................................................................................................6

    I.      Plaintiffs Are Likely To Succeed On The Merits Of Their Illinois Unfair Competition Claim (Count VI) Because Uber Unfairly Competes With Plaintiffs By Violating The Law. ...............................................................................6

    II.     Without An Injunction, Plaintiffs Will Continue To Suffer Immediate And Irreparable Harm From Uber's Illegal Conduct .........................................................9

    III.    Plaintiffs Have No Adequate Remedy At Law To Compensate Them For Uber's Continued Unfair Competition ..................................................................13

    IV.    The Balance Of Hardships Favors Injunctive Relief. ............................................14

    V.     It Is In The Public's Interest To Enjoin Further Violations Of Chicago's Public Transportation Laws. ..................................................................................14

Conclusion ..................................................................................................................................15

# **TABLE OF AUTHORITIES**

Page(s)

### CASES

*Abbott Labs. v. Mead Johnson & Co.*,
  971 F.2d 6 (7th Cir. 1992) ...................................................................................................4

*CSC Holdings, Inc. v. Greenleaf Elecs., Inc.*,
  No. 99 C 7249, 2000 U.S. Dist. LEXIS 7675 (N.D. Ill. June 1, 2000)...................................14

*Girl Scouts of Manitou Council v. Girl Scouts of the United States of Am., Inc.*,
  549 F.3d 1079 (7th Cir. 2008) ..............................................................................................4

*Huawei Techs. Co. v. Motorola, Inc.*,
  No. 11-cv-497, 2011 U.S. Dist. LEXIS 17165 (N.D. Ill. Feb. 22, 2011) ...............................13

*Jones v. Smith Oil and Refining Co.*,
  15 N.E.2d 42 (Ill. App. 1938) ............................................................................................5, 6

*Keebler Co. v. Nabisco Brands, Inc.*,
  No. 92 C 2848, 1992 U.S. Dist. LEXIS 6826 (N.D. Ill. May 18, 1992)............................9, 13

*McCormack v. Cole*,
  97 S.W.2d 33 (Ky. 1936) reversed ........................................................................................5

*ON/TV of Chicago v. Julien*,
  763 F.2d 839, 844 (7th Cir. 1985) ......................................................................................14

*Moore v. Cox*,
  215 S.W.2d 666 (Tx. Ct. App. 1948).....................................................................................5

*Promatek Indus., Ltd. v. Equitrac Corp.*,
  300 F.3d 808 (7th Cir. 2002) ................................................................................................4

*Re/Max North Cent., Inc. v. Cook*,
  272 F.3d 424 (7th Cir. 2001) ..............................................................................................10

*Roland Mach. Co. v Dresser Indus., Inc.*,
  749 F.2d 380 (7th Cir. 1984) ..............................................................................................13

### STATUTES

Chi. Mun. Code § 9-112-040 ....................................................................................................12

Chi. Mun. Code § 9-112-390(3) ................................................................................................12

Chi. Mun. Code § 9-112-220 ....................................................................................................13

Chi. Mun. Code § 9-112-600(B) ..................................................................................................3

Chi. Mun. Code § 9-114-060 ..................................................................................................3, 7

Chi. Mun. Code § 9-114-280 .....................................................................................................7

**OTHER AUTHORITIES**

90 A. L. R.2d 7 § 6(b) ................................................................................................................5

*Introduction*

Defendant Uber Technoloies, Inc. ("Uber") is operating its transportation business in Chicago and elsewhere in violation of the laws governing transportation service providers. The City of Chicago has promulgated comprehensive laws and regulations to protect the riding public, safeguard healthy competition, and ensure sufficient public transportation services for all Chicago residents in all areas of the City. Uber, however, openly practices its ethos of defying applicable regulations, which has drawn the ire of regulators throughout the country.

In contrast, Plaintiffs are taxicab and livery companies, which operate within the established laws and regulations and are being damaged by competing for fares with a transportation service that refuses to play by the same rules. Uber's willful disregard for the public transportation laws irreparably harms competing transportation companies, such as Plaintiffs, which expend significant time and resources to abide by Chicago's ordinances and regulations. Accordingly, Plaintiffs seek a preliminary injunction preventing Uber from continuing to operate in violation of the applicable laws.

*Background Facts and Nature of the Case*

Uber is a transportation company that contracts with taxi and limousine drivers to provide transportation services to the public. (First Amended Compl. ("FAC") ¶ 1.) Uber uses smartphone applications ("apps") to connect the riding public with Uber's drivers, measure and calculate the fares, and bill the passengers directly. (FAC ¶ 24.) Uber provides taxicab drivers and drivers of livery vehicles (often known as "Black cars") mobile phones preloaded with a version of the Uber app designed for the drivers. (FAC ¶ 26.) Consumers who want to use Uber sign up for an Uber account, provide Uber with their credit card information, and install the Uber app onto their smartphones. When a consumer wants to take an Uber ride, they open the app on

their phone, select whether they want a taxi, Black car, or SUV (also a black, livery vehicle), and set the pickup location. (FAC ¶ 83.) When the consumer enters all of the required information, a request is transmitted to the nearest Uber drivers of the vehicle type the consumer selected. (FAC ¶ 84.) Uber drivers receive a notification of the request on their Uber-issued phone, accept the pickup request through the Uber driver app, and then drive to the location entered by the consumer. (FAC ¶ 84.) Uber's app mimics the telephone dispatch process other transportation companies have used for decades in Chicago.

If the Uber driver is driving a livery vehicle (Black car or SUV), the fare for the ride is measured by Uber's driver app and the GPS on the Uber-issued phone. (FAC ¶ 53.) Uber's driver app measures the distance, time, and speed traveled during the ride in the Black car and calculates the fare based on those variables, just like a taximeter. (FAC ¶ 50.) At the end of the ride Uber determines the final fare and charges the customer's credit card. (FAC ¶ 26.) Uber keeps a portion of the passenger's fare as Uber's fee and uses the remainder of the fare to pay Uber's drivers. (FAC ¶ 24.)

If the Uber driver is driving a taxicab, the driver starts the taximeter when the customer gets in the car and keeps the taximeter running throughout the ride. (FAC ¶ 26.) At the end of the ride, the driver manually enters the amount registered by the taximeter into the Uber driver app. (FAC ¶ 26.) Uber automatically adds 20% to the metered fare and bills the customer's credit card for the metered fare plus 20%. (FAC ¶ 26.) Uber advertises that its fares are "standard taxi rates," but the reality is that Uber's fares are 20% more than standard taxi rates. (FAC ¶ 27.) Uber also inaccurately describes its 20% add-on as "gratuity" when, in fact, only 10% goes to the driver and Uber keeps the remaining 10% for itself. (FAC ¶ 28.) As Uber

explains to its drivers (but not the public) the 10% Uber keeps includes an 8% service charge and a 2% credit card processing fee for all fares.[1] (FAC ¶ 29.)

Uber promotes itself as a "disruptive" business, preaches its animosity toward all regulations and, since its beginning, has shown a callous disregard for the authorities. Uber was initially called UberCab, owing to the fact that Uber operates livery vehicles as a high-end taxi service. (Ex. A.) In October 2010, the City of San Francisco issued a cease-and-desist letter to Uber because Uber did not have a license to operate a cab service. (Ex. B.) Uber partially capitulated and dropped the "Cab" from its name. More recently, however, the heart of Uber's business practices have continued to come under fire as regulators around the country have determined that Uber violates various state and municipal public transportation laws. For example, Uber was recently fined by the Consumer Protection and Safety Division of the California Public Utilities Commission and was the subject of cease-and-desist letters from the City of Dallas, New York City and others. (Ex. C.)

In Chicago, the Department of Business Affairs and Consumer Protection ("BACP") recently issued citations to Uber for violating the taxi, livery, and dispatch laws governing public transportation companies. (Decl. of Allison Keller, Exs. 1-4.) Specifically, Uber was cited for illegally using meters in non-taxi vehicles in violation of Chi. Mun. Code § 9-114-060 (*Id.* at Ex. 1), for charging taxi passengers more than the regulated fares in violation of Chi. Mun. Code § 9-112-600(B) (*Id.* at Ex. 2), for deceptive practices in stating that Uber's taxi rates are "at standard taxi rates" but including a 20% "gratuity" (*Id.* at Ex. 3), and for illegally obtaining a dispatch license while Uber was not in good standing with the Illinois Secretary of State (*Id.* at Ex. 4). Although these citations are a clear statement that Uber is operating illegally, Uber continues to

---

[1] A consumer class action filed and currently in state court alleges that this activity violates state deceptive practices law.

-3-

ignore the laws and treat the citations as the cost of doing business. Indeed, Uber continues its illegal practices to this day and clings to the preposterous notion that the rules do not apply to Uber despite the fact that Uber provides transportation services to the public through its contracted drivers as do other transportation companies, including Plaintiffs, and holds the same taxi dispatch license as Plaintiffs Yellow Affiliation and 5 Star Flash.[2] (FAC ¶ 59.) Uber also has a fee-sharing arrangement with livery vehicle operators in exchange for dispatch services and credit card processing, the same way Plaintiff Your Private Limousine (the "Limo Plaintiff") operates. (Decl. of Tracy Raimer ("Raimer Decl.") ¶ 2.)

### *Legal Standard*

To obtain the requested injunction, Plaintiffs must demonstrate that (i) they have a "better than negligible" chance of success on the merits; (ii) absent injunctive relief, Plaintiffs will suffer irreparable harm prior to final resolution of their claims; and (iii) legal remedies would be inadequate. *Girl Scouts of Manitou Council v. Girl Scouts of the United States of Am., Inc.*, 549 F.3d 1079, 1085, 1096 (7th Cir. 2008); *see also Promatek Indus., Ltd. v. Equitrac Corp.*, 300 F.3d 808, 811 (7th Cir. 2002). Once Plaintiffs satisfy these threshold requirements, the Court balances the threatened injury to Plaintiffs with the potential harm the injunction may inflict on Uber and considers the public interest in granting or denying the injunctive relief. *Id*. In applying these criteria, the Court uses a "sliding scale" approach: the more likely a claim is to succeed on the merits, the less showing of harm is required. *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 12 (7th Cir. 1992).

---

[2] In its Motion to Dismiss, Uber posited that it was not subject to the regulations and that no regulatory body had said otherwise. (Dkt. No. 13 at 1.) Uber stated this in the face of having received multiple citations from the BACP, providing notice of regulatory violations and having been required to obtain a taxi dispatch license, albeit through misrepresentations. In its second Motion to Dismiss, Uber's tune changed. (*See* Dkt. No. 20 at 1, 9.) Uber now claims it has not yet been found to have violated the rules Uber previously claimed did not apply.

Under Illinois law, a competitor is entitled to enjoin another competitor from competing unfairly by violating the law. *Jones v. Smith Oil and Refining Co.*, 15 N.E.2d 42, 44 (Ill. App. 1938). *Jones* involved a dispute between two competing gas stations. *Id.* at 43. The plaintiff alleged that the defendant was using an illegal lottery as a marketing scheme to attract customers. *Id.* The court held that the marketing scheme violated Illinois' prohibition of lotteries and enjoined the defendant from using the marketing scheme. *Id.* at 44. The court rejected the defendant's argument that courts have no jurisdiction to restrain a person from violating the law. *Id.* As the court explained, an injunction is properly issued "on the theory that the contemplated plan was a violation of law and that the same would be unfair competition of trade as against [plaintiff], and if permitted to continue would seriously interfere with the business of the [plaintiff]." *Id.* As such, Illinois law allows Plaintiffs to enjoin Uber from engaging in illegal activity that gives Uber a competitive advantage.

Other courts have granted injunctions to taxi companies, specifically, which enjoin competitors from gaining a competitive edge by violating the law. As the American Law Report has observed: "In the few cases wherein the question has been raised, the courts have all upheld the right of a company or person operating taxicabs in compliance with the applicable statute or ordinance to enjoin others from operating competing taxicabs in violation of the law." 90 A. L. R.2d 7 § 6(b). For instance, the court in *McCormack v. Cole*, 97 S.W.2d 33 (Ky. 1936) reversed the trial court's denial of an injunction against a taxi company operating in violation of the relevant law. *Id.* at 34–35. Similarly, in *Moore v. Cox*, 215 S.W.2d 666 (Tx. Ct. App. 1948), the court affirmed the trial court's injunction prohibiting a competing taxi company from violating the relevant regulations when the plaintiff taxi company had made significant investments to comply with those regulations. *Id.* at 667–69. In this case, Uber has gained a competitive

advantage by openly disregarding the applicable laws and should not be permitted to continue to exploit that advantage to the irreparable detriment of Plaintiffs and the public.

*Argument*

I. **Plaintiffs Are Likely To Succeed On The Merits Of Their Illinois Unfair Competition Claim (Count VI) Because Uber Unfairly Competes With Plaintiffs By Violating The Law.**

Plaintiffs' First Amended Complaint seeks redress for Uber's false representations of its services and false representations of affiliation under the Lanham Act (Counts I and II respectively), violations of the Illinois Deceptive Trade Practices Act and the Illinois Consumer Fraud and Deceptive Business Practices Act (Counts III and IV respectively), tortious interference with Plaintiffs' contractual relations (Count V), and unfair competition under Illinois common law (Count VI). Because Plaintiffs' requested preliminary injunction seeks only to prevent Uber's continued unfair competition through illegal transportation practices, this memorandum addresses only Count VI.

To prove that Uber is unfairly competing with Plaintiffs in violation of Illinois common law, Plaintiffs must show that Uber has violated the law, thereby gaining an unfair competitive advantage. *Jones*, 15 N.E.2d at 44. As an initial matter, Uber competes with Plaintiffs. Uber's brief in support of its Motion to Dismiss goes to great lengths to attempt to dispel this undeniable truth (Dkt. No. 20 at 4–7), but Uber's lawyers cannot avoid the facts or Uber's outspoken CEO. Travis Kalanick has repeatedly stated that Uber competes with taxi and livery companies, such as Plaintiffs.[3] Uber's strategy is to cast itself as merely a conduit to connect drivers and

---

[3] Travis Kalanick, Uber's CEO, has said, for example: "The taxi industry is upset because you have a high-quality *alternative to taxis*, and they're not used to competing, . . . *We are an alternative* . . . ." (Ex. D (emphasis added)); "[T]he taxi industry is not used to having an alternative. *It's not used to having to compete*." (Ex. E (emphasis added)).

passengers. Uber fails to mention, however, that Uber connects passengers to its own drivers, through whom Uber derives all its revenues from the passenger's transportation fares. Uber's repeated touting of its "Uber fleet," "Uber rides," "Uber Black cars," and "Uber taxis" is consistent with Uber's business model as a transportation company that competes with Plaintiffs.

Uber also cannot escape the fact that it deliberately violates the laws and regulations of the City of Chicago. Uber's recent citations by the BCAP eliminate any doubt that Uber is in violation of at least four Chicago ordinances and demonstrate that Plaintiffs are likely to succeed in proving that Uber's business practices are unlawful. Specifically, Plaintiffs will be able to prove that Uber's practice of determining livery fares by using a smartphone and app as a meter to measure time and distance is illegal. In Chicago, it is unlawful for a livery service to use any mechanical device that measures the distance traveled and registers a fare based on distance measured. Chicago Mun. Code § 9-114-060. Moreover, a livery vehicle may only be hired using a charge or fare fixed by agreement in advance. Chicago Mun. Code § 9-114-280. Uber violates both of these laws. Uber's Black car fares are not fixed in advanced, rather the fares are based on distance and time as measured by Uber's unlawful meter. Indeed, Uber admits the illegality of its metering practices by urging the public to petition the City not to adopt new livery regulations that merely restate the City's existing anti-metering ordinances. (Ex. F; *see also* Ex. G comparing the proposed regulations with the existing ordinances.) According to Uber, implementing the new rules would not allow Uber to continue to operate its Black car business in Chicago, but Uber's metering practices are already illegal under existing ordinances.

By violating laws with which Plaintiffs must (and do) comply, Uber unfairly competes with and harms Plaintiffs as further explained below. *See Section II infra.* Specifically, Uber's violations put the Limo Plaintiff at a distinct disadvantage because the Limo Plaintiff's sedan

drivers only use predetermined rates and cannot use devices to calculate fares based on time and distance. (Raimer Decl. ¶ 3.) Some customers would presumably rather have an on-demand sedan driver charge by time and distance and not use predetermined rates, particularly for shorter trips, just like taxis. (*Id.*) The Limo Plaintiff loses out on these customers because the Limo Plaintiff follows the rules—Uber unfairly gains customers by breaking them. (*Id.*)

Uber's violations also put the Taxi Plaintiffs at a competitive disadvantage. Uber operates its Black cars as unlicensed taxicabs, offering *on-demand*, *short-haul*, and *metered* transportation services to the public. Like all taxi companies in Chicago, the Taxi Plaintiffs are required by law to operate through the ownership of medallions (taxi licenses) and with specific maximum metered rates, among other requirements. Uber circumvents these requirements by transforming livery vehicles into "luxury taxicabs" with an iPhone as a meter. By ignoring the medallion and anti-metering livery laws, Uber provides taxi-like services without the expense of acquiring medallions and can charge whatever it wants for metered rates. In fact, Uber frequently implements "surge pricing," instantaneously raising rates by a multiplier when it perceives increased demand for rides. (Ex. H.) The Taxi Plaintiffs, of course, are not permitted the luxury of doubling, tripling, or even quintupling their rates as Uber does, just because it is raining or a holiday.

Furthermore, Plaintiffs have expended substantial sums to comply with the taxicab and livery regulations. (Decl. of John Moberg ("Moberg Decl.") ¶ 3; Decl. of Henry Elizar ("Elizar Decl.") ¶ 3.) For example, Plaintiffs have invested in meters, dispatch services, licenses, insurance and infrastructure, all of which comply with the applicable regulations. (Moberg Decl. ¶ 3; Elizar Decl. ¶ 3.) Uber, on the other hand, has developed a business that not only freeloads on Plaintiffs' substantial investments, infrastructure (including its taxis), and insurance, but,

ironically, flaunts the very regulations with which Plaintiffs have gone to great lengths to comply. (*See, e.g.*, FAC ¶¶ 32-33.) This Court should not allow Uber to unfairly compete by breaking the law.

## II. Without An Injunction, Plaintiffs Will Continue To Suffer Immediate And Irreparable Harm From Uber's Illegal Conduct.

Courts readily find the harm caused by unfair competition to be irreparable due to the intangible nature of the damage. *Keebler Co. v. Nabisco Brands, Inc.*, No. 92 C 2848, 1992 U.S. Dist. LEXIS 6826, at *29-*30 (N.D. Ill. May 18, 1992) ("It has generally been held that the damages suffered due to unfair competition are, by their very nature, irreparable and very difficult, if not impossible, to measure in terms of monetary damages."). Uber's illegal operation irreparably harms Plaintiffs by siphoning off Plaintiffs' drivers and passengers and undermining Plaintiffs' positions in the marketplace. Uber's business model is to create a bogus class of public transportation vehicles free from regulations and without the associated expenses, including the cost of acquiring medallions and insurance. Uber's illegal practice of using mobile phones and apps to hail and meter fares for livery services transforms livery vehicles into unregulated, unlicensed taxicabs. Consumers use Uber Black cars in the same way they use taxicabs, in that they can electronically hail Uber drivers when they are ready to be picked up and the fare is determined by measuring the distance and time of the ride, just like a taximeter. Indeed, CEO Kalinick actively promotes Uber as an "alternative to taxis." *See supra* n.1. The harms inflicted by Uber's rogue operations are distinct to the various types of Plaintiffs.

Uber's illegal Black car and taxi operations directly compete with and irreparably harm taxi affiliations such as Plaintiffs Yellow Cab Affiliation Inc. and 5 Star Flash, Inc. (the "Affiliation Plaintiffs"). Taxi affiliations are organizations of taxicab medallion owners that provide affiliation members with, among other things, a dispatch system, vehicle insurance, and

-9-

uniform trademarks and colors. (FAC ¶ 23.) In exchange for these services, affiliation members pay weekly or monthly dues to the Affiliation Plaintiffs. (Moberg Decl. ¶ 5; Elizar Decl. ¶ 5.) Uber provides many of the same services as the Affiliation Plaintiffs—namely dispatch, centralized booking, and trademarks—but instead of weekly dues, Uber keeps a portion of the 20% "gratuity" illegally added to passengers' taxi fares and a larger portion of livery fares.

Uber's system of bypassing the Affiliation Plaintiffs' dispatch systems to dispatch fares directly to taxi drivers at an inflated rate incentivizes drivers to work outside the affiliations and accept only Uber dispatches. The Affiliation Plaintiffs are losing control over their dispatch services as drivers routinely refuse to accept affiliation-dispatched calls, instead preferring to take illegal Uber dispatches, which are concentrated in the downtown area and near north. (Moberg Decl. ¶ 6; Elizar Decl. ¶ 6.) As the Affiliation Plaintiffs lose the ability to reliably dispatch calls throughout the city, the quality of their services is adversely impacted and goodwill of the trademark owners associated with those dispatch services, Plaintiffs Flash Cab and Yellow Cab, is tarnished. *Re/Max North Cent., Inc. v. Cook*, 272 F.3d 424, 432 (7th Cir. 2001) (the Seventh Circuit has "clearly and repeatedly held that damage to a trademark holder's goodwill can constitute irreparable injury for which the trademark owner has no adequate legal remedy"). Moreover, Uber actively recruits the most valuable taxi drivers from the Affiliation Plaintiffs (*i.e.* drivers who respond to the most dispatch calls) to work for Uber's illegal Black-car taxi operation. (Ex. I.) Thus, Uber's unfair competition disrupts the Affiliation Plaintiffs' services and strips the Affiliation Plaintiffs of their most valuable drivers to work for Uber.

Uber's illegal "alternative" taxi scheme also irreparably harms taxi medallion owners, such as Plaintiffs YC1 LLC and Chicago Medallion One LLC. (the "Medallion Owner Plaintiffs") by diverting the ridership base of licensed taxis and by using the promise of higher

fares to lure the Medallion Owner Plaintiffs' drivers into driving for Uber. When consumers who would normally have taken a taxicab choose instead to take an illegal Uber livery ride, the overall number of taxicab fares drops. (Moberg Decl. ¶ 9; Elizar Decl. ¶ 9.) The lower number of available taxicab fares lessens the potential income for taxi drivers and makes driving a taxicab less economically attractive. (Moberg Decl. ¶ 9; Elizar Decl. ¶ 9.) The irreparable harm on the Medallion Owner Plaintiffs from this decrease in taxi ridership is twofold.

First, the Medallion Owner Plaintiffs are irreparably harmed because the number of leased taxicabs (a measure known as "utilization,") declines as potential drivers opt for other means of income. (Moberg Decl. ¶¶ 8-10; Elizar Decl ¶¶ 8-10.) The only source of income for the Medallion Owner Plaintiffs is from the leasing of their cars to their customers, the taxi drivers. Any drop in utilization immediately impacts the Medallion Owner Plaintiffs' ability to pay for their fixed overhead such as cars, equipment, insurance, garages and support staff needed to stay in business. (Moberg Decl. ¶ 10; Elizar Decl ¶ 10.) The Medallion Owner Plaintiffs have already seen a steady drop in utilization since Uber opened its doors in Chicago, resulting in a severe decline in revenues. (Moberg Decl. ¶ 10; Elizar Decl ¶ 10.) Uber further exacerbates the drop in utilization by actively recruiting taxi drivers to become Uber drivers for its illegal Black car business. (Ex. I.)

Second, the lower taxicab ridership and lower utilization also impacts the value of taxicab medallions in the City of Chicago. (Moberg Decl. ¶ 11; Elizar Decl. ¶ 11.) Taxicab medallions are the licenses to operate taxis in Chicago and the City issues only a finite number. (Moberg Decl. ¶ 7; Elizar Decl. ¶ 7.) Each medallion is individually numbered and constitutes a license to operate a single taxicab. (Moberg Decl. ¶ 7; Elizar Decl. ¶ 7.) Medallions are treated as commodities and their value is determined by the demand of the market. (Moberg Decl. ¶ 7;

Elizar Decl. ¶ 7.) When Uber turns Black cars into unlicensed taxies and floods the market with its illegal service, Uber dilutes the taxi market and diminishes the value of the Medallion Owner Plaintiffs' medallions. (Moberg Decl. ¶ 11; Elizar Decl. ¶ 11.)

Moreover, many of Uber's taxi drivers have leased Plaintiffs' taxi vehicles. By causing those taxicabs to be operated in violation of the laws and regulation of Chicago as described above, Uber puts the Medallion Owner Plaintiffs at risk that their medallions will be revoked. *See* Chicago Mun. Code §§ 9-112-040, 9-112-390(3). The inability of the Medallion Owner Plaintiffs to control the illegal practices of the Uber drivers, such as charging illegal fares above the metered rate, further irreparably harms the Medallion Owner Plaintiffs.

The Limo Plaintiff is being irreparably harmed by having to compete with another livery service that chooses not to comply with Chicago's livery laws. (Raimer Decl. ¶ 4.) The Limo Plaintiff operates much the same as the Affiliation Plaintiffs and Uber by contracting with independent owners and drivers to provide livery service. (*Id.* at ¶ 2.) The Limo Plaintiff provides centralized booking and dispatch and, like Uber, derives its revenue by sharing fares with the drivers. (*Id.*) Unlike Uber, however, the Limo Plaintiff does not use illegal meters and is therefore foreclosed from competing with Uber for customers who may prefer on-demand, short-haul, metered livery service. (*Id.* at ¶ 3.) Several of the Limo Plaintiffs' drivers have started working for Uber while, at the same time, continuing to work for the Limo Plaintiff. (*Id.* at ¶ 4.) When the drivers work for Uber, they do not share their receipts with Limo Plaintiff. (*Id.*) Additionally, as with the Affiliation Plaintiffs, Uber actively recruits drivers from the Limo Plaintiff to work exclusively for Uber. (*Id.* at ¶ 5.) Indeed, several of the Limo Plaintiffs' drivers have stopped working for the Limo Plaintiff altogether, working instead full time in Uber's illegal Black car operation. (*Id.*)

### III. Plaintiffs Have No Adequate Remedy At Law To Compensate Them For Uber's Continued Unfair Competition.

"To show lack of an adequate remedy at law, the moving party must show that monetary damages would be 'seriously deficient as a remedy for the harm suffered.'" *Roland Mach. Co. v Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984). A damages remedy may be inadequate if the nature of the plaintiffs' loss makes damages very difficult to calculate. *Id.* It is well-established that "it is virtually impossible to ascertain the precise economic consequences of intangible harms, such as damage to reputation and loss of goodwill" caused by trademark infringement and unfair competition. *Id.*; *Keebler*, 1992 U.S. Dist. LEXIS 6829, at *29-*30.

The intangible damage to the services and goodwill of the Affiliation Plaintiffs and the trademark owner Plaintiffs, Flash Cab and Yellow Group, are incalculable. Moreover, it will be difficult or impossible to determine the precise scope of the Affiliation Plaintiffs' and the Limo Plaintiffs' financial damages, the amount of business and goodwill lost to Uber's illegal operations, or to accurately allocate Uber's illegally obtained profits among the many taxi and livery businesses from which Uber is wrongfully appropriating business.

While the lost business of some Plaintiffs *may eventually* be calculable, such remedies may be too late to save the Taxi Plaintiffs' businesses. *Huawei Techs. Co. v. Motorola, Inc.*, No. 11-cv-497, 2011 U.S. Dist. LEXIS 17165, *29-30 (Feb. 22, 2011 N.D. Ill.) (Coleman, J.) ("A party is irreparably harmed where the damages the party suffers are difficult to calculate or where the remedy comes too late to save the plaintiff's business."). The Medallion Owner Plaintiffs are prohibited by law from raising their lease rates to compensate for lower utilization rates. Chicago Mun. Code § 9-112-220. If Uber's illegal practices are permitted to continue, a sustained drop in utilization rates from the loss of their drivers will cause the Taxi Plaintiffs to have insufficient funds to continue their operations. (Moberg Decl. ¶ 10; Elizar Decl. ¶ 10.)

**IV.     The Balance Of Hardships Favors Injunctive Relief.**

Plaintiffs are asking the Court only to enjoin Uber from practices that are already prohibited by existing laws.  Uber cannot claim any hardship by being compelled to comply with the same laws as its competitors.  *CSC Holdings, Inc. v. Greenleaf Elecs., Inc.*, No. 99 C 7249, 2000 U.S. Dist. LEXIS 7675, at *25 (N.D. Ill. June 1, 2000) ("A balancing of the parties' respective hardships reveals that the injunction means only that Defendants will be enjoined from conducting a business that is prohibited by federal law.  Such illegal activities are not worthy of any protection.") (citing *ON/TV of Chicago v. Julien*, 763 F.2d 839, 844 (7th Cir. 1985)).  In contrast, Plaintiffs will suffer great hardship and potential insolvency as detailed above if they are forced to continue to compete with Uber's illegal business practices.

**V.     It Is In The Public's Interest To Enjoin Further Violations Of Chicago's Public Transportation Laws.**

Regardless of whether Uber agrees with the current laws, those laws were put in place to protect consumers and benefit the riding public as a whole and not, as its CEO Travis Kalanick asserts, to protect the entrenched ownership interests against free market forces.  (Exs. J-K.)  The ordinances regulating the taxi and livery companies are part of the public transportation fabric in Chicago.  The public transportation laws are intended to provide safe and non-discriminatory access to transportation for all of Chicago's residents.  Uber's practice of circumventing Chicago's public transportation laws to create an elite class of taxi-like transportation damages the public by concentrating transportation services only in the most affluent areas of Chicago for those who can afford Uber's inflated pricing and smartphones.  Users of Uber's taxi service pay a 20% premium over regulated taxi rates to use Uber.  Uber uses this premium, half of which goes to the driver, to incentivize drivers to use Uber rather than pick up street hails or accept dispatch fares from their taxi affiliations.  Moreover, unlike other licensed dispatch companies,

such as Plaintiffs, all Uber dispatches are optional, that is, if no Uber driver is willing to pick up a customer, that customer cannot obtain transportation through Uber.  Thus, Uber's illegal taxi rate scheme encourages taxi drivers to pick up Uber riders over all others, while leaving the less-desirable, standard-rate rides in traditionally underserved areas for non-Uber drivers.

Unsurprisingly, Uber rides tend to be centered in the wealthiest areas of Chicago. Attached as Exhibit L is a map created and published by Uber showing the most frequent start and end points for Uber rides.  Uber's ride map correlates with income distribution maps of the city, indicating that Uber's illegal pricing practices increase the transportation options for those who can afford the 20% premium over regulated rates and decreasing the number of available cabs for those who cannot.  (*Compare* Ex. L to Ex. M.)  This inequity is precisely what regulated taxi rates seek to avoid.

The lower utilization rate Uber causes is bad for the general citizenry as it lowers the number of taxicabs on the streets of Chicago, which adversely impacts the availability of legal taxicabs throughout the city.  This disproportionately impacts people outside of Uber's "chosen" demographics—people with smartphones, who have credit cards, who live or work near the Loop or north side, and those willing and able to pay for a Black-car or an extra 20% for a traditional taxicab—and completely ignores those with disabilities, those who must pay with subsidized CTAP vouchers, and those in underserved areas of the City, all of whom are required to be served by the other taxi companies in Chicago.  Therefore, it is within the public's interest to prevent Uber's continued violations of Chicago's public transportation laws.

*Conclusion*

For the foregoing reasons, Plaintiffs request that the Court enter an order enjoining Uber from continuing to unfairly compete with Plaintiffs by violating the law.

Dated: January 28, 2013   Respectfully submitted,

/s/Michael A. Stiegel
Michael A. Stiegel (ARDC #2735830)
  mastiegel@michaelbest.com
Carrie A. Hall (ARDC #6269884)
  cahall@michaelbest.com
Paul R. Coble (ARDC #6296105)
  pcoble@michaelbest.com
MICHAEL BEST & FRIEDRICH LLP
Two Prudential Plaza
180 N. Stetson Avenue
Suite 2000
Chicago, Illinois  60601

*Attorneys for Plaintiffs*