# Appendix A



2 of 2 DOCUMENTS



Caution
As of: Jan 28, 2013

**KEEBLER COMPANY, Plaintiff, v. NABISCO BRANDS, INC., Defendant.**

**Civil Action No. 92 C 2848**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*1992 U.S. Dist. LEXIS 6826*

**May 18, 1992, Decided**
**May 19, 1992, Docketed**

**SUBSEQUENT HISTORY:**     Adopting Order of May 21, 1992, Reported at *1992 U.S. Dist. LEXIS 6987.*

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff trademark holder sought a preliminary injunction against defendant infringer. The trademark holder claimed that its trademark and trade dress were infringed upon and commenced suit for the infringement as well as the infringer's violation of federal and state unfair competition statutes.

**OVERVIEW:** The trademark holder acquired the rights to the term "Supreme." The infringer sought to use the trade name for cookies. The trademark holder commenced suit in trademark and trade dress infringement with related causes of action for unfair competition under federal and state law and sought a preliminary injunction. The magistrate granted the injunction. The court held that: (1) there was irreparable harm if the injunction was not granted because there was no other remedy at law; (2) there was a less than negligible likelihood success on the merits on the trademark infringement claim because the trademark holder did not use the mark on cookies for 20 years; (3) however, there was a likelihood of success on the trade dress infringement claim because the trade dress of the trademark holder's product was inherently distinctive and there was likelihood of confusion because the trademark holder used the same basic elements in its trade dress for its "Supreme" cookies over the past 10 years that the infringer used; and (4) the balance of harms favored the trademark holder and the injunction was in the public interest because of the likelihood of confusion.

**OUTCOME:** The court granted the preliminary injunction against the infringer on the trademark holder's trade dress claim and enjoined the infringer from selling cookies of similar trade dress to the trademark holder.

**LexisNexis(R) Headnotes**

1992 U.S. Dist. LEXIS 6826, *

*Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions*
*Trademark Law > Federal Unfair Competition Law > Trade Dress Protection > Causes of Action*
*Trademark Law > Infringement Actions > Remedies > Equitable Relief > Preliminary Injunctions*

[HN1] A preliminary injunction is an extraordinary remedy. To obtain preliminary injunction relief, the movant must establish the following factors: (1) that there is no adequate remedy at law which exists and that irreparable harm will be suffered by it if the injunction is not issued; (2) that the irreparable harm suffered by the movant if the injunction is denied outweighs the irreparable harm which will be suffered by Nabisco if the injunction is erroneously granted; (3) the movant has a reasonable likelihood of prevailing on the merits; and (4) that the injunction will serve the public interest.

*Civil Procedure > Remedies > Injunctions > Elements > General Overview*

[HN2] Each element must be shown before an injunction will issue. The injunction test involves a "sliding scale" which requires a plaintiff to show substantially greater relative harm if it has a poor likelihood of success on the merits.

*Civil Procedure > Remedies > Damages > Monetary Damages*
*Contracts Law > Sales of Goods > Damages & Remedies > General Overview*
*Trademark Law > Infringement Actions > Remedies > Equitable Relief > General Overview*

[HN3] The damages suffered due to unfair competition are, by their very nature, irreparable and very difficult, if not impossible, to measure in terms of monetary damages. One of the reasons for this is that the loss of confidence in the consumer may not be felt immediately and is inherently difficult to measure, as is damage to one's reputation in the marketplace. Courts readily find irreparable harm in trademark infringement cases because of the victim's inability to control the nature and quality of the infringer's goods.

*Trademark Law > Infringement Actions > Burdens of Proof*
*Trademark Law > Infringement Actions > Determinations*
*Trademark Law > Protection of Rights > Registration >*

*Evidence*

[HN4] In order to show a likelihood of success on the merits as to its trademark infringement case, a plaintiff must prove its ownership of a valid trademark and that the use of the mark being challenged is likely to cause confusion among the consumers. Rights in trademarks arise from use, not merely from registration. The Landham Act requires that the owner use its trademark in commerce in order to establish and preserve his exclusive rights therein. The term "use in commerce" means the bona fide use of a mark in the ordinary course of trade, and not merely to reserve a right and a mark.

*Trademark Law > Protection of Rights > Commercial Use > General Overview*

[HN5] A mark shall be deemed used in commerce, on goods when: (a) it is placed in any manner on the goods or their containers or that it is placed associated therewith on the bags, tags, labels, affixed thereto, or if the nature of the goods makes such placement impracticable, then on the documents associated with the goods or their sale; and (b) the goods are sold or transported within commerce. *15 U.S.C.S. § 1127 (1990).*

*Trademark Law > Protection of Rights > Abandonment > General Overview*

[HN6] A mark shall be deemed to be abandoned when its use has been discontinued with intent not to resume such use. Intent not to resume may be inferred from circumstances. Non use for two consecutive years shall be prima facie evidence of abandonment. "Use" of a mark means the bona fide use of that mark made in the ordinary course of trade and not made merely to reserve a right in a mark.

*Antitrust & Trade Law > Clayton Act > Defenses*
*Trademark Law > Infringement Actions > General Overview*
*Trademark Law > Protection of Rights > Registration > Incontestability > General Overview*

[HN7] Abandonment of the defense to a claim of infringement of trademark rights and a ground for cancellation of Federal Trademark Registration under *15 U.S.C.S. § 1064*. Abandonment is also a defense to a claim of incontestable trademark rights. The burden of proof as to abandonment is on the party asserting the abandonment. The party asserting abandonment must prove this by clear and convincing evidence. Proof of two

Case: 1:12-cv-07967 Document #: 24-2 Filed: 01/28/13 Page 4 of 45 PageID #:363

Page 3
1992 U.S. Dist. LEXIS 6826, *

years of non use creates a rebuttable presumption of abandonment. Once non use for two years is established, a burden of production to explain the non use or establish the existence of an intent to resume use arises on the part of the owner of the mark. This burden of production, however, requires only that the trademark owner produce evidence to rebut the presumption. Once this is done, the ultimate burden of persuasion of abandonment rests and remains with the party asserting the abandonment. A mere subjective intent to continue use, however, is not sufficient to overcome the prima facie evidence of abandonment, rather, the owner must show specific plans for commercial use of the mark, not just an intent not to abandon.

***Trademark Law > Infringement Actions > Remedies > Equitable Relief > Preliminary Injunctions***
***Trademark Law > Likelihood of Confusion > General Overview***
***Trademark Law > Subject Matter > Strength***
[HN8] Unlike a patent or a copyright, a trademark does not grant a monopoly. The function of a trademark is to designate source, and its protection is accordingly limited to the prevention of likelihood of confusion. A showing of a mere possibility of deception and confusion is not enough. There must be proof that an appreciable number of potential purchases will, in fact, be deceived. In making this determination, a court must stand in the shoes of the ordinary purchaser and take into account the normally prevalent conditions of the market and the manner in which purchasers make their choices.

***Trademark Law > Likelihood of Confusion > General Overview***
***Trademark Law > Subject Matter > Distinctiveness > General Overview***
***Trademark Law > Subject Matter > Secondary Meaning > General Overview***
[HN9] To establish a cause of action for trade dress infringement, a plaintiff must prove both: (1) that the trade dress of its product is protectible, that is, it is inherently distinctive or has acquired secondary meaning; and (2) that there is a likelihood of confusion with respect to the original of the defendant's product. In order to show a protectible trade dress, plaintiff must establish either that its trade dress is inherently distinctive, or that it has acquired secondary meaning in the marketplace.

***Trademark Law > Federal Unfair Competition Law > Trade Dress Protection > General Overview***
***Trademark Law > Subject Matter > Distinctiveness > Inherent Distinctiveness***
***Trademark Law > Subject Matter > Secondary Meaning > General Overview***
[HN10] A trade dress which is arbitrary and served no function either to describe the product or assist in its effective packaging is protectible, even in the absence of a finding of secondary meaning. The elements which must be established are: (1) that the trade dress is arbitrary; and (2) that the trade dress serves no function to either describe the product or assist in its effective packaging.

***Trademark Law > Federal Unfair Competition Law > Trade Dress Protection > General Overview***
***Trademark Law > Subject Matter > Distinctiveness > General Overview***
***Trademark Law > Subject Matter > Labels, Packaging & Trade Dress***
[HN11] Under the "inherently distinctive" test, the court must determine whether the design in question is a common basic shape or design. Whether it is unique or unusual in a particular field, or whether it was a mere refinement of a commonly adopted and well known form of ornamentation for the particular class of goods viewed by the public as a dress or ornamentation for the goods.

***Trademark Law > Conveyances > General Overview***
***Trademark Law > Subject Matter > Distinctiveness > General Overview***
***Trademark Law > Subject Matter > Secondary Meaning > General Overview***
[HN12] The determination as to whether or not trade dress has acquired a secondary meaning is a question of fact. The following factors are to be considered in making such a determination: (a) consumer testimony; (b) consumer surveys; (c) exclusivity, length and manner of use; (d) amount and manner of advertising; (e) amount of sales and number of customers; (f) established place in the market; and (g) proof of intentional copying.

***Trademark Law > Federal Unfair Competition Law > Trade Dress Protection > Causes of Action***
***Trademark Law > Federal Unfair Competition Law > Trade Dress Protection > Infringement Actions > General Overview***

1992 U.S. Dist. LEXIS 6826, *

*Trademark Law > Likelihood of Confusion > Similarity > Appearance, Meaning & Sound > Appearance*
[HN13] Among the factors which are relevant to the determination of confusion are the degree of similarity between the trade dress in appearance and suggestion; the similarity of the products for which they are used; the area and manner of concurrent use; the degree of care likely to be exercised by consumers; the strength of plaintiff's mark and trade dress; evidence of actual confusion; and intent on the part of the alleged infringer.

*Civil Procedure > Remedies > Injunctions > Elements > Public Interest*
*Trademark Law > Infringement Actions > Remedies > Equitable Relief > General Overview*
*Trademark Law > Likelihood of Confusion > Consumer Confusion > General Overview*
[HN14] To the extent that the injunction helps to stop or diminish confusion among the public with respect to the origin of the product or purchasing, it will serve the public interest.

**JUDGES:** [*1] GUZMAN

**OPINION BY:** RONALD A. GUZMAN

**OPINION**

Judge Marovich

Magistrate Judge Guzman

TO: HONORABLE GEORGE M. MAROVICH, JUDGE

UNITED STATES DISTRICT COURT

HONORABLE SIR:

*REPORT AND RECOMMENDATION of Magistrate Judge Ronald A. Guzman*

*FINDINGS OF FACT*

1. Plaintiff, Keebler Company ("Keebler"), is a Delaware corporation with offices located at 677 Larch Avenue, Elmhurst, Illinois 60126.

2. Defendant, Nabisco Brands, Inc. ("Nabisco"), is a Delaware corporation and is doing business at 1700 Higgins Road, Des Plaines, Illinois 60018.

3. Both are leading manufacturers of cookies in direct national competition with each other.

4. Nabisco's products bear its well-known Nabisco name and red triangle logo (Thomas). Keebler's products bear its well-known Keebler name and tree design logo (Hanna, Thomas).

5. This action arises under the Trademark and Unfair Competition Laws of the United States (*15 U.S.C. § 1051, et seq.*), as hereinafter more fully appear, and jurisdiction is based upon *15 U.S.C. § 1121*, *28 U.S.C. § 1331*, and *28 U.S.C. § 1338*.

6. Venue is proper in the Northern District of Illinois under *28 U.S.C. § 1391(b)* and under *28 U.S.C. § 1391(c)* because Nabisco is subject to personal [*2] jurisdiction in this District and therefore, for purposes of venue, resides in this District.

7. This action was commenced on April 29, 1992, by the filing of a Complaint for Injunctive and Other Relief. A Motion for a Temporary Restraining Order was filed the same day, and the Motion was heard by Judge Marovich on April 30, 1992. On May 1, 1992, Keebler's Motion for Preliminary Injunction was set for hearing, and the hearing was held on May 8, 10 and 11, 1992.

8. Count I of the Complaint alleges trademark and Trade Dress infringement pursuant to *15 U.S.C. § 1125(a)*. Count II of the Complaint alleges trademark infringement pursuant to *15 U.S.C. § 1114(1)*. Count III of the Complaint alleges common law unfair competition under the laws of Illinois and other states. Count IV of the Complaint alleges deceptive and unfair trade practices, pursuant to the Illinois Uniform Deceptive Trade Practices Act, Ill. Rev. Stat. Ch. 121 1/2, § 311, et seq. Count V of the Complaint alleges common law and statutory dilution, pursuant to the Illinois Anti-Dilution Act, Ill. Rev. Stat. Ch. 140, § 22, et seq. Count VI of the Complaint alleges unfair trade practices, pursuant to the Consumer Fraud and [*3] Deceptive Business Practices Act, Ill. Rev. Stat. Ch. 121 1/2, § 261, et seq.

9. For over 130 years, Keebler and its predecessor companies have actively engaged in the business of manufacturing and marketing snack items, including cookies, crackers and more recently, salty snacks. Keebler is one of the nation's largest manufacturers of such goods and extensively markets and advertises its products throughout the United States to retail,

convenience and food service customers. Keebler also manufactures and sells prepared food products, such as lasagna through its food service division.

10. Keebler's predecessor companies first began selling cookies under the "Supreme" trademark in 1912.

11. Keebler has sold a variety of products, including

cookies and currently sells lasagna under its "Supreme" trademark.

12. Keebler is the owner of the following subsisting United States Trademark registration for its "Supreme" trademark:

| REG. NO. | ISSUE DATE | MARK | GOODS |
|----------|-----------|------|-------|
| 124,976 | 04/01/19 | Supreme | cookies, crackers, cookie and cracker |
| | | | sandwiches, biscuits, wafers, and ice |
| | | cream cones | |
| | | Plaintiff's Exhibit 20 | |

13. In October 1991, Nabisco began development of a pecan shortbread [*4] product to be sold under the mark "Pecan Supremes." As of this time, Nabisco has not yet begun to sell products under the "Pecan Supremes" mark.

14. As between the parties, Keebler was the first to adopt and use the trademark "Supreme" for cookies and is the present user of the mark on lasagna.

15. Cookies, crackers and a wide variety of other products bearing the "Supreme" trademark were sold by Keebler or its predecessors-in-interest throughout the United States up until the late 1960's. However, Keebler has not used the "Supreme" trademark in commerce for cookies, crackers or baked goods since the late 1960's (Plaintiff's Exhibits 21-23, 31; Hanna, Stevens).

16. Beginning about 1983, Keebler spent considerable time and money developing a line of premium-priced cookie products termed the "International Classics" line and including one cookie product proposed to be sold under the trademark "Coffee Supremes." This product however was never sold (Plaintiff's Exhibits 24-27).

17. Subsequently, the Keebler's "Supreme" trademark has been often considered for use by Keebler in connection with cookie concepts and products.

18. In January 1991, Keebler's Food Services

division began [*5] selling a lasagna product under the "Supreme" mark. "Supreme" lasagna is marketed to the food service industry and food service operators and is sold at grocery store deli counters and is served at restaurants, hospitals and schools throughout the United States (Plaintiff's Exhibit 53).

19. Sales for "Supreme" lasagna were approximately 1.2 million dollars in 1991 and have surpassed $ 500,000 in the first quarter of 1992.

20. Keebler's "Supreme" lasagna is Keebler's most extensively advertised frozen product. Advertisements and coupons for it appear in a variety of magazines, and table tents bearing the mark are used in restaurants (Plaintiff's Exhibits 50-52).

21. The market for Keebler's lasagna however is the trade, e.g., restaurants, hospitals, and schools; the product is not sold on grocery or supermarket shelves (Goodman).

22. Other than the evidence of lack of actual use no other evidence of intent to abandon has been presented.

23. Pecan shortbread cookies are part of a known and defined segment of the cookie market called "fruit and nut" cookies.

24. Keebler sells and has sold for over thirty-five years its shortbread cookies, baked with pecans, under its "Pecan Sandies" [*6] trademark (Plaintiff's Exhibits 1,

3A-3H).

25. Keebler is the owner of the following United States Trademark registration for its "Pecan Sandies" trademark:

| REG. NO | ISSUE DATE | MARK | GOODS |
|---|---|---|---|
| 648,660 | 07/16/57 | | Pecan cookies, crackers, |
| | | Sandies | and cracker sandwiches, biscuits, |
| | | | wafers, and ice cream cones |
| | | Plaintiff's Exhibit 2 | |

26. Since their introduction, Keebler's "Pecan Sandies" cookies have been widely marketed, and Keebler has spent substantial sums of money, time and effort to promote and advertise its "Pecan Sandies" cookies.

27. Keebler's "Pecan Sandies" cookies are distributed nationwide and are Keebler's second largest selling cookie, representing 13% of Keebler cookie tonnage (Plaintiff's Exhibit 56).

28. The volume of Keebler's "Pecan Sandies" shortbread cookies sold is over 12 times that of Nabisco's "Pecan Shortbread," and Keebler's "Pecan Sandies" cookies are the leading selling shortbread cookie product in the market (Plaintiff's Exhibit 56).

29. Keebler advertises and has advertised its "Pecan Sandies" cookies through magazine advertisements, television commercials, national and local coupons, mass-transit billboard advertising and free standing [*7] inserts ("FSI's") placed in major metropolitan area newspapers (Plaintiff's Exhibits 4-19).

30. For the period January 1, 1983 to December 31, 1992, Keebler has spent and will spend in excess of $ 20 million to advertise and promote its pecan shortbread cookies.

31. In addition, Keebler also appears at national trade shows and provides sales materials for its various cookie products, including its "Pecan Sandies" cookies.

32. As a result of this extensive advertising and promotion and the public's acceptance of the product, Keebler's "Pecan Sandies" cookies have become the best selling shortbread cookie in the United States with sales in excess of $ 60 million dollars annually.

33. Since at least 1981, Keebler's "Pecan Sandies" pecan shortbread cookies have been sold in a Trade Dress consisting of at least the following elements: a yellow background color applied to the specific configuration of the generally rectangular cookie package; Keebler's trademark, "Pecan Sandies;" the phrase, "Rich Shortbread Cookies With Crunchy Pecans;" a brown-colored lettering for the mark and descriptive phrase; stacking of the words of the mark; the serif type style of the mark; and the photographs [*8] of several cookies arranged together and of pecans, appearing on the front panel (Plaintiff's Exhibit 3D through 3I) (the current package).

34. No packaging for any pecan or other shortbread cookie now on the market utilizes the exact same combination of elements arranged in the same exact manner.

35. There was testimony by some of the witnesses that yellow is generally believed in the industry to connote a "rich buttery" flavor and of course, the words "rich shortbread cookies with crunchy pecans" is descriptive of certain characteristics of the cookies themselves; as are the pictures of the cookies and pecans on the front of the package. Therefore, there is some evidence that several of the elements of Keebler's "Pecan Sandies" Trade Dress are functional.

36. Keebler's pecan shortbread cookies in its current "Pecan Sandies" Trade Dress have, for over ten years, been widely marketed to the grocery trade and advertised and extensively offered to the public throughout the United States, under both its registered trademark "Pecan Sandies" and its Trade Dress. By virtue of such long and

extensive use, Keebler's "Pecan Sandies" mark and its "Pecan Sandies" Trade Dress have gained widespread [*9] and favorable public acceptance and recognition by both the trade and the public.

37. Keebler's "Pecan Sandies" Trade Dress has acquired strong secondary meaning in the minds of the public who equate the "Pecan Sandies" Trade Dress with Keebler as the source of products bearing this appearance.

38. Nabisco is the largest manufacturer of cookie products in the United States.

39. For many years to the present, Nabisco has been selling a pecan shortbread product under the mark "Pecan Shortbread."

40. The packaging for Nabisco's currently marketed "Pecan Shortbread" is a white package with blue lettering (Plaintiff's Exhibit 30).

41. In September of 1991, Nabisco's marketing group recommended that Nabisco introduce a new shortbread product specifically targeted at Keebler's pecan shortbread cookie market share (Plaintiff's Exhibit 62; Tessler Deposition, pp. 145 and 150). Sharon Tessler, one of Nabisco's Associate Product Managers, circulated a memorandum to the marketing group noting that "the "Pecan Sandies" name and impactful package bring equity to Keebler's franchise. In contrast, Nabisco's Pecan Shortbread has no brand name, and its recessive package does not stand out on the [*10] shelf" (Plaintiff's Exhibit 56).

42. Taste tests were conducted of Nabisco's pecan shortbread cookie versus Keebler's "Pecan Sandies" cookies (Plaintiff's Exhibit 62; Tessler Deposition, p. 200).

43. In January or February of 1992, Nabisco's marketing department also suggested the introduction of a "Mini Pecan Supremes" to directly challenge Keebler's "Bite-Size "Pecan Sandies." A die roll was ordered for the Nabisco's "Mini "Pecan Sandies"" specifically based upon the size of Keebler's "Mini "Pecan Sandies" product (Plaintiff's Exhibit 54).

44. Nabisco's marketing department also suggested that the new pecan shortbread cookie should retail at $ 2.99. This is the same price as Keebler's "Pecan Sandies"

shortbread cookies (Plaintiff's Exhibit 62; Tessler Deposition, p. 185).

45. Several names were considered for Nabisco's new pecan shortbread product, including "Pecan Shorties," "Pecan Scotties" and "Pecan Supremes."

46. Nabisco selected the name PECAN SUPREMES based on a name selection contest conducted among its sales force. The name PECAN SUPREMES was proposed by 29 people (Tessler).

47. When Nabisco's attorneys discovered a federal registration for the mark "Scottie" for [*11] candy, Nabisco had outside counsel contact Scott's of Wisconsin, the owner of that registration, and proposed that Scott's assign its "Scottie" trademark to Nabisco or alternatively consent to Nabisco's use of the "Pecan Scotties" mark. However, Scott's declined to accept Nabisco's proposal.

48. On September 30, 1991, attorneys for Nabisco ordered a trademark search of the "Pecan Supremes" mark from Corsearch. The results of the search were received by Nabisco on or about October 1, 1991 and revealed Keebler's federal registration of the mark "Supreme" for cookies (Defendant's Exhibit AA).

49. In October 1991, after reviewing that information, Mr. Hartman advised the marketing group that the mark PECAN SUPREMES was available and on 10/2/91 filed an application to register PECAN SUPREMES (Hartman; D. Exhibit BB).

50. Although Nabisco was aware of Keebler's registration of "Supreme" in October 1991, no one at Nabisco investigated the use or non-use of the Keebler's "Supreme" mark prior to filing an application to register "Pecan Supremes" or prior to granting approval for Nabisco's adoption and marketing a line of pecan shortbread cookies under the "Pecan Supremes" trademark.

51. [*12] The marketing department received the legal department's approval for the yellow-gold "Pecan Supremes" Trade Dress on December 23, 1991 (Plaintiff's Exhibit 55).

52. In January, Nabisco's "Pecan Supremes" packaging went into production (Plaintiff's Exhibit 62; Tessler Deposition, p. 193).

53. On January 6, 1992, Nabisco's Intent-to-Use application for the mark "Pecan Supremes" was rejected by the Patent and Trademark Office on the grounds that it was likely to cause confusion with Keebler's federal registration for its "Supreme" mark (Defendant's Exhibit 66). The trademark examiner did not cite Keebler's registration of the Pecan Sandies mark against Nabisco's application for registration of Pecan Supremes (Hartman, Spatz).

54. On or about January 20, 1992, Mr. Hartman instructed Ms. Richard, a secretary of his office, to contact Keebler's customer service department to determine if Keebler had any use of the mark SUPREME. Ms. Richard regularly conducts such searches for Mr. Hartman as part of her duties at Nabisco. Ms. Richard was advised by the customer service department at Keebler that Keebler did not use the SUPREME mark for cookies. Within a day or two Ms. Richard also checked [*13] all available Keebler packaging at a grocery store and determined that none of the Keebler cookie packages displayed the word SUPREME (Hartman).

55. On January 22, 1992, Nabisco entered into a contract with Valassis Inserts for the insertion of FSI's promoting its "Pecan Supremes" shortbread cookies in newspapers nationwide. Nabisco paid $ 128,902 as the cost of this promotion (Plaintiff's Exhibit 60). The cost of the coupon redemption to Nabisco was estimated to be between $ 700,000 and $ 750,000 (Plaintiff's Exhibit 62; Tessler Deposition II, p. 71). So while it knew that Keebler owned the trademark "Supreme" for cookies and on the strength of a phone call to Keebler's consumer information number and a walk through of one grocery store, Nabisco committed to over $ 100,000.00 worth of advertising and promotions.

56. On or about January 31, 1992, after Nabisco had already begun plans and expended money to advertise its "Pecan Supremes" cookies, Joanne Spatz, one of Keebler's attorneys, was contacted by Mr. Hartman and was asked to consent to Nabisco's registration of its proposed "Pecan Supremes" trademark in connection with cookies. Mr. Hartman represented that the U.S. Patent [*14] and Trademark Office Examiner had rejected Nabisco's attempt to register "Pecan Supremes."

57. On February 27, 1992, Mr. Hartman received a letter from Ms. Spatz dated February 18, 1992, stating that Keebler would not consent to Nabisco's request for consent to use of the mark "SUPREME." In the letter Ms.

Spatz said: "If Keebler were to consent to Nabisco's use and then decided to introduce its own 'SUPREME' product, the likelihood of confusion would be significant" (Hartman).

58. On or about March 19, 1992, notwithstanding Keebler's explicit refusal to consent to Nabisco's use of the "Supreme" trademark, Keebler learned that Nabisco had begun marketing to the trade of a sample "Pecan Supremes" pecan shortbread cookie package and thereafter obtained a sample package of Nabisco's "Pecan Supremes."

59. On March 23, 1992, Ms. Spatz contacted Mr. Hartman by telephone and again reiterated Keebler's position concerning Nabisco's use of the "Supreme" trademark. She also advised Mr. Hartman of Keebler's concern over the similarities between Keebler's Trade Dress for its "Pecan Sandies" shortbread cookies, and Nabisco's yet to be introduced "Pecan Supremes" packaging.

60. On March 25, 1992, [*15] after Ms. Spatz's call, Nabisco revised its contract with Valassis Inserts to increase the number of newspapers in which its "Pecan Supremes" FSI's would appear and agreed to pay an additional sum of money for the expanded service (Plaintiff's Exhibit 59).

61. On April 1, 1992, Craig S. Stevens, Vice President, General Counsel and Secretary of Keebler telephoned James A. Kirkman, Senior Vice-President, General Counsel and Secretary of Nabisco to reiterate Keebler's position that Nabisco's sample pecan shortbread packaging infringed not only Keebler's established Trade Dress for its shortbread cookie packaging, but also Keebler's federally registered "Supreme" and "Pecan Sandies" trademarks. Mr. Kirkman indicated that he was not aware of the problem or Nabisco's new sample packaging for its proposed product and promised to call Mr. Stevens back.

62. Late on April 16, 1992, Mr. Kirkman telephoned Mr. Stevens and offered to modify the background color of the sample package at a future date. However, he said Nabisco planned to continue to use the objected-to-package to introduce its product and to leave that package on the market until all inventory was sold.

63. On April 24, 1992, [*16] Nabisco sent Keebler a letter stating, in part: "As I advised you on April 16,

Nabisco would be willing to accommodate Keebler by changing the color of the package to a buff tan (specimen enclosed). We have, at least for the time being, stopped further printing of the yellow bag, and can also confirm that we could begin packaging product in the new bag on or about May 11. On that schedule, we would expect to exhaust our inventory of product in the yellow bags by mid-June." Nabisco sent a sample of the proposed package with the April 24, 1992, letter (Stevens, Hartman; Exhibit V).

64. Despite Keebler's stated objections and the Patent and Trademark Office's refusal to register the "Pecan Supremes" mark, Nabisco continued to market and advertise to the trade and has plans to advertise and sell to the public, commencing on May 17, 1992, pecan shortbread cookies in packaging bearing a substantially similar to Keebler's established "Pecan Sandies" Trade Dress. As of this date, Nabisco has produced 3.2 million packages of its "Pecan Supremes" in the complained of packaging and has distributed these packages to 130 distribution centers nationwide. All of these packages, with the exception [*17] of some shipped to stores in Indianapolis, remain in Nabisco distribution centers and under Nabisco's control.

65. Keebler never responded to Nabisco's request for information to show it had use of the SUPREME mark for any goods and never mentioned the use of SUPREME for lasagna (Hartman).

66. A variety of package designs were considered for the new product. A warm buttery color was desired, somewhere between off white and golden. Initially a buff background color was favorably considered. But this color was abandoned at the objection of the sales force. (Plaintiff's Exhibit 62;, Tessler Deposition, pp. 158-159).

67. Side-by-side comparisons were made of Keebler's "Pecan Sandies" Trade Dress and the proposed "Pecan Supremes" package by Nabisco's marketing department. No brand of pecan shortbread cookies except Keebler's "Pecan Sandies" cookies were present or compared to Nabisco's "Pecan Supremes" package at various Nabisco marketing meetings concerning the "Pecan Supreme" package because the marketing department was unaware of and unable to find any other brands of pecan shortbread either in local markets or through an Info Scanning data base (Plaintiff's Exhibit 62; Tessler Deposition, [*18] pp. 167-170).

68. An initial descriptor was considered for the new product consisting of the phrase "Rich Shortbread Cookies, Loaded with Pecans." When this phrase was rejected by the Sales Department as being too "blue-collar," the descriptor phrase "Rich Shortbread Cookies Baked with Crispy Pecans" was substituted and appears on Nabisco's "Pecan Supremes" current packaging (Plaintiff's Exhibit 62; Tessler Deposition, pp. 166, 173, 179).

69. After the initial buff background color was rejected by the Sales Department, a variety of other background colors were considered, including green and magenta. Ultimately, it was decided to use a yellow-gold color for the package's background (Plaintiff's Exhibit 62; Tessler Deposition, p. 160).

70. Nabisco also planned to initiate a promotion for the period May 17, 1992 to June 7, 1992 whereby purchasers of Keebler's "Pecan Sandies" shortbread cookies would be given a coupon for Nabisco's "Pecan Supremes' cookies at the check-out line (Plaintiff's Exhibit 62, Tessler Deposition, pp. 189-190).

71. The word "Supremes" in Nabisco "Pecan Supremes" mark is virtually identical to Keebler's federally registered "Supreme" mark.

72. A close inspection [*19] of the two trademarks reveals that Nabisco's "Pecan Supremes" mark also closely resembles Keebler's "Pecan Sandies" mark in sound and sight. Both marks contain the same number of syllables; they have the same stress pattern, with primary accent on the first syllable and secondary accent on the second syllable of both words. The initial and final sounds of "Sandies" and "Supremes" are also acoustically similar. Therefore, the marks are similar in sight and sound.

73. The descriptors of both products are also very similar in sight and sound. Keebler's "Rich Shortbread Cookies With Crunchy Pecans" is very similar to Nabisco's "Rich Shortbread Cookies Baked With Crispy Pecans".

74. Although not exactly the same, both Keebler's and Nabisco's packaging include similar shades of yellow applied to the background, shades of brown either for or around the lettering for the mark and descriptive phrase; stacking of the words of the trademark; some similarities in the type style; and photographs of several cookies and

pecans arranged around the cookies, appearing on the front panel and in identical locations on the side panel.

75. The "Pecan Supremes" package has bolder and more centralized [*20] lettering for the trade mark with a burgundy color surrounding the trade mark, the word "PECAN" is in white upper case lettering, as opposed to Keebler's brown lowercase lettering, and the "Pecan Supremes" logo is more dominant of the packaging than is Keebler's "Pecan Sandies." The Nabisco package also has the word "new!" in somewhat smaller type - but in the color red.

76. The "Pecan Sandies" package has a seal proclaiming it to be America's most popular shortbread cookie and on the lower right hand front of the package in yellow and white smaller type set in strips of blue and red background, an announcement that the product is "Low Cholesterol" and "Low in Saturated Fat." The "Pecan Supremes" package does not have either of these elements.

77. The "Pecan Sandies" of course have the "Keebler" brand name and distinctive logo and the "Pecan Supremes" have the "Nabisco" brand name and distinctive logo on the upper left hand corner of the package - the usual placement which the consumer is undoubtedly accustomed to.

78. A close comparison of the two packages results in a finding that they do project the same overall visual image due mainly to the size and shape of the bag, the background [*21] color, the use of the similar trademarks and descriptions and the pictures of the cookies and pecans which are prominently displayed.

79. Various elements of the PECAN SUPREMES package are common to other Nabisco packages. The use of the rectangular bag is common to Nabisco. Most of Nabisco's packages feature product photographs. Nabisco sells other cookies in predominantly yellow packaging and uses a stacked arrangement of words for many of its brand names (Thomas; Exhibit A-D, S and T).

80. Nabisco intends that its PECAN SUPREMES product will compete directly with Keebler's PECAN SANDIES product. There is no direct evidence, however, that Nabisco attempted to copy Keebler's packaging or trade on Keebler's goodwill by adopting a confusing package (Tessler, Thomas).

81. The product in the packaging is of course, of the same type, namely, pecan shortbread cookies. The goods of both parties will be sold in the same stores and will be marketed in the same aisle of such stores.

82. The goods are also marketed to the same consumers. In fact, Nabisco was aware of the characteristics of the typical purchaser of Keebler's "Pecan Sandies" and intended to target this same consumer group. [*22] Nabisco also intends to take advantage of the similarity of consumers through a coupon promotion whereby purchasers of Keebler's "Pecan Sandies" cookies would be given a coupon for Nabisco's "Pecan Supreme" cookies (Plaintiff's Exhibit 62, Tessler Deposition, pp. 189-190).

83. The two products are also to be the same weight for substantially the same price (at $ 2.99).

84. A further factor to consider is that Nabisco chose to go ahead with production and substantial expenditures in advertising commitments of its trademarks and trade dress for its new pecan shortbread cookies after having actual notice of Keebler's registrations and rights in the trademarks "Supreme" and "Pecan Sandies" and with the knowledge that Keebler was objecting to its trade dress.

85. Nabisco began production and sales to retailers of its PECAN SUPREMES product in February and March 1992. In that same time period, Nabisco purchased newspaper coupon advertising. The PECAN SUPREMES newspaper advertising is part of a group advertisement depicting the advertisements of other companies as well as Nabisco, has already been printed and will be distributed by an independent company on May 31, 1992. The advertisement [*23] is no longer in Nabisco's control and cannot be cancelled by Nabisco (Thomas, Lees).

86. Prior to the filing of this suit, retailers around the country had also made commitments to run their own newspaper advertising for the PECAN SUPREMES product based on Nabisco's commitment to begin distribution of the product for sale during the week of May 17. That retailer advertising will begin the week of May 17, 1992, is not in Nabisco's control and cannot be cancelled by Nabisco (Thomas, Lees).

87. Prior to this suit, Nabisco stopped printing the yellow packaging. Nabisco has approximately 3.2 million filled packages of cookies in the yellow package. These

are located in about 105 Nabisco distribution centers around the country ready for delivery to retailers. The cost of the filled packages is about 3.7 million dollars (Thomas, Lees).

88. Nabisco has agreed to replace the yellow package with a buff-tan colored package pending the final resolution of this lawsuit. That package is in production, and Nabisco has destroyed 10% of its yellow packaging which was not already filled. Nabisco expects that its existing inventory of yellow packages should be sold out of the stores by mid-June, [*24] or within about 35 days. Nabisco is also prepared to put a 1-1/4" x 1-3/8" blue sticker bearing the words "New! From Nabisco" on each of its yellow packages to further emphasize that it is a Nabisco product (Thomas, Lees).

89. Nabisco's sales force has been instructed to place Nabisco's PECAN SUPREMES cookies in the middle of the Nabisco cookie section of grocery stores next to Nabisco's CHIPS AHOY cookies.

90. Cookies of the type at issue in this case are sold through grocery outlets. Both Keebler and Nabisco distribute their products to grocery outlets using mainly their own sales forces which are responsible for shelving the products in the stores to the extent the retailers allow this. Cookie products are often, but not always shelved according to manufacturer, that is, all of the Nabisco products in one section, all of the Keebler products in their own section, and so forth. Store brands are usually placed between the Keebler and the Nabisco product sections (Hanna, Thomas, Lees). At least one major retailer however, Kroger, shelves cookies according to type of cookie and not according to manufacturers. In this major chain, the two packages in question here may very well appear [*25] next to each other in head to head competition (Hanna).

91. It is common in the cookie and cracker market to find similar product types in similar package colors. Historically, Nabisco, Keebler and other manufacturers have marketed similar product types with similar package colors. For example, both Nabisco and Keebler sell vanilla wafer products in yellow packaging, as do many other manufacturers. Nabisco, Keebler and other manufacturers sell products like Nabisco's RITZ crackers in red packaging and products like Keebler's CLUB crackers in green packaging. Products like Nabisco's OREO cookies are commonly sold in blue packaging. Several manufacturers use yellow-gold packaging for pecan shortbread cookies (Hanna, Lees).

92. Virtually every color is in use by cookie manufacturers, making it almost impossible to select new colors without using a color already in use. The primary colors - red, yellow and blue - are widely used (Lees).

93. Many manufacturers use yellow as a packaging color for cookies and crackers. In addition to the PECAN SUPREMES product, Nabisco uses yellow packaging for a number of products, including FIG NEWTONS, LORNA DOONE, TEDDY GRAHAMS, and NILLA WAFERS.

[*26] 94. Since consumers when selecting cookie and cracker products in stores are often confronted with a wide array of similarly colored cookie and cracker products, it is probable that such consumers are less likely to be confused or misled merely by similarities in the color of packaging.

95. Keebler has regularly changed the package design of its PECAN SANDIES product, but since the early 1980's the changes have been small details. The current package (Plaintiff's Exhibit 3-I) was adopted in 1991. Keebler first used a similar trade dress with different shades of yellow in the early 1980's. Keebler no longer claims rights in the shades of yellow it used prior to the current package (Hanna).

96. Nabisco would suffer harm if enjoined from selling its existing inventory of product on the currently scheduled dates. First, it would have to destroy 3.7 million dollars worth of product. The cookies could not be repackaged because they are fragile and would be damaged from the handling that would occur if repackaging were attempted. If the packages were over-wrapped or if the package or logo was covered, the product would not be marketable because consumers would think it was a reject or [*27] had been tampered with. Finally, the product has a limited shelf life and would not be of marketable quality if stored pending the final outcome of this case (Thomas, Lees).

97. The most serious harm to Nabisco would be with its customer and consumer relations. Nabisco has made commitments to retailers to delivery product for sale beginning the week of May 17. Based on those commitments, retailers have committed to newspaper advertising, which in turn will create consumer demand for the PECAN SUPREMES product. The failure to

make the product available as advertised is unprecedented in Nabisco's history. If the product is not delivered, consumer expectations will be damaged at the expense of both Nabisco and its retailers. The failure to have the product available might suggest to some a recall for health reasons and therefore tarnish Nabisco's reputation for wholesome, quality products. Retailers will be angry with Nabisco for not fulfilling its commitments. That reaction will damage Nabisco's ability to obtain future retailer commitments for product and will damage the relationship of trust formed between retailers and the Nabisco sales force. Nabisco has about 100,000 retail accounts [*28] and estimates that the losses that would accrue from the damage to its relations with retailers from the failure to fulfill its commitments on PECAN SUPREMES would be hundreds of millions of dollars (Thomas, Lees).

98. Keebler's evidence of injury is by necessity less concrete, since the events that could cause that injury have yet to occur. Mr. Hanna testified that the PECAN SUPREMES product could cause a short term down turn in sales. In the long run he stated there was "a possibility" of dissatisfied customers if the product did not meet their expectations. If the quality was poor, Keebler "could possibly" lose customers on a permanent basis. Even if the quality was good, Mr. Hanna stated he "believes" the sale of the PECAN SUPREMES product would damage the distinctiveness of Keebler's trade dress (Hanna).

### CONCLUSIONS OF LAW AND DISCUSSION

This is an action for trademark and trade dress infringement with related causes of action for unfair competition under federal and state law. Keebler seeks a preliminary injunction against Nabisco's introduction of its Pecan Supreme pecan shortbread cookies. [HN1] A preliminary injunction is an extraordinary remedy. *Fox Valley Harvestore, Inc. v. A.O. Smith Harvester Products, Inc., 554 F.2d 1096, 1097 (7th Cir. 1976).* [*29] To obtain preliminary injunction relief, Keebler must establish the following factors:

    1. That there is no adequate remedy at law which exists and that irreparable harm will be suffered by it if the injunction is not issued;

    2. That the irreparable harm suffered by Keebler if the injunction is denied

outweighs the irreparable harm which will be suffered by Nabisco if the injunction is erroneously granted;

    3. That it, Keebler, has a reasonable likelihood of prevailing on the merits; and

    4. That the injunction will serve the public interest.

*Turtle Wax, Inc. v. First Brands Corp., 781 F.Supp. 1314, 1317 (N.D. Ill. 1991),* citing *Somerset House, Inc. v. Turnock, 900 F.2d 1012, 1014-15 (7th Cir. 1990).*

[HN2] Each element must be shown before an injunction will issue. The 7th Circuit has held that the injunction test involves a "sliding scale" which requires a plaintiff to show substantially greater relative harm if it has a poor likelihood of success on the merits. *Roland Machinery Co. v. Dresser Industries, Inc., 749 F.2d 380, 392 (7th Cir. 1984).*

### IRREPARABLE HARM

It has generally been [*30] held that [HN3] the damages suffered due to unfair competition are, by their very nature, irreparable and very difficult, if not impossible, to measure in terms of monetary damages. *A.G. Canfield Co. v. Vess Beverages, Inc. 612 F.Supp 1081, 1089 (N.D. Ill. 1985),* affirmed *796 F.2d 903 (7th Cir. 1986).* One of the reasons for this is that the loss of confidence in the consumer may not be felt immediately and is inherently difficult to measure, as is damage to one's reputation in the marketplace. In *Wesley - Jessen Division of Schering Corp. v. Bausch and Lomb, Inc., 698 F.2d 862, 867 (7th Cir. 1983),* the Appellate Court held "Courts readily find irreparable harm in trademark infringement cases because of the victim's inability to control the nature and quality of the infringer's goods. " As pointed out in the Findings of Fact above, although it is not possible at this time for direct and concrete evidence of irreparable injury to be offered because the sale of the alleged infringing product has not yet commenced, the possibility of loss of market share and damage to reputation, all due to consumer confusion, is sufficient to establish [*31] irreparable harm to the plaintiff.

### LIKELIHOOD OF SUCCESS ON THE MERITS

**Federal Trademark Infringement**

[HN4] In order to show a likelihood of success on the merits as to its trademark infringement case, Keebler must prove its ownership of a valid trademark and that the use of the mark being challenged is likely to cause confusion among the consumers. *Munters Corporation v. Matsui American, Inc., 909 F.2d 250, 252 (7th Cir. 1990)*. As noted in factual finding no. 12 above, Keebler is the owner of Trademark Register No. 124976 for the trademark "Supreme" for goods, including cookies, crackers, sandwiches, wafers, and ice cream cones. This is *prima facie* evidence of the validity of the registration of Keebler's ownership of the mark and of Keebler's exclusive right to use the mark on cookies and other included products. *Ye Olde Tavern Cheese Products, Inc. v. Planters Peanuts Division Standard Brands, Inc., 261 F.Supp. 200 (N.D. Ill. 1966)*, affirmed *394 F.2d 833 (7th Cir. 1966)*. Rights in trademarks, however, arise from use, not merely from registration. *John Morrell and Company v. Reliable Packing Company, 295 F.2d 314, 316 (7th Cir. 1961)*. [*32] The Landham Act requires that the owner use its trademark in commerce in order to establish and preserve his exclusive rights therein. The term "use in commerce" means the bona fide use of a mark in the ordinary course of trade, and not merely to reserve a right and a mark. [HN5] A mark shall be deemed used in commerce,

    1. On goods when

        a) it is placed in any manner on the goods or their containers or that it is placed associated therewith on the bags, tags, labels, affixed thereto, or if the nature of the goods makes such placement impracticable, then on the documents associated with the goods or their sale and

        b) the goods are sold or transported within commerce, . . . *15 U.S.C. § 1127 (1990)*.

Section 45 provides that [HN6] a mark shall be deemed to be abandoned:

    1. When its use has been discontinued with intent not to resume such use. Intent not to resume may be inferred from circumstances. Non use for two consecutive years shall be *prima facie* evidence of abandonment. "Use" of a mark means the bona fide use of that mark made in the ordinary course of trade and not made merely to reserve a right in a mark. *Id. See also Roulo v. Russ Berrie & Company, Inc., 886 F.2d 931, 938 (7th Cir. 1989)*. [*33]

[HN7] Abandonment of the defense to a claim of infringement of trademark rights and a ground for cancellation of Federal Trademark Registration under *15 U.S.C. § 1064*. Abandonment is also a defense to a claim of incontestable trademark rights.

The burden of proof as to abandonment is on the party asserting the abandonment. The party asserting abandonment must prove this by clear and convincing evidence. Proof of two years of non use creates a rebuttable presumption of abandonment. Once non use for two years is established, a burden of production to explain the non use or establish the existence of an intent to resume use arises on the part of the owner of the mark. This burden of production, however, requires only that the trademark owner produce evidence to rebut the presumption. Once this is done, the ultimate burden of persuasion of abandonment rests and remains with the party asserting the abandonment. *Roulo v. Russ Berrie, Inc., supra; Exxon Corporation v. Humble Exploration Co., Inc., 695 F.2d 96, 99 (5th Cir. 1983)*. A mere subjective intent to continue use, however, is not sufficient to overcome the *prima facie* evidence of abandonment, [*34] rather, the owner must show specific plans for commercial use of the mark, not just an intent not to abandon. *Exxon Corporation v. Humble Exploration Company, Inc., supra at 102-103*.

As the factual findings above make clear, Keebler has shown direct and substantial evidence of the fact that it is now using the "Supreme" trademark on its product Bernardi's Supreme Lasagna. It has also shown tests, plans, and investment of funds in development of products which contemplated the use of the mark

"Supreme," although it is uncontested that these other products never went to market. Defendant Nabisco emphasizes the fact that Bernardi's Supreme Lasagna is not a competing product, and that, therefore, the use of the mark "Supreme" in such a product is not sufficient to show use. This same issue was confronted by Judge Prentiss Marshall in *Sands, Taylor and Wood v. The Quaker Oats Company,* No. 84 C 8075, U.S. District Court, Northern District of Illinois, Eastern Division, decided December 20, 1990, Memorandum Opinion, not reported in Fed. Supp., also cited as 1990 WL 251914. At page 7, thereof, Judge Marshall states as follows:

> "Defendant's contention that plaintiff's [*35] only use of THIRST-AID is on the Murray's label at the institutional level, is clearly contrary to the law and the evidence. It is axiomatic that the trademark laws do not require direct competition between the party's products for an actionable infringement claim." *Union Carbide Corporation v. Ever-Ready, Inc., 531 F.2d 366, 382 (7th Cir. 1976).* Consequently, lack of direct competition does not support an abandonment defense. That plaintiff primarily used the THIRST-AID mark at the institutional level on ice cream toppings while defendant marketed its product at retail on an isotonic beverage does not constitute non use for purposes of abandonment. *Lyon Metal Products, Inc. v. Lyon, 134 U.S.P.Q. 31 (1962)* (Use of Trademark Through One Channel of Distribution does not constitute abandonment)."

This holding and reasoning is directly applicable to the case before us. Lack of direct competition between Bernardi's Supreme Lasagna, which is sold mainly on an institutional level and not to the retail public, and defendant Nabisco's "Pecan Supremes" does not support an abandonment defense. Judge Marshall goes on to note:

> "The totality of [*36] plaintiff's efforts to find a product at retail for THIRST-AID reflect a clear intent to exploit the market in the reasonably foreseeable future by permitting its use by others. *See,*

> *Silverman v. CBS, Inc., 870 F.2d 40, 47 (2nd Cir. 1989)."*

Similarly, in the case before us, Keebler has shown, as the factual findings above demonstrate, substantial efforts to exploit the mark "Supreme" and a substantial use of that mark in its Bernardi's Supreme Lasagna product. I therefore recommend that the court find that there has been no abandonment of the "Supreme" trademark by Keebler.

But, lack of abandonment is not enough in order for Keebler to maintain a trademark infringement action with respect to its mark "Supreme." Keebler must also establish that there is a likelihood of confusion in the consuming public for the use of that mark by Nabisco. *Henri's Food Products Company v. Kraft, Inc., 717 F.2d 352, 354 (7th Cir. 1983).* [HN8] Unlike a patent or a copyright, a trademark does not grant a monopoly. The function of a trademark is to designate source, and its protection is accordingly limited to the prevention of likelihood of confusion. *United Drug Company v. Theodore Rectanus Co., 248 U.S. 90* [*37] (918). A showing of a mere possibility of deception and confusion is not enough. *Nebraska Consolidated Mills Co. v. Shawnee Milling Co., 198 F.2d 36, 38 (10th Cir. 1952).* There must be proof that an appreciable number of potential purchases will, in fact, be deceived. *Restatement of Torts,* Sec. 728, comment (a) (1938). So in order to show that it is entitled to a preliminary injunction on the basis of its trademark "Supreme," Keebler must establish more than a mere possibility of deception or confusion. In making this determination, it has been held that the court must stand in the shoes of the ordinary purchaser and take into account the normally prevalent conditions of the market and the manner in which purchasers make their choices. *General Mills, Inc. v. Kellog Company, 824 F.2d 622, 627 (8th Cir. 1987).*

The fact that the term "Supreme" is itself a descriptive term, also works to make the likelihood of confusion weaker. Because it is less likely that in the mind of the consumer, the term will be seen as a trademark, as opposed to merely a descriptive word. It is also true that Keebler has not used the mark "Supreme" on a cookie product [*38] for more than twenty years. In fact, Keebler's exhibit no. 21 shows that at one time, Keebler did use the trade name or trademark "Supreme" in a large number of cookies, crackers, candies, and other snacks. But at that time it used the term "Supreme" inside

of a logo which included a depiction of a cooking pot with the further trade name "Kitchen Rich" in all of its products. This distinctive logo has not been used by Keebler for many years, and it is doubtful that any one in the public who observed the term "Supreme" on Nabisco's "Pecan Supremes" would confuse this product and take it to be one of Keebler's Supreme Kitchen Rich products of many years ago. Further, the evidence also shows that there are dozens of federal registrations of marks containing the work "Supreme" for food products. This fact, along with the fact of the lack of use by Keebler of the term "Supreme" on any cookie product for over twenty years, as well as the fact that the current use of the mark "Supreme" by Keebler is on a product that does not compete on any level with the product being complained of in this petition for relief, and the fact that the use of the term in its current lasagna product by Keebler [*39] differs significantly from the prior use of twenty years ago, which was at that time, prevalent and likely to have been easily recognized by the public, leads me to recommend that the court find that there is no likelihood that the consuming public will confuse the origin of Nabisco's "Pecan Supremes" by virtue of the use of the mark "Supreme." And I, therefore, further recommend that although abandonment of the "Supreme" mark has not been shown, that the court find that there is less than a negligible likelihood of success on the merits as to Keebler's Trademark Infringement action.

### *Trade Dress Infringement*[HN9]

To establish a cause of action for trade dress infringement, Keebler must prove both 1) that the trade dress of its "Pecan Sandies" product is protectible - that is, it is inherently distinctive or has acquired secondary meaning, and 2) that there is a likelihood of confusion with respect to the original of the defendant's "Pecan Supremes" product. *See Roulo v. Russ Berrie & Company, 886 F.2d 931, 935 (7th Cir. 1989), cert. denied 493 U.S. 1075, 110 S.Ct. 1124 (1990).* As noted above, in order to show a protectible trade [*40] dress, Keebler must establish either that its trade dress is inherently distinctive, or that it has acquired secondary meaning in the marketplace. Two tests exits for analyzing the inherent distinctiveness of a trade dress:

> 1) That enunciated by the 2nd Circuit in *Seabrook Foods, Inc. v. Bar-Well Foods, Limited 568 F.2d 1342 (C.C.P.A. 1977)* (the "Seabrook Test"), and

> 2) the alternative test utilized by the 5th Circuit in *Chevron Chemical Co. v. Voluntarily Purchasing Groups, Inc., 659 F.2d 695,* (5th Cir. 1981) *cert. denied, 457 U.S. 1126, 102 S.C. 2947 (1982).*

To date, the 7th Circuit has not identified a definitive test to be applied in determining whether a trade dress is inherently distinctive. *Blue Coral, Inc. v. Turtle Wax, Inc., 664 F.Supp. 1153, 1160 (N.D. Ill. 1987)* (Aspen, J.). Given the 7th Circuit's silence as to which of the tests ought to be applied, if either, both Judge Aspen, in the *Blue Coral* decision and Judge Rovner, in *Turtle Wax, Inc. v. First Brands Corp., 781 F.Supp. 1314 (N.D. Ill. 1991)* have applied both tests in their analyses. [*41] I will do the same.

The principle rule of protectibility in inherently distinctive trade dresses, in the absence of secondary meaning was established in *Chevron Chemical Co. v. Voluntary Purchasing Groups, 659 F.2d 695, 702 (5th Cir. 1981)* (cited with approval by the 7th Cir. in *Blau Plumbing, Inc. v. S.O.S. Fix-It, Inc., 781 F.2d 604, 608 (7th Cir. 1986).* In *Chevron,* the plaintiff was unable to prove secondary meaning for a particular trade dress, despite the fact that the product had been on the market in the trade dress for over five years. The court there held that the trade dress of *Chevron's* product was a common-law trademark, and found that the colors of the trade dress presented in *Chevron's* particular geometric pattern created a distinctive visual impression. The court then concluded that [HN10] a trade dress which was arbitrary and served no function either to describe the product or assist in its effective packaging would be protectible, even in the absence of a finding of secondary meaning. Under this holding then, the elements which must be established are 1) that the trade dress is arbitrary and 2) that the trade dress [*42] serves no function to either describe the product or assist in its effective packaging. Applying these legal principles to the facts, I find, and I recommend that the court find, that the "Pecan Sandies" trade dress is not inherently distinctive within the meaning of the law as delineated in the *Chevron* case.

The evidence, as summarized in the factual findings above, establishes the following. The trade dress that Keebler claims is protectible consists of the following

elements:

> A yellow background color applied to the specific configuration of the generally rectangular cookie package; Keebler's trademark, "Pecan Sandies;" The phrase "Rich Shortbread Cookies With Crunchy Pecans;" a brown colored lettering for the mark and descriptive phrase. The stacking of the words of the mark the serif type style of the mark and the photographs of several cookies arranged together and of pecans appearing on the front panel (See Plaintiff's Exhibit No. 3D through 3I - the current package.)

Clearly, the word "pecan" in Keebler's trademark "Pecan Sandies" is a descriptive word. It is functional in that it describes the product. As does the phrase "Rich Shortbread Cookies with Crunchy [*43] Pecans. " This phrase further describes the nature and quality of the product being sold and, as such, is certainly functional and not arbitrary or capricious. The photographs of the several cookies on the front of the package as well as the photographs of the pecans on the front of the package also are elements that are clearly functional in that they serve to describe again the product being sold. The configuration of the package being generally rectangular is not functional. It does not serve in any way to describe the product, nor is it necessary for efficient packaging. This element of the trade dress is, I believe, arbitrary as is the placement of the pictures of the cookies and the pecans, both with respect to each other and with respect to the package. Also arbitrary are the lettering on the package and the color and type style for the trademark and the descriptor. To a certain extent, the background color of yellow can also be said to be arbitrary, although this is somewhat blurred by the testimony of several witnesses that yellow is generally believed in the industry to connote a rich buttery flavor. If chosen for this purpose, then the color yellow becomes, to some degree [*44] at least, functional in its indirect description of the product. There was also some testimony by Nabisco executives that their choice of the color yellow for the "Nabisco Pecan Supremes" was influenced by the desire to get a color that is bright and stands out in a large shelf full of products. This, of course, would add another functional element to the color yellow. A consideration of the above elements leads me to conclude, and I

recommend that the court find, that the "Pecan Sandies" trade dress, although it contains some arbitrary elements, is primarily functional in that it serves to describe the qualities of the product.

As pointed out above, the 11th Circuit has adopted a different test to determine whether a trade dress is inherently distinctive, i.e., the "Seabrook Test." In the *Seabrook* case, the court set forth the key factors to consider when determining whether a design for a trademark is inherently distinctive. [HN11] According to this test, the court must determine whether the design in question is a common basic shape or design. Whether it is unique or unusual in a particular field, or whether it was a mere refinement of a commonly adopted and well known form of ornamentation [*45] for the particular class of goods viewed by the public as a dress or ornamentation for the goods. The parties have essentially agreed in the presentation of their evidence that the two products in question will be sold in the same supermarket aisle and although the exact location of each of the cookies will vary from store to store, the two goods will find themselves generally placed in one of two ways. Either the cookies will be placed among all of the other cookie and snack type products of the particular brand, or they will be placed in direct competition with each other - that is, all cookies of the same type regardless of which brand name will be placed together for the consumer to view. Given this testimony, the field or class of goods to which Keebler's "Pecan Sandies" belongs. It is not limited merely to the segment or field of fruit and nut cookies, but rather we may expect it to be competing for the consumer's attention with a whole host of other types of cookies and crackers. When viewed against the backdrop of the large number of exhibits of other cookie products introduced both by the plaintiff and defendant in this case, it is clear that the "Pecan Sandies" trade [*46] dress, although the exact combination of elements it contains is undoubtedly unique, the overall visual impression of the package is neither unique nor unusual in the field of goods, with which it competes. The generally rectangular package is common, as can be seen by comparing the same to Plaintiff's Exhibits no. 21 and 30, Defendant's Exhibit S, W, X, Y, and JJ. These exhibits and the testimony establish clearly that this particular rectangular type of packaging has been in existence for a long time and is used by a large number of different manufacturers for different cookie products. A cursory glance at almost every single package of cookies introduced into evidence, and there were at least thirty

such, also establishes that photographs of the cookie products on the front of and on the side of the packaging is extremely common, almost universal, as is the use of descriptive phrases to describe the qualities of the product. As pointed out above in the factual findings, and again as can be seen by a review of the packages introduced into evidence, the color combination of yellow or yellow orange, or golden yellow with white or brown lettering is also neither unique or unusual, [*47] but no more than a refinement of common elements found in packaging of many different types of cookies, including Nabisco's Fig Newtons, Honey Teddy Grahams, Nilla Wafers, and Keebler's Vanilla Wafers, as well as Barton's Pecanorific Pecan Shortbread cookies, Food Lyon's Pecanorific Shortbread cookies, and Nature's Best Pecan Shortbread Cookies. Plaintiff's own exhibit no. 21 also contains numerous examples of previously used packaging containing shades of yellow and brown. Neither can I find any evidence to support the conclusion that the stacking of the trademark name is unique or unusual. Quite the contrary appears to be true from all of the exhibits that have been introduced. A substantial number, if not an actual majority has the trademark stacked rather than stretched out along the lengths of the packaging. Based upon the above considerations, I conclude and I recommend that the court find that the plaintiff Keebler has failed to establish even a more than negligible likelihood of success in proving that its trade dress is protectible under the "Seabrook" standard.

Lacking in inherent distinctiveness then, Keebler must establish secondary meaning as the only other alternative [*48] to proving a protectible trade dress. [HN12] The determination as to whether or not trade dress has acquired a secondary meaning is a question of fact. The following factors are to be considered in making such a determination:

a) Consumer testimony

b) Consumer surveys

c) Exclusivity, length and manner of use

d) Amount and manner of advertising

e) Amount of sales and number of customers

f) Established place in the market and

e) Proof of intentional copying

*Turtle Wax, Inc. v. First Brands Corp., 781 F.Supp. 1314, 1323 (N.D. Ill. 1991).*

There was no testimony or evidence presented with regards to consumer surveys, nor was their any consumer testimony. However, Keebler did establish both length and manner of use of its trade dress and a certain degree of exclusivity in that regard. As noted above in the factual findings, the evidence clearly supports the conclusion that Keebler has used the same basic elements in its trade dress for the "Pecan Sandies" cookies over the last ten years. Although there have been changes, I find that these changes have been small and insignificant and mainly in the form of details as [*49] opposed to any change in the overall visual impression of the package. The "Pecan Sandies" product in this particular trade dress has been widely marketed to the grocery trade and advertised extensively throughout the United States. This was specifically admitted in the testimony of Sharon Tessler, one of Nabisco's associate product managers who circulated a memorandum noting that "The Pecan Sandies name and impactful package bring equity to the Keebler Franchise. In contrast, Nabisco's pecan shortbread has no brand name and its recessive package does not stand out on the shelf." Keebler's "Pecan Sandies" cookies are its second largest selling cookie, representing 13% of Keebler's cookie tonnage. "Pecan Sandies" for example, sell over 12 times in volume that which is sold by Nabisco's pecan shortbread cookie. Keebler's "Pecan Sandies" are the leading shortbread cookie product in the market in the United States. Keebler's advertising of its "Pecan Sandies" cookies includes magazine advertisements, television commercials, national and local coupons, mass transit billboard advertising and free standing inserts placed in major metropolitan area newspapers. For the period between January [*50] 1, 1983 to December 31, 1992,

Keebler has spent and will spend in excess of 20 million dollars to advertise and promote its pecan shortbread cookies. Thus, Keebler, through its evidence has established both a substantial period of use of this particular trade dress, a large and varied amount of advertising, a preeminent place in the market of shortbread cookies in the United States, and that its sells a large amount of its "Pecan Sandies" cookies and has done so over the ten years in this particular trade dress. It is difficult to believe that a product could be so successful for so long without the formation of secondary meaning for its trade dress in the mind of the consumer. The only other pecan shortbread cookies of which any evidence was presented that appear in packaging which can be called in any way similar were regional brands that were not marketed throughout the entire United States and whose packaging is only somewhat similar to Keebler's "Pecan Sandies." A comparison of plaintiff's exhibit 3I, with defendant's exhibit W, X and Y is sufficient to establish that although there are some similarities in the package products, there are sufficient distinctions to allow Keebler [*51] to claim that its trade dress over the last ten years has been relatively exclusive. I therefore find, and I recommend that the court find, that Keebler has successfully established that it has a reasonable likelihood of success in establishing the element of secondary meaning on the merits at trial.

### *Likelihood of Confusion*

Having established a protectible trade dress by virtue of secondary meaning, it is now incumbent upon Keebler to prove that there is a likelihood of confusion with respect to the origin of Nabisco's "Pecan Supremes" package. *Roulo v. Russ Berrie & Co., supra.* I have already recommended to the court that it find that there is no likelihood of confusion with respect to the assertion of trademark infringement. The issue which will now be addressed is the likelihood of confusion with respect to the trade dress of the two products.

[HN13] Among the factors which are relevant to the determination of confusion are the degree of similarity between the trade dress in appearance and suggestion; the similarity of the products for which they are used; the area and manner of concurrent use; the degree of care likely to be exercised by consumers; the [*52] strength of plaintiff's mark and trade dress; evidence of actual confusion; and intent on the part of the alleged infringer. *International Kennel Club of Chicago, Inc. v. Mighty Star, Inc., 846 F.2d 1079, 1087 (7th Cir. 1988).* Although I had previously determined that there is no likelihood of confusion because of the use of the mark "Supremes" by Nabisco, for purposes of determining whether or not there is a likelihood of confusion due to the overall visual impression of the trade dress, it is appropriate to point out that Nabisco's "Pecan Supremes" mark very closely resembles Keebler's "Pecan Sandies" mark in both sound and sight. *See for example G. D. Searle & Co. v. Chas. Pfizer & Co., 265 F.2d 385, 387 (7th Cir. 1959).* The descriptors of both products are also extremely similar in sight and sound. Keebler's "Rich Shortbread Cookies with Crunchy Pecans" is very similar to Nabisco's "Rich Shortbread Cookies Baked with Crispy Pecans." Both packages include closely similar shades of yellow in the background. Similarities were also found in the shades of brown used for the lettering for the trademark and the descriptive phrases; the stacking [*53] of the words of the trademark; photographs of the several cookies and the pecans arranged the cookies which appear on the front panel and in identical locations on the side panels. To be sure, there are some differences. The "Pecan Supremes" package has bolder and more centralized lettering for the trademark with a burgundy color surrounding the trademark, the word "Pecan" is in uppercase white lettering as opposed to Keebler's lowercase brown lettering, and the "Pecan Supremes" logo is more dominant of the packaging than is Keebler's "Pecan Sandies." The Nabisco package also has the word "New!" in somewhat similar type, but in a red color. The "Pecan Sandies" package has a seal proclaiming it to be "American's Most Popular Shortbread Cookie" and on the lower right hand front of the package in yellow and white smaller type set in the background of strips of blue and red, it contains an announcement that the product is "low cholesterol" and "low in saturated fat." The "Pecan Supremes" package has none of these distinctions. Finally, both packages have the distinctive brand name and logo of the two well known companies. It is clear that neither of these two logos could ever be mistaken [*54] for the other.

The two products for which the trade dresses in question are being used are of course similar products. They are both shortbread cookies with pecans, and, as such, will have the same likely purchasers or consumers attracted to them. The products compete head-to-head on a national market, with both of these major companies selling to the same major retailers. In analyzing the degree of care likely to be exercised by consumers,

1992 U.S. Dist. LEXIS 6826, *54

several factors come in to play. First, it has been established, as set out in the findings of fact, that there is a tendency in the market for the different producers of cookie and cracker products, and snacks to use similar colors to denote similar types of cookies. For example, Keebler's "Club Style" crackers, as shown in defendants's exhibit 14, is packaged in a green background box. Also packaged in green boxes are Nabisco's "Waverly" crackers which are of the same type as Keebler's "Club" and Kroger's "Country Club" crackers and Hy Vee's "Rich and Crisp" crackers, as well as Parade's "Gourmet Crackers." See defendant's exhibits G, H, I, J, and K. The same can be said of Nabisco's "Ritz Crackers," which come in a red box, and Keebler's "Townhouse [*55] Crackers," which also come in a red box and are the same type of crackers. The same can be said for Nabisco "Nilla" wafers and Keebler's "Golden Vanilla" wafers and, as established through the testimony, for a large number of other companies that make vanilla wafers, and also package them in boxes of a predominantly yellow background color. See defendant's exhibits A, B, D, and C. To the extent that this is prevalent in the market, and it appears to be fairly prevalent, one would expect consumers who are accustomed to looking at packages of similar color to denote similar type products would be more discriminating and careful in looking at the details of the packages to make sure that they are able to pick out the actual product and brand name that they want. That is, they would be accustomed to looking beyond the first initial visual impression to the greater detail of the packages. On the other hand, it has to be pointed out that Keebler's "Pecan Sandies" have had fairly exclusive use of the particular visual impression of its current trade dress for at least ten years, and that there has been no reason, therefore, for purchaser's of Keebler's "Pecan Sandies" to develop a habit [*56] of looking closely at the packages when they go to purchase this particular product. So that the likelihood of confusion as to this particular product may be greater than it would generally be for the overall market of crackers and cookies. Finally, after studying the evidence in detail, I find little or no direct evidence of an intent on the part of Nabisco to actively copy the Keebler trade dress. On the other hand, I cannot help but comment upon how surprising it is that having all of the colors in the rainbow to choose from, Nabisco happens to end up with a yellow background color so similar to that of the already existing "Pecan Sandies" by Keebler. I also find it extremely unlikely that with Keebler's "Pecan Sandies" package containing the descriptor "Rich Shortbread Cookies with Crunchy Pecans" that Nabisco would totally by accident come up with a descriptor for their "Pecan Supremes" of "Rich Shortbread Cookies Baked with Crispy Pecans." The first three words of Nabisco's descriptor are exactly the same as Keebler's long standing descriptive phrase. I also think that the possibility for confusion, especially at the early stages when Nabisco's product first comes out on the [*57] market, is likely to be aggravated and increased by Nabisco's plan of giving to every customer who purchases a box of "Pecan Sandies" automatically at the cash register a coupon for a discount for Nabisco's "Pecan Supremes" next time they come to the store. Whether or not this marketing scheme ever goes into effect, its very existence gives us a rather telling glimpse into Nabisco's thinking and approach in marketing this particular product. Based upon a careful review of all of the above factors and considerations, I find and I recommend that the court find, that Keebler has established a reasonable likelihood of success on the merits in establishing a likelihood of confusion between the two trade dresses.

## BALANCE OF HARMS

The injury which Keebler can expect to suffer if an injunction is not granted has already been discussed above under the discussion of "Irreparable Harm." On the other side of the scale, Nabisco has alleged some substantial economic and non-economic harm, if the injunction is in fact granted. The harm Nabisco stands to suffer can be divided into two categories. First is the cost of the promotions which it has already commissioned for its new product. [*58] This cost apparently is somewhere around $ 128,000.00 according to Nabisco's evidence. Also the cost of the already packaged cookies, which would have to be destroyed goes into the millions. On the other hand, Nabisco is just as worried, if not more so, about the loss or damage to its reputation with both the ultimate consumers and the trade, if, after it has announced a new product, promoted both national and local advertising for it, and, in essence, promised it to its distributors and its consuming public, it fails to deliver the product when promised. This is not a possibility of loss to be taken lightly. Indeed, both parties appear to have a substantial amount at risk. However, I find that the scale tips in favor of Keebler. A close reading of Factual Findings 37 though 71 reveals that to a considerable extent, Nabisco has been responsible for its own jeopardy. In its haste to compete with Keebler, it appears to have proceeded ahead with expenditures and

commitments in the face of considerable risk. For example, even after having received a trademark search revealing Keebler's Federal Registration of the Mark "Supreme" for cookies, Nabisco's chief patent and trademark attorney [*59] Mr. Hartman, advised its marketing group that the mark "Pecan Supremes" was available and that they should proceed. Nabisco's "Pecan Supremes" packaging went into production even before they had received a response from the Patent and Trademark Office on their "Intent to Use" application for the mark "Pecan Supremes." So even before receiving this initial office action, Nabisco had already committed time, effort and money and had begun actually producing the packaging it now seeks to save. It was not until January 31 of 1992 after Nabisco had already begun plans and expended money to advertise its "Pecan Supremes" cookies that Hartman contacted Keebler's attorneys to request a consent to Nabisco's registration and use of the "Pecan Supremes" trademark in connection with the cookies. Further, after receiving, on February 27, 1992, Keebler's letter indicating that they would not consent to the mark, and therefore, knowing that the use of the mark would likely be challenged, nothing was done to slow down Nabisco's production, promotion, or preparation for the marketing of the product. And finally, on March 23 of 1992, Mr. Hartman was informed by one of Keebler's counsel that not only [*60] would Keebler not consent to the use of the "Supreme" trademark by Nabisco, but that Keebler was also very concerned over what it considered to be the extreme similarities between Keebler's trade dress for its "Pecan Sandies," and Nabisco proposed trade dress for its "Pecan Supremes." Two days after this phone call, Nabisco increased the number of newspapers in which its initial advertising for its "Pecan Supremes" would appear and agreed to pay additional money for that expanded service. It is the loss of the money paid for this very advertising that Nabisco now cites as a harm that it would suffer, if the injunction were to be entered. It is clear that Nabisco, had it been more prudent, could have avoided putting itself in the situation where it now has so much at risk if an injunction is actually issued. In one of his letters to counsel of another firm whose trademark Nabisco was also seeking the consent to use, Mr. Hartman made a reference to "Drawing to an inside straight" in an apparent allusion to an attempt by that counsel to bluff his way to the preservation of a trademark, to which he probably was not entitled. It appears to me that Mr. Hartman may have been playing a bit [*61] of poker himself in his dealings with Keebler. It is true that I have found, and I have

recommended that the court find, that there is no likelihood of confusion with respect to the trademarks, and therefore Nabisco's rush to get into production and to make commitments before clearing its ability to use the trademark cannot be said to be a direct cause of its predicament today. Nevertheless, I think that the chronology of events and the attitude which Nabisco displayed with respect to the trademark issue, is an indication of the fact that they proceeded without the necessary prudence and caution in this case, and therefore are to some extent at least, responsible for their own predicament. As indicated above, I have also found that there is strong evidence that Keebler has established over the course of many years, a very strong following for its "Pecan Sandies" products. It would be fundamentally unfair to allow a competitor which has failed in its attempt to establish its own pecan shortbread cookie to now attempt to piggyback on the hard earned reputation of another rather than establishing its own place in the market. I therefore find and I recommend that the court find that the [*62] balance of harms tips in favor of Keebler.

### PUBLIC INTEREST [HN14]

To the extent that the injunction helps to stop or diminish confusion among the public with respect to the origin of the product or purchasing, it will serve the public interest. *A.J. Canfield Co. v. Vess Beverages, Inc., 796 F.2d 903, 905 (7th Cir. 1986)*. It is not in the public interest to allow one manufacture to piggyback on the reputation, advertising and established product of another. From a review of all the evidence, I am convinced that Nabisco's "Pecan Supremes" trade dress, as exhibited in plaintiff's exhibit 28, is sufficiently similar in its overall visual impression to Keebler's "Pecan Sandies" trade dress as shown in the plaintiff's exhibit 3I, that there is a substantial likelihood that the consuming public would confuse one with the other. I therefore recommend that the court find that the public interest would best be served by the issuance of an injunction in this case.

### SUMMARY

Accordingly, I recommend that the court preliminarily enjoin Nabisco, its officers, agents, servants, employees, distributors, advertisers, customers, attorneys, and all persons in active [*63] concert or participation with them who receive notice from advertising selling directly or indirectly pending final

determination of this action, shortbread cookies with pecans in the trade dress represented by plaintiffs exhibit 28 in these proceedings, or any other substantially similar trade dress.

    Respectfully submitted,

    RONALD A. GUZMAN

    United States Magistrate Judge

DATE: MAY 18, 1992

Any objections to this Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of receipt of this notice. Failure to file objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn, 474 U.S. 140 (1985)*; *The Provident Bank v. Manor Steel Corp., 882 F.2d 258 (7th Cir. 1989).*





Analysis
As of: Jan 28, 2013

HUAWEI TECHNOLOGIES CO., LTD., Plaintiff, v.
MOTOROLA,INC.,MOTOROLA SOLUTIONS, INC., MOTOROLA MOBILITY
HOLDINGS, INC., NOKIASIEMENSNETWORKSUS, LLC AND NOKIA
SIEMENS NETWORKS B.V., Defendants.

CIVIL ACTION NO. 11-cv-497

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
ILLINOIS, EASTERN DIVISION

*2011 U.S. Dist. LEXIS 17165*

February 22, 2011, Decided
February 22, 2011, Filed

**PRIOR HISTORY:** *Huawei Techs. Co. v. Motorola, Inc., 2011 U.S. Dist. LEXIS 13161 (N.D. Ill., Feb. 10, 2011)*

**COUNSEL:** [*1] For Huawei Technologies Co., Ltd, Plaintiff: Dale A. Rice, L.J. Chris Martiniak, L.j. chris Martiniak, Nathan E. Shafroth, Samuel F. Ernst, PRO HAC VICE, Covington & Burling Llp, San Francisco, CA; David M. Airan, H. Michael Hartmann, Leydig, Voit & Mayer, Ltd., Chicago, IL; Robert T Haslam, Stanley Young, Covington & Burling Llp, Redwood Shores, CA.

For Motorola, Inc., Defendant: Thomas James Frederick, LEAD ATTORNEY, Dana E Schaffner, Maureen L Rurka, Raymond C. Perkins, Winston & Strawn LLP, Chicago, IL.

For Nokia Siemens Networks US, LLC, Nokia Siemens Networks B.V. Defendants: Daniel J. Wolman, Paul Lall, PRO HAC VICE, Stewart A. Baker, Thomas Lee Holt, Thomas Gerard Pasternak, Steptoe & Johnson LLP,

Chicago, IL; William G. Pecau, Steptoe & Johnson, Washington, DC.

For Motorola Solutions, Inc., Defendant: Thomas James Frederick, LEAD ATTORNEY, Dana E Schaffner, Maureen L Rurka, Raymond C. Perkins, Winston & Strawn LLP, Chicago, IL; Robert Mark Halligan, Nixon Peabody LLP, Chicago, IL.

For Motorola Mobility Holdings, Inc., Defendant: Sheila Ann Sundvall, LEAD ATTORNEY, Paul, Hastings, Jonofsky & Walker, Chicago, IL; Christopher Francis Allen, Paul, Hastings, Janofsky & Walker Llp, [*2] Chicago, IL; Kevin C. Logue, PRO HAC VICE, Paul Hastings, New York, NY.

**JUDGES:** The Honorable Sharon Johnson Coleman, United States District Court Judge.

**OPINION BY:** Sharon Johnson Coleman

2011 U.S. Dist. LEXIS 17165, *2

## OPINION

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on motion by Huawei Technologies Co., Ltd. ("Huawei") for a preliminary injunction against Defendants Motorola Solutions, Inc. [1] ("Motorola"), Nokia Siemens Networks US, LLC and Nokia Siemens Networks B.V. to maintain the *status quo* pending arbitration and prevent Motorola from disclosing Huawei confidential information and trade secrets to the Nokia Defendants (collectively "NSN") and to prevent NSN from using the same. (Dkt. No. 9.) The parties filed extensive briefs on the matter and the Court conducted an evidentiary hearing beginning on February 11, 2011 and continuing on February 14, 2011. For the reasons that follow, the Court grants Huawei's request for a preliminary injunction in part and denies the request in part.

> 1  As of January 4, 2011, Motorola, Inc. was spun off into two publicly traded companies: (1) Motorola Solutions, Inc. and Motorola Mobility Holdings, Inc. Motorola, Inc. no longer exists. Huawei voluntarily dismissed Motorola Mobility Holdings, [*3] Inc. without prejudice on February 10, 2011. (Dkt. No. 96.)

## BACKGROUND

### I. The Parties

Huawei is a Chinese corporation and leading provider of next generation telecommunications network solutions for operators around the world. Motorola is a Delaware corporation and global provider of wireless and broadband communications. NSN is a joint venture formed from business units of Nokia Corporation of Finland and Siemens AG of Germany. Nokia Siemens Networks US LLC is a Delaware corporation and Nokia Siemens Networks B.V. is a Dutch corporation. NSN sells mobile infrastructure hardware and service agreements to carrier companies and is a direct competitor to Huawei.

### II. The Huawei and Motorola Agreements

Beginning in June 2000, Huawei and Motorola entered into a series of agreements under which Huawei would develop, design, and implement new optimized technologies for cellular communications networks and then sell those technologies and other Huawei products to Motorola. Motorola would then resell the technologies and products under the Motorola brand. The technologies Huawei developed and provided to Motorola under the various agreements include: Global Systems for Mobile ("GSM") communications [*4] products, Radio Network Controller ("RNC") products, and Universal Mobile Telecommunications Systems ("UMTS") products. Motorola purchased approximately $878 million in equipment from Huawei from 2000 through the present.

To ensure that Motorola could service its customers and repair and maintain the Huawei equipment, the agreements between the companies contemplated that Huawei provide Motorola with highly confidential information. The agreements required Motorola to protect Huawei's confidential information and prohibited Motorola from disclosing Huawei's confidential information to third parties. The two agreements that are most relevant to the instant matter are the Restated Cooperation Agreement ("RCA") and the Joint Research and Development Center Agreement ("JRDC"). Both agreements remain in force today and impose ongoing protections on Motorola's use of Huawei's confidential information. Under the RCA, Motorola and Huawei agreed that the party receiving confidential information acknowledges that this information may contain trade secrets and proprietary information and that the unauthorized disclosure of this information may cause irreparable harm to the disclosing party. Dispute [*5] resolution provisions in the RCA and JRDC provide that all disputes arising under the agreements must be resolved through arbitration before a Tribunal of the International Chamber of Commerce in Geneva, Switzerland.

### III. The Motorola/NSN Transaction

In the fall of 2009, investment bankers working on Motorola's behalf contacted Huawei and other parties to explore whether they would be interested in purchasing Motorola's wireless networks infrastructure business and its assets. Through this business, Motorola provides equipment and services to wireless network carriers such as Verizon and AT&T. Huawei submitted an initial non-binding bid in December 2009 and a revised bid in April 2010. Motorola ultimately decided to sell its wireless networks business to NSN and the Motorola/NSN transaction was announced on July 19,

2010. With the exception of the Ministry of Commerce of the People's Republic of China ("MOFCOM"), the Motorola/NSN transaction had been approved by the necessary government antitrust agencies. The transaction is expected to close following MOFCOM's approval. Under the contemplated transaction, NSN will acquire Motorola's GSM and UMTS networks, including all of the equipment [*6] and connections that comprise these networks as well as Motorola's business in servicing and maintaining these networks. NSN will also acquire all of the network equipment that Huawei has provided Motorola pursuant to the RCA, JRDC, and other agreements between Huawei and Motorola.

### IV. Motorola Seeks Huawei's Consent To Assign The Agreements To NSN

By letter dated September 13, 2010 Michael Annes, Corporate Vice President of Business Development and Ventures for Motorola, informed Huawei of the Motorola/NSN transaction and requested Huawei consent to Motorola's assignment to NSN of 13 Motorola-Huawei agreements. (Annes Decl. Ex. E.) Huawei declined to consent to the assignment and demanded Motorola identify effective measures to protect the confidential information Huawei shared with Motorola pursuant to the agreements. (*Id.* at Ex. F.) On October 13, 2010, Motorola and NSN jointly responded with measures both organizations agreed to undertake to "prohibit the dissemination of Huawei Confidential Information ("Huawei CI") while still properly supporting Motorola's infrastructure customers using Huawei-manufactured Products." (*Id.* at Ex. G.) The identified measures placed Motorola personnel [*7] into separate categories depending upon whether they had access to Huawei confidential information relating to currently available or future Huawei products and described the access to Huawei confidential information that would be permitted once the transaction closed and the personnel became NSN employees. Post-closing, former Motorola employees with access to future Huawei product features, offerings, and specifications would be required to review their files and destroy any materials related to these future products. The former Motorola employees with access to commercially available Huawei products would be "firewalled" within NSN so that they would be the only NSN employees with access to Huawei confidential information.

On October 26, 2010, Huawei sent a response to Motorola and NSN reiterating that Huawei would not consent to the assignment of the agreements and explaining that the proposed measures were not sufficient to protect the confidentiality of Huawei's confidential information. (*Id.* at Ex. H.) Motorola and Huawei's discussions on protection of the Huawei confidential information continued into November and December 2010. (Annes Decl. Exs. I & J.) On January 8, 2011, [*8] Huawei sent separate letters to Motorola and NSN restating its position and specifying the steps Huawei believed necessary to protect its confidential information and to avoid trade secret misappropriation and breach of the Motorola-Huawei agreements. (*Id.* at K; Dianyao Decl. Ex. 10.) The steps included Motorola's agreement that it would not facilitate NSN's hiring of Motorola employees who have had access to Huawei confidential information, not grant any NSN personnel access to any Huawei confidential information, and require all Motorola employees who have had access to Huawei confidential information to sign nondisclosure agreements with Huawei. (*Id.*) Motorola responded by letter dated January 10, 2011 indicating that neither it nor NSN had any intention of breaching any agreement with Huawei or misappropriating any of its trade secrets through the sale of Motorola's network infrastructure business to NSN. (Annes Decl. at Ex. L.) Motorola also stated that it was willing to discuss "all commercially reasonable steps to protect Huawei's trade secrets" in addition to the firewall solution Motorola previously recommended. (*Id.*) At Motorola's suggestion, the parties met in Hong Kong [*9] later that week on January 14, 2011 but were unable to reach agreement on the measures that would provide adequate protection for the Huawei confidential information. (Dianyao Decl. ¶ 38.)

The dispute resolution provision in the JRDC and the RCA provide that any disputes relating to the agreements follow a formal dispute resolution procedure. (Dianyao Decl., Ex. 1 at ¶ 31.2.) The procedures call for a 60 day waiting period after a meeting of top executives of Huawei and Motorola before a request for an arbitration can be filed. (*Id.*) Four days after the Hong Kong meeting, Huawei proposed to Motorola that the parties waive the 60 day waiting period and submit their dispute regarding the protection of Huawei's confidential information to arbitration. (*Id.* at Ex. 12.) Motorola did not agree to accelerate the arbitration process and the instant litigation followed.

### PROCEDURAL HISTORY

## A. Commencement of Litigation and Motion for Temporary Restraining Order

On the morning of January 24, 2011, Huawei filed the instant action asserting claims of breach of contract, actual or threatened misappropriation of trade secrets, and copyright infringement against Motorola and claims of actual or threatened [*10] misappropriation of trade secrets and contributory copyright infringement against NSN. (Dkt. No. 1) That same morning, Huawei filed motions for a temporary restraining order and a preliminary injunction against Motorola and NSN. (Dkt. Nos. 9, 14.) That afternoon, the Court held a hearing on Huawei's motion for a temporary restraining order ("TRO"). Huawei requested an order requiring Motorola to provide Huawei and the Court with at least five business days' notice in advance of the closing of the Motorola/NSN transaction. Huawei argued that Motorola and NSN intended to close the transaction immediately after receiving MOFCOM approval. Huawei contended that if it were not granted injunctive relief, that Huawei's confidential information would be transferred to NSN before the arbitration tribunal had an opportunity to consider Huawei and Motorola's dispute thereby rendering the arbitration a meaningless exercise. Huawei argued that it needed the notice so that it could take steps to seek further relief if necessary. In asking the Court to deny the TRO, Motorola argued that it could not provide the Court with the five days' notice Huawei was seeking because Motorola did not know when [*11] MOFCOM would approve the deal or when the transaction would close. The Court issued a TRO ordering Motorola not to provide any Huawei confidential information to NSN. (Dkt. No. 20.) Further, the Court ordered Motorola to provide the Court and Huawei with immediate written notice of any action taken by MOFCOM. [2]

> [2]   The Court later modified the TRO on 1/27/2011 and again on 2/4/2011 at the request of the parties. (Dkt. Nos. 42, 100.)

## B. Motion for Preliminary Injunction

The parties submitted extensive briefing on Huawei's motion for a preliminary injunction. Huawei initially sought a preliminary injunction to preserve the *status quo* by ordering Motorola to "modify its transaction with NSN to prevent the transfer of Motorola's GSM and UMTS business to NSN until such time as an arbitral tribunal has determined whether further interim relief is necessary." Huawei also sought injunctive relief against

NSN to "prevent NSN from obtaining Huawei's trade secrets and copyrighted material in a manner for which Motorola may disclaim responsibility - for instance, by hiring Motorola employees in possession of Huawei's confidential information into service and support positions where they will necessarily [*12] need to make use of this information." (Dkt. No. 9-1 p. 3.) Huawei filed numerous declarations under seal in support of its motion which detailed the various categories of Huawei confidential information and trade secrets designated with "Internal Use" or "Highly Confidential" legends that it shared with Motorola and sought to protect, the investment Huawei made in developing this confidential information, the harm Huawei would suffer in the marketplace should this information be made available to a competitor, and the unfair competitive advantage NSN would gain should Motorola transfer this confidential information to NSN. (Xiren, Guangfeng, Wei, Hao, Yuqiao, Jianhui, Kai, Xiaocheng, and Yuan Decls.) The declarations establish that Huawei's technology and trade secrets are deeply embedded in Motorola's GSM and UMTS telecommunications networks. Huawei also provided declarations of Huawei employees and an industry expert attesting to the fact that NSN could not service, support, and maintain Motorola's wireless infrastructure business without using Huawei's confidential information. (Dianyao, Wei, and Crowe Decls.) Finally, Huawei produced a declaration explaining that Huawei's confidential [*13] information would be used at NSN if the Motorola employees who have been involved with Motorola-branded GSM and UMTS systems containing Huawei products are permitted to move to NSN and continue in their present roles. (Dianyao Decl. ¶ 32.) Huawei argues that this evidence demonstrates that Huawei has a high likelihood of succeeding on the merits on its claim that former Motorola employees who possess Huawei trade secrets would inevitably rely on Huawei trade secrets while employed by NSN in contravention of the law.

In its reply brief, Huawei proposed alternative injunctive relief including: (1) an order that would temporarily bar the transfer of Huawei's confidential information and Motorola's UMTS business unit and select portions of Motorola's GSM network supplied by Huawei; (2) an order barring the transfer to NSN of Huawei's confidential information and all customer contracts for customers that have Huawei equipment pending arbitration; and (3) an injunction that continues the relief that is currently in place by virtue of the TRO.

(Dkt. No. 87 p. 26.)

## C. Evidentiary Hearing

### 1. Opening Arguments

The Court heard opening arguments on behalf of all of the parties followed by the testimony [*14] of witnesses called by Motorola and Huawei. Huawei argued that the record contained undisputed evidence that Huawei shared confidential information with Motorola and that the need for an injunction to protect this information was clear given Motorola's letter of January 10, 2011 proposing that Motorola grant NSN employees access to Huawei confidential information. Huawei argued that the evidence showing that NSN could not provide customers with the same level of support as Motorola without access to Huawei's confidential information stood unchallenged. Huawei then conceded that the relief it originally sought to prohibit the transfer of the UMTS business or NSN's hiring of Motorola employing was not without consequences. Huawei proposed injunctive relief that instead included a monitoring and audit system to ensure that Motorola did not transfer any Huawei confidential information to NSN, an exit interview and new hire process to make personnel aware of the prohibition on taking or receiving Huawei confidential information, and the use of a third party vendor to ensure that any Huawei confidential information stored in electronic format was wiped clean such that the information could [*15] not be recovered or retrieved. (2/11/2011 Hr'g Tr. 19:16-24:17.)

Motorola argued that while Huawei now appeared to "sound reasonable" in its latest request for injunctive relief, that there was no injunctive relief that was good for Motorola or justified. (*Id.* at 27:19-23.) Motorola claimed that Huawei could not meet its burden to show it was entitled to a preliminary injunction and that any such order would allow NSN to make a claim that Motorola failed to use its best efforts to assign the contracts thereby providing NSN with a basis to walk away from the pending transaction. (*Id.* at 29:17-22.) Motorola contended that Huawei did not care about its confidential information, which it had already divulged, and that its true intent was to use its confidential information as a "poison pill" to kill the Motorola/NSN transaction. (*Id.* at 32:5-15, 43:7-12.) Motorola cited the lawsuit it filed against Huawei and others as a reason why Huawei wanted to sabotage the Motorola/NSN transaction. [3] (*Id.* at 32:9-15.) Counsel argued that Motorola had already

suffered harm due to the uncertainty surrounding the transaction that was originally scheduled to close on January 1, 2011 and that Motorola would [*16] suffer further harm if the transaction does not close by April 30, 2011. (*Id.* at 43:13-22, 45:7-16.)

> 3 The lawsuit Motorola referenced is *Motorola, Inc. v. Lemko, Corp.*, No. 08-cv-05427, pending before Judge Kennelly.

NSN argued that Huawei was not entitled to a preliminary injunction because Huawei could not show that it had been harmed or that any harm was imminent. (*Id.* at 54:3-7.) NSN claimed that it had no Huawei confidential information and that all that Huawei was left with was a threat that NSN would obtain Huawei's confidential information. (*Id.* at 54:11-12.) NSN further claimed that it did not want to improperly obtain Huawei confidential information nor did NSN want Motorola to violate any of its agreements with Huawei. (*Id.* at 54:13-14, 55:7-11.) NSN stated, however, that it did want the Huawei information necessary for NSN to repair, service, connect, and maintain the Huawei equipment that NSN intends to acquire from Motorola. (*Id.* at 54:12-20.) Counsel for NSN alleged that any injunction that restricts NSN"s ability to repair, service, or maintain the Huawei products "kills the deal" between Motorola and NSN. (*Id.* at 59:21-60:3.)

### 2. Testimony of Michael Annes

Michael Annes [*17] ("Annes"), Corporate Vice President of Business Development and Ventures testified that he is responsible for leading all mergers, acquisitions, and divestures and that he led the negotiations related to the sale of Motorola's wireless infrastructure business. (*Id.* at 82:18-24.) Annes also led Motorola's discussions with Huawei to obtain its consent to assign the Motorola-Huawei agreements to NSN. (*Id.* at 84:22-24.) Annes testified that the firewall that Motorola proposed in its January 10, 2011 letter to Huawei would actually allow certain Motorola employees who transfer to NSN to continue to have access to Huawei confidential information. (*Id.* at 97:25-98:23.) Annes explained that the reason Motorola proposed allowing NSN employees to use Huawei confidential information was to ensure NSN provided the proper support to Motorola customers using Huawei manufactured products. (*Id.* at 100:12-17.) Annes testified that Motorola's agreements with Huawei entitle Motorola to provide Huawei confidential information to

certain third parties. (*Id.* at 96:3-11.)

Annes testified that there is no requirement in the Master Acquisition Agreement ("MAA") between Motorola and NSN that requires Motorola [*18] to transfer Huawei confidential information to NSN. (*Id.* at 90:19-22.) Under the MAA, if Motorola is unable to obtain consent to assignment, then Motorola will not make the assignment. (Id at 90:25-91:5.) Annes admitted that he did not know whether Motorola would decide to give Huawei confidential information to NSN if the Court does not issue an injunction. (*Id.* at 111:24-112:5.) Annes stated that such a decision would be made by Motorola's law division. (*Id.*)

Annes also testified that he believed any delay in the closing of the Motorola/NSN transaction pending the completion of arbitration would "kill the deal." (*Id.* at 93:15-94:4.) Annes admitted that Huawei proposed that the parties accelerate the arbitration process. (*Id.* at 94:15-95:6.) Annes explained that Motorola declined to do so because Motorola was afraid that the arbitration would distract them. (*Id.*)

### 3. Testimony of Scott Morrison

Scott Morrison ("Morrison"), Senior Director and General Manager of Motorola's GSM and UMTS research and development engineering teams testified about the COMPASS system Motorola uses to protect third party confidential information. (*Id.* at 126:20-127:8.) Morrison stated that it was his belief [*19] that many of the servers and applications that Motorola uses today will remain at Motorola and be accessible by former Motorola employees who transfer to NSN. (*Id.* at 135:15-19.)

Morrison also testified about the increased attrition rate that the engineering team began to experience in December 2010 due to the uncertainty employees were experiencing because of the delay in closing the Motorola/NSN transaction. (*Id.* at 131:18-133:10.) Morrison admitted that he could not see how the increased attrition rate had anything to do with the lawsuit Huawei filed against Motorola and NSN. (*Id.*)

### 4. Testimony of Bruce Brda

Bruce Brda ("Brda"), Senior Vice President and General Manager of Motorola's wireless networks business testified that NSN made job offers to all 7,000 Motorola employees in the networks business. (*Id.* at 157:4-9.) Brda stated that NSN is also buying Motorola's buildings and other assets including computers and furniture. (*Id.* at 159:2-14, 162:3-7.)

Brda testified about the uncertainties that Motorola and any company faces when they announce the sale of a business. (*Id.* at 162:15-24) He stated that these uncertainties will continue until MOFCOM approves the deal. (*Id.*) Brda stated [*20] Huawei had nothing to do with the uncertainties that caused Motorola to lose business in China and Vietnam. (*Id.* at 162:8-17.)

Brda testified that the agreement with NSN could close without Motorola providing any Huawei confidential information to NSN. (*Id.* at 164:10-21.) Brda admitted that an injunction prohibiting the transfer of Huawei confidential information would not cause Motorola to breach its agreement with NSN. (*Id.* at 164:22-165:6.) Brda stated that he believed NSN would have no basis to back out of the deal if Motorola did not provide NSN with Huawei confidential information. (*Id.* at 165:8-13.)

### 5. Testimony of Tim Danks

Tim Danks ("Danks") testified that he is responsible for customer support and for Huawei's technical support centers. (*Id.* at 174:1-12.) Danks testified about the difference between the type of service and support provided by a vendor of telecom equipment and the operation and maintenance that a customer performs on its telecom equipment. (*Id.* at 174:23-175:10.) Danks described the various resources that a vendor uses to support its equipment including signaling protocols between equipment, internal documentation, and other confidential information. (*Id.* at [*21] 175:13-16.) Danks testified that vendor support cannot be provided without the use of confidential information that is not provided to customers. (*Id.* at 175:19.) Danks testified that vendor level confidential information would be made available to an OEM like Motorola. (*Id.* at 176:13-15.)

### 6. Testimony of David Crowe

The Court heard testimony from David Crowe ("Crowe"), who Huawei presented as an expert witness in the area of telecommunication network systems. (*Id.* at 192:1-16.) Crowe testified that he reviewed Huawei's ABIS interface, which is the link between cellular transmission towers ("base stations") and the processor

("base station controllers") that allows them to work as a unit by allocating calls and resources between them. (*Id.* at 192:5-9.) Crowe opined that the ABIS interface used in Motorola's network was proprietary to Huawei. (*Id.* at 192:5-9.) Crowe testified that without knowledge of Huawei's proprietary ABIS interface, one could not properly service a Huawei 2G GSM network with UMTS capability containing hundreds of base station towers controlled by a base station controller. (*Id.* at 194:23-195:7.) Crowe testified that in the event that a Huawei base station controller [*22] failed, that someone with access to Huawei's proprietary ABIS interface could modify another manufacturer's base station controller to operate in the network and save the expense of replacing hundreds of base station towers. (*Id.* at 194:23-196:8.) Crowe opined that vendor level customer support cannot be provided without access to the confidential information of the manufacturer. (*Id.* at 196:13-197:18.)

**G. Kristian Kuhn Declaration**

The night before the evidentiary hearing, Motorola filed the declaration of Kristian Kuhn ("Kuhn"), Head of Managed Services for NSN. In the declaration, Kuhn stated that NSN had received Huawei confidential information pursuant to a managed services agreement between NSN and Nextel. Nextel purchased all of the equipment for its 3G telecommunications network from Huawei. Under the NSN-Nextel agreement, Nextel outsourced the maintenance of this equipment to NSN. At the hearing, Motorola claimed that the Nextel-NSN agreement proved that NSN already had Huawei confidential information and thus Huawei could not be irreparably harmed should Motorola provide NSN this same information.

Since the Kuhn declaration was filed after the close of briefing on the instant [*23] motion and neither Motorola nor NSN called Kuhn as a witness, the Court granted Huawei leave to file a response to this declaration. Huawei first noted that the Kuhn declaration was not supported with copies of any of the confidential documents Kuhn claimed were in NSN's possession. Huawei argued that the confidential information Kuhn referred to was information that Huawei provides to customers pursuant to a non-disclosure agreement to assist them in operating and maintaining the Huawei equipment they purchase. Huawei claimed customer level information is different from the confidential technical information related to the design and development of

Huawei products that Huawei provided Motorola. As an example, Huawei described the training it provides Motorola to allow it to sell and service the Huawei equipment as a vendor as distinct from the standard training Huawei provides its customers to assist them in operating and maintaining Huawei equipment. Huawei also noted that the Kuhn declaration did not state that NSN had received Huawei's proprietary ABIS interface or many of the other categories of confidential information that Huawei seeks to protect. Huawei supported its response [*24] with the declaration of Wu Haibin ("Haibin"), a Technical Product Manager at Huawei who is responsible for working with Nextel and NSN. Haibin attached several documents as exhibits to his declaration which disputed much of the Kuhn declaration. Haibin also included a copy of the customer training materials Huawei provided Nextel and NSN.

**FACTUAL FINDINGS**

1. Huawei has provided Motorola with Huawei confidential information to enable Motorola to provide vendor level support, service, and maintenance to Motorola's customers with Huawei equipment.

2. NSN will need the Huawei confidential information to provide the newly acquired Motorola customers with the same level of vendor support, service, and maintenance that Motorola provided.

3. As recently as January 10, 2011, Motorola proposed providing its former employees who transfer to NSN with access to Huawei confidential information.

4. NSN does not currently have any vendor level Huawei confidential information.

5. NSN has customer level Huawei confidential information that Huawei provides to its customers under non-disclosure agreements.

6. Huawei and NSN are direct competitors in the wireless networks infrastructure business.

7. NSN will gain [*25] an unfair competitive advantage if it obtains Huawei's vendor level confidential information without Huawei's consent.

8. As part of the Motorola/NSN transaction, NSN intends to acquire Motorola's wireless assets including Motorola's buildings, computers, and equipment.

9. NSN intends to employ former Motorola personnel to service, support, and maintain the Huawei equipment that NSN will acquire pursuant to the Motorola/NSN transaction.

10. Many of the Motorola employees involved with Huawei equipment will perform the same job responsibilities once they become NSN employees including providing support, service, and maintenance to customers with Huawei equipment with some employees even working in the same location.

11. The Motorola/NSN transaction has been delayed pending approval by MOFCOM.

12. Motorola has experienced a higher than average attrition rate in its wireless networks business which began prior to the commencement of this litigation.

13. If NSN obtains vendor level Huawei confidential information from Motorola before a Swiss arbitral panel has the opportunity to determine Motorola and Huawei's rights and obligations, the *status quo* will be altered leaving Huawei with inadequate [*26] relief.

## LEGAL STANDARDS AND CONCLUSIONS

A preliminary injunction is an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief. *Winter v. Nat'l Res. Def. Council, 555 U.S. 7, 129 S. Ct. 365, 376, 172 L. Ed. 2d 249 (2008)*. To determine whether a situation warrants such a remedy, plaintiffs must show: (1) that they are likely to succeed on the merits; (2) that they are likely to suffer irreparable harm without the injunction; (3) that the harm they would suffer is greater than the harm that the preliminary injunction would inflict on the defendants; and (4) that the injunction is in the public interest. *Judge v. Quinn, 612 F.3d 537, 546 (7th Cir. 2010)*. These considerations are interdependent such that "the greater the likelihood of success on the merits, the less net harm the injunction must prevent in order for preliminary relief to be warranted." *Id.* Taking into account all these considerations, the Court must exercise its discretion to arrive at a decision based on a subjective evaluation of the import of the various factors and a personal, intuitive sense about the nature of the case. *Girl Scouts of Manitou Council v. Girl Scouts of the United States of America, Inc., 549 F.3d 1079, 1085 (7th Cir. 2008)*.

**A.** [*27] **Threatened Misappropriation of Trade**

**Secret Claim**

A party seeking a preliminary injunction in a threatened misappropriations of trade secrets case must prove both the existence of a trade secret and a threatened misappropriation *PepsiCo, Inc. v. Redmond, 54 F.3d 1262, 1268 (7th Cir. 1995)* ("PepsiCo I"). A plaintiff may prove a claim of threatened misappropriation of trade secrets by demonstrating that new employment will inevitably lead employees to rely upon trade secrets gained during their previous employment. *PepsiCo I, 54 F.3d at 1269*. To determine whether a threatened misappropriation is actionable under the inevitable disclosure doctrine, the Court examines: (1) the level of competition between the owner of the trade secrets and the new employer; (2) whether the employees' position with the new employer is comparable to the position with the former employer; and (3) the actions the new employer has taken to prevent the new employees from using or disclosing the trade secrets. *PepsiCo, Inc. v. Redmond, 1995 U.S. Dist. LEXIS 19380, 1996 WL 3965, at *20 (N.D. Ill. 1996)* ("PepsiCo II"). Contractual prohibitions against disclosure of trade secrets are routinely rejected as insufficient to prevent inevitable disclosure [*28] or use. *1995 U.S. Dist. LEXIS 19380, [WL] at *21* (collecting cases).

Huawei has taken reasonable steps to maintain the secrecy of its confidential information including its ABIS interface specification, product and technical specifications, technology roadmaps, design and interface documentation, LTE statement of compliance and test case, original and design requirements, and configuration tools. These reasonable steps include marking any printed documents containing this information with the legend "Internal Use" or "Highly Confidential" and providing this information only under a non-disclosure agreement. Huawei derives economic value from this information not being generally known to its competitors who can benefit economically from the disclosure of this information. Huawei's confidential information constitutes a trade secret under the Illinois Trade Secrets Act, *765 ILCS 1065/1 et seq.* (West 2011).

As recently as January 10, 2011, Motorola proposed allowing its former employees who transfer to NSN to have access to Huawei confidential information stored at Motorola. While Motorola concedes that the Huawei-Motorola agreements prohibit Motorola from disclosing Huawei confidential information without

Huawei's [*29] consent, Motorola maintains that it has the right to disclose Huawei's confidential information to certain third parties. Motorola's proposal and it insistence that it can disclose Huawei trade secrets under certain circumstances, threaten to make Huawei confidential information available to Huawei's direct competitor NSN.

Similarly, NSN's intent to employ former Motorola personnel with access to Huawei confidential information to support, service, and maintain customers with Huawei equipment will inevitably cause these employees to use Huawei confidential information. While employees may use generalized skills and knowledge acquired during their previous employment, they cannot use particularized plans or processes disclosed to them by their previous employer which are unknown to others in the industry and which give the owner of such information an advantage over its competitors. *PepsiCo I, 54 F.3d at 1269*; *AMP, Inc. v. Fleischhacker, 823 F.2d 1199, 1202 (7th Cir. 1987)*.

In light of the above factors, the Court concludes that Huawei has a strong likelihood of succeeding on its threatened misappropriations of trade secrets claim against Motorola and NSN.

### B. Irreparable Harm

A party is [*30] irreparably harmed where the damages the party suffers are difficult to calculate or where the remedy comes too late to save the plaintiff's business. *Gateway E. Ry. Co. v. Terminal R.R. Ass'n of St. Louis, 35 F.3d 1134, 1140 (7th Cir. 1994)*. Where trade secrets are involved, the threat is significant that the harm experienced by a misappropriation will be irreparable. *IDS Fin'l Servs. v. Smithson, 843 F. Supp. 415, 418 (N.D. Ill. 1994)*. Since competitive position in an industry defies calculation, courts lack a reasonably precise method of calculating the pecuniary damage a corporation faces for its loss of competitive position sustained by the disclosure of its trade secrets and confidential information. *PepsiCo II, 1995 U.S. Dist. LEXIS 19380, 1996 WL 3965, at *30*.

The Court concludes that Huawei is likely to suffer irreparable harm if, without Huawei's consent and prior to arbitration, Motorola provides NSN with Huawei confidential information or if former Motorola employees use Huawei confidential information after transfering to NSN. In either case, NSN would gain an unfair competitive advantage at Huawei's expense.

### C. Balance of Hardships

There is a risk that NSN will walk away from the Motorola/NSN transaction [*31] if the Court enters an order that prevents Motorola from using its best efforts to effectuate the assignment of the Motorola-Huawei agreements. Neither Motorola nor NSN has presented any evidence that the injunctive relief proposed by Huawei will provide NSN with a basis to walk away from the pending transaction. Furthermore, the Motorola/NSN transaction may not close for other reasons including a lack of approval by MOFCOM. The evidence establishes that Motorola may suffer harm if the transaction does not close by April 30, 2011 but this same evidence fails to establish a causal connection between the transaction's success or failure and an injunction protecting Huawei's confidential information. The harms Motorola alleges it will suffer are attributable to causes other than the instant lawsuit. The increased attrition rate and the loss of market share that Motorola has experienced predate the filing of this action and stem from the uncertainty caused by the delay in closing the Motorola/NSN transaction. Neither Motorola nor NSN argue that Huawei is in any way responsible for this delay.

The Court finds that the balance of hardships weighs in Huawei's favor as the harm that it will [*32] suffer if Motorola and NSN are not enjoined is concrete and the causes are identifiable whereas the risk that the pending transaction will not close is speculative and the causes for such cannot yet be known.

### D. Public Interest

The public interest is well-served by enforcing valid agreements and protecting trade secrets. Trade secrets law serves to protect "standards of commercial morality" and encourage invention and innovation while maintaining the public interest in having free and open competition in the manufacture and sale of unpatented goods. *PepsiCo I, 54 F.3d at 1268*. The Court finds that the public interest favors granting an injunction to ensure that Huawei's trade secrets are protected and that its bargained-for right to meaningful arbitration is maintained.

### ORDER

Huawei has demonstrated that it has a reasonable likelihood of success on the merits of its threatened misappropriation of trade secrets claim against Motorola

and NSN relating to NSN's plan to acquire Motorola's networks business and hire former Motorola employees with knowledge of Huawei's trade secrets. Huawei has established that it will suffer irreparable competitive harm if its trade secrets are disclosed to [*33] NSN or are inevitably relied upon by former Motorola employees who transfer to NSN. The balance of hardships lies in its favor, and the public interest will be furthered by affording meaningful protection to Huawei's confidential information.

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT** effective immediately:

1. For purposes of this Order, "Huawei Confidential Information" includes information or documents provided to Motorola by Huawei that have not been publicly disclosed by Huawei and that constitute or relate to:

 o Huawei's ABIS interface design specifications, other design specifications, proprietary software and code for Huawei's wireless and core network techncologies and products, and any work derived thereof;

 o Huawei Offering Requirements ("OR"), Design Requirements ("DR"), Scenario Designs ("SD"), Service Scenario Analyses ("SSA"), "AR," and similar Huawei technical documents that contain detailed information about the design, features, functionality and operation of Huawei products;

 o Configuration Manuals, Configuration Specifications, Configuration Tools and other confidential configuration and pricing information and tools for Huawei products and system [*34] configurations;

 o Huawei's future market strategy and future products to the extent that Huawei has not made that information public (for example, product roadmaps that address future product plans);

 o Performance, operation, interoperability and standards compliance of Huawei's products (for example, testing reports and analyses, test cases, statements of compliance, feature lists and analyses, training information and materials);

 o Vendor service support and the resources, tools and systems used to provide those services (for example, pre-caution notices, problem reports and solutions made available to Motorola on Huawei's iCare system and Global Customer Request Management System, maintenance service documentation, tools and resources); and

 o Confidential information or trade secrets as defined by the Huawei-Motorola Agreements.

2. [*35] Huawei Confidential Information for purposes of this Order as it pertains to NSN shall not include information that NSN receives pursuant to a managed services agreement with a Huawei customer, provided that use of such information comports with the applicable agreements, including any non-disclosure agreement and any use restrictions relating to such information.

3. Defendant Motorola and its subsidiaries, affiliates, officers, directors, agents, employees, servants, licensors, successors, assigns, and all those acting in concert with them, are hereby enjoined from:

 o Disclosing Huawei Confidential Information to NSN, directly or indirectly, by any means;

 o Inducing, encouraging, or providing material aid to others to disclose or use Huawei's Confidential Information;

 o Granting NSN personnel access to Huawei Confidential Information or trade secrets; and

 o Transferring any records or assets to NSN, including but not limited to hard copy records, servers, databases, web-based or internet resources, mobile phones or other handheld devices used for

business purposes, personal computers, hard drives, computer hardware, computer memory, electronic or digital media, software, code of any type, [*36] and any equipment, prototypes, samples or parts, that contain, reference or disclose any Huawei Confidential Information.

4. Defendant NSN and its subsidiaries, affiliates, officers, directors, agents, employees, servants, licensors, successors, assigns, and all those acting in concert with them, are hereby enjoined from:

o Using Huawei Confidential Information disclosed to it by Motorola either directly or indirectly, for any purpose;

o Inducing, encouraging, or providing material aid to Motorola and its subsidiaries, affiliates, officers, directors, agents, employees, servants, licensors, successors, assigns, and all those acting in concert with them to disclose Huawei's Confidential Information to NSN;

o Granting NSN personnel access to Huawei Confidential Information or trade secrets that Huawei has made available to Motorola; and

o Acquiring any records or assets of Motorola, including but not limited to hard copy records, servers, databases, web-based or internet resources, mobile phones or other handheld devices used for business purposes, personal computers, hard drives, computer hardware, computer memory, electronic or digital media, software, code of any type, and any equipment, [*37] prototypes, samples or parts, that contain, reference or disclose any Huawei Confidential Information.

5. Defendants Motorola, NSN and their subsidiaries, affiliates, officers, directors, agents, employees, servants, licensors, successors, assigns, and all those acting in concert with them, are further ordered to comply with the following requirements to ensure that Motorola does not

transfer and NSN does not acquire or use any Huawei Confidential Information.

o Motorola and NSN shall take all necessary steps to ensure that Motorola does not transfer and NSN does not acquire any Huawei Confidential Information as part of NSN's acquisition of any records or assets of Motorola, including but not limited to hard copy records, servers, databases, web-based or internet resources, mobile phones or other handheld devices used for business purposes, personal computers, hard drives, computer hardware, computer memory, electronic or digital media, software, code of any type, and any equipment, prototypes, samples or parts.

o Before any Motorola records or assets that could contain Huawei Confidential Information are transferred from Motorola to NSN, Motorola and NSN shall retain a qualified third [*38] party vendor to inspect those records and assets to ensure that all Huawei Confidential Information has been removed and can no longer be recovered by any means.

o NSN shall maintain auditable records of all service it performs on Motorola-branded systems that include Huawei products. The records shall include the name of the customer, the location of the system or equipment being serviced, the problem reported, the resolution of the problem, the resources used to resolve the problem, and the name(s) of the NSN personnel who perform the servicing.

o NSN [*39] shall assign an employee in the United States who is familiar with this Order to be responsible for performing periodic audits on the service call records. Huawei shall have a right to audit the NSN service records on a monthly basis during the time period that this injunction is in effect, but only with

regard to records that relate to servicing of Huawei hardware and software products. In the event that it is not possible to segregate records relating to Huawei products, a qualified third party shall be retained to review the records, segregate records relating to Huawei products and provide Huawei with access to those segregated records.

o All Motorola employees who have had access to Huawei Confidential Information and who accept employment at NSN will be provided with notice of this Order and will be specifically informed, and will sign an undertaking, that (1) they cannot retain any Huawei Confidential Information when they move to NSN; (2) they cannot disclose any Huawei Confidential to any other employee or representative of NSN; and (3) they cannot use Huawei Confidential Information for any purpose once they have commenced employment at NSN

6. With respect to Motorola, this [*40] injunction is

to remain in effect until Huawei returns to this Court with enforceable interim relief from the arbitral tribunal or the arbitral tribunal denies Huawei's request for interim relief or until further order of this Court;

7. With respect to NSN, this injunction is to remain in effect until further order of the Court.

8. Huawei is ordered to post a security bond in the amount of $500,000 with the Clerk of the Court to pay the administrative costs and third party vendor fees associated with the auditing and monitoring system included in this injunction should it be determined that Motorola and NSN were wrongfully enjoined.

9. This Court's Temporary Restraining Order of January 24, 2011 as modified on January 27, 2011 and February 10, 2011 is hereby vacated.

**IT IS SO ORDERED.**

Date: February 22, 2011

By: /s/ Sharon Johnson Coleman

The Honorable Sharon Johnson Coleman

United States District Court Judge



14 of 24 DOCUMENTS



Positive
As of: Jan 28, 2013

**CSC HOLDINGS, INC., Plaintiff, v. GREENLEAF ELECTRONICS, INC., CHRISTINE ALONSO, KATHY "DOE", JOHN DOES 1-10, JANE DOES 1-10, UNIDENTIFIED CORPORATIONS 1-10, AND UNIDENTIFIED BUSINESS ENTITIES 1-10, Defendants.**

**Case No. 99 C 7249**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*2000 U.S. Dist. LEXIS 7675*

**June 1, 2000, Decided**
**June 2, 2000, Docketed**

**DISPOSITION:** [*1] Recommended that Plaintiff's Motion For Preliminary Injunction granted. Motion By Timothy L. Alonso & Anthony Serra To Intervene In Motion To Partially Dissolve Preliminary Injunction granted. Christine Alonso's Motion To Partially Dissolve Preliminary Injunction denied.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff moved for a preliminary injunction, a defendant moved to partially dissolve a preliminary injunction, and parties moved to intervene in the motion to partially dissolve the preliminary injunction in a case relating to pirating of cable services.

**OVERVIEW:** Plaintiff, a cable television operator, brought a motion for a preliminary injunction against defendants, who were engaged in the business of selling pirate cable television decoding devices for use on plaintiff's cable systems. A temporary restraining order had earlier been granted by the court, which enjoined defendants' further sales of the devices, provided for a freeze of defendants' business and personal assets, and allowed expedited discovery. Plaintiff was entitled to an equitable injunction. Plaintiff was likely to prevail on the merits of its claims, as it demonstrated the defendants likely were in violation of *47 U.S.C.S. § 553* and *17 U.S.C.S. § 1201*. Plaintiff would suffer irreparable harm, including the loss of revenue and subscribers as well as the loss of goodwill. The harm to defendants in granting the injunction was less than that to plaintiff, as defendants had no protectable interest in breaking the law. The injunction was in the public interest as it prevented conduct Congress declared illegal. Continuing the asset freeze was appropriate as plaintiff's complaint included claims for both monetary damages and equitable relief.

2000 U.S. Dist. LEXIS 7675, *1

**OUTCOME:** Grant of preliminary injunction recommended; plaintiff made the necessary showing with respect to each factor required for a preliminary injunction. Motion to intervene granted; the parties held accounts which had been affected by the asset freeze. Motion to partially dissolve preliminary injunction denied; the issuance of a preliminary injunction and a continued asset freeze were supported by the facts of the case.

**LexisNexis(R) Headnotes**

*Communications Law > Cable Systems > General Overview*
[HN1] See *47 U.S.C.S. § 553(a)(1).*

*Communications Law > Cable Systems > General Overview*
*Communications Law > Federal Acts > Cable Communications Policy Act*
*Communications Law > Theft of Services > Cable Services > General Overview*
[HN2] *47 U.S.C.S. § 553(a)(2)* defines the prohibition against "assisting" in intercepting or receiving an unauthorized communications service offered over a cable system to include the manufacture or distribution of illegal or "pirate" descrambling devices. Assisting in intercepting or receiving includes the manufacture or distribution of equipment intended by the manufacturer or distributor of equipment (as the case may be) for unauthorized reception of any communications service offered over a cable system in violation of subparagraph (1). Legislative history confirms that this subsection was primarily aimed at preventing the manufacture and distribution of so-called black boxes and other unauthorized converters which permit reception of cable service without paying for the service.

*Communications Law > Cable Systems > General Overview*
*Communications Law > Theft of Services > Cable Services > General Overview*
[HN3] The manufacture or sale of modified converter-decoders with specific knowledge or intent that the device will be used for unauthorized interception and decryption of cable television programming is a violation

of *47 U.S.C.S. § 553(a)(1).*

*Computer & Internet Law > Copyright Protection > Digital Millennium Copyright Act > Prohibited Conduct*
*Copyright Law > Digital Millennium Copyright Act > Prohibited Conduct*
*Copyright Law > Digital Millennium Copyright Act > Remedies*
[HN4] *17 U.S.C.S. § 1201* prohibits the circumvention of technological measures that control access to a copyrighted work.

*Computer & Internet Law > Copyright Protection > Digital Millennium Copyright Act > Prohibited Conduct*
*Copyright Law > Criminal Offenses > General Overview*
*Copyright Law > Digital Millennium Copyright Act > Prohibited Conduct*
[HN5] See *17 U.S.C.S. § 1201(a)(2).*

*Communications Law > Cable Systems > General Overview*
[HN6] *720 Ill. Comp. Stat. 5/16-10(a)(3)* prohibits the assistance or instruction of another person to obtain cable. Intent to defraud must also be present.

*Communications Law > Cable Systems > General Overview*
[HN7] 720 Ill. Comp. Stat. 5/16-12 prohibits knowingly selling or distributing cable decoders with intent to aid a person seeking unauthorized reception of cable services.

*Civil Procedure > Remedies > Injunctions > Elements > Public Interest*
*Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions*
[HN8] A plaintiff seeking a preliminary injunction has the burden of establishing: (1) the plaintiff's likelihood of prevailing on the merits of his claim; (2) that the plaintiff would suffer irreparable harm absent an injunction because the remedy at law would be inadequate; (3) that the harm to the defendant if the injunction were granted is less than the harm to the plaintiff if it were not; and (4) that the injunction is in the public interest. Affidavits and other evidence not admissible at trial may be considered at the preliminary injunction stage.

2000 U.S. Dist. LEXIS 7675, *1

*Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions*
*Copyright Law > Digital Millennium Copyright Act > Prohibited Conduct*
[HN9] A loss of goodwill or the loss of sales and the opportunity to maintain and develop relationships with existing customers can constitute irreparable injury.

*Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions*
[HN10] Illegal activities prohibited by federal law are not worthy of any protection.

*Civil Procedure > Judgments > Relief From Judgment > General Overview*
*Civil Procedure > Remedies > Injunctions > General Overview*
[HN11] In an action for a statutory injunction, once a violation has been demonstrated, the moving party need only show that there is a reasonable likelihood of future violations in order to obtain relief.

*Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions*
[HN12] 12 U.S.C.S. § 1203(b)(1) and *47 U.S.C.S. § 553(C)(2)(A)* explicitly allow the court to grant a preliminary injunction to the extent reasonable to prevent or restrain a violation.

*Civil Procedure > Remedies > Damages > Special Damages*
*Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions*
[HN13] 720 Ill. Comp. Stat. 5/16-13 provides for an injunction for any violation of *720 Ill. Comp. Stat. 5/16-10*, 5/16-11, or 5/16-12.

*Civil Procedure > Remedies > Damages > Monetary Damages*
*Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions*
[HN14] A court has no authority to issue a preliminary injunction preventing a party from disposing its assets pending adjudication of a claim for money damages. However, a court still has the equitable power to freeze a party's assets where injunctive relief is sought. The power to freeze assets includes cases where a combination of

monetary and equitable relief is sought.

*Civil Procedure > Judicial Officers > Magistrates > Objections*
*Civil Procedure > Appeals > Reviewability > Preservation for Review*
*Governments > Courts > Judges*
[HN15] When a matter has been referred to a magistrate judge, acting as a special master or § 636(b)(2) jurist, a party waives his right to appeal if he has not preserved the issues for appeal by first presenting them to the District Judge as objections to the magistrate judge's report.

COUNSEL: For CSC HOLDINGS INC, plaintiff: Linda K. Stevens, Schiff, Hardin & Waite, Chicago, IL.

For CSC HOLDINGS INC, plaintiff: Daniel J. Lefkowitz, Wayne R. Louis, Attorney at Law, Jericho, NY.

For CHRISTINE ALONSO, defendant: Thomas F. Howard, Jr., Attorney at Law, Bloomingdale, IL.

JUDGES: W. Thomas Rosemond, Jr., United States Magistrate Judge.

OPINION BY: W. Thomas Rosemond, Jr.

OPINION

### Report & Recommendation

Before the Court are Plaintiff's *Motion For Preliminary Injunction*; Defendant *Christine Alonso's Motion To Partially Dissolve Preliminary Injunction*; and the *Motion By Timothy L. Alonso & Anthony Serra To Intervene In The Motion To Partially Dissolve Preliminary Injunction*. Plaintiff's *Motion For Preliminary Injunction* is granted. The *Motion By Timothy L. Alonso & Anthony Serra To Intervene In The Motion To Partially Dissolve Preliminary Injunction* is granted. *Christine Alonso's* [*2] *Motion To Partially Dissolve Preliminary Injunction* is denied.

### Background.

On November 8, 1999 Plaintiff brought an *ex parte Motion For Temporary Restraining Order, For Preliminary Injunction, For Asset Freeze And*

*Accounting, And To Expedite Discovery*. On November 8, 1999, the District Judge granted an *ex parte Temporary Restraining Order* which provided for a freeze of Defendants' assets, an accounting, and expedited discovery. [1] Pursuant to the *Order*, Plaintiff posted a $ 15,000 bond with the Clerk of the Court. The *Motion For Preliminary Injunction* was referred to the Magistrate Judge. *Christine Alonso's Motion To Partially Dissolve Preliminary Injunction* and the *Motion By Timothy L. Alonso & Anthony Serra To Intervene In The Motion To Partially Dissolve The Preliminary Injunction* are also included within the scope of the referral. The Magistrate Judge held a preliminary injunction hearing on December 9, 1999.

> 1    District Judge's November 8, 1999 *Order* (docket entry # 10).

[*3] **FINDINGS OF FACT.**

1. Plaintiff is a cable television service provider that operates and maintains cable television systems pursuant to franchises awarded to it, which authorize it to construct, operate, and maintain cable television systems in communities located in parts of New York, New Jersey, Connecticut, Massachusetts, Ohio, and Michigan. Plaintiff offers cable television programming to subscribers who request and pay for the programming. [2]

> 2    Aff. of Donald Kempton, P 3 (Oct. 29, 1999).

2. Plaintiff's programming is offered to its subscribers in "packages" of programming services. "Basic" and "Family" are packages of programming services that a subscriber selects at a monthly rate. Subscribers may also elect to purchase one or more "premium" programming services, such as Cinemax, Home Box Office, and Showtime for an additional monthly charge per service. [3]

> 3    *Id.* at P 4.

[*4] 3. Plaintiff also offers pay-per-view programming, a service enabling subscribers to purchase individual movies, sporting events, or other entertainment for a per event fee over and above the subscriber's regular monthly subscription fee. [4]

> 4    *Id.*, at P 5.

4. Each subscriber is entitled to receive only that level of programming and services that he or she selects and purchases. [5]

> 5    *Id.*, at P 6.

5. The signals for all of Plaintiff's cable television services, many of which originate as over-the-air satellite signals, are transmitted from Plaintiff's reception facilities to subscribers' homes through a network of cable wiring and equipment (the "System"). In order for a subscriber to receive these transmitted "non-broadcast" cable television signals on his or her television set, Plaintiff provides each subscriber with a device [*5] known as a "converter", which converts the signals of multiple services simultaneously transmitted over the System into different "channels" which can be viewed clearly on a subscriber's television set. [6]

> 6    *Id.*, at P 7-8.

6. Plaintiff's signals are private telecommunications not intended for public use. [7]

> 7    *Id.*, at P 14.

7. To prevent subscribers from receiving programming services for which they have not paid, Plaintiff encodes or "scrambles" the signals for specific programming services. Subscribers purchasing scrambled programming services are provided with a device known as a "decoder", which is incorporated into a converter. Together, they are called a "converter-decoder". This device decodes the scrambled signals so that the programming selected and purchased can be viewed clearly on a subscriber's television set. Programming [*6] services not purchased, therefore, will continue to be scrambled and will be unviewable on the subscriber's television set. [8]

> 8    *Id.*, at P 8.

8. Encoding or "scrambling" is a primary security method employed by Plaintiff (and most cable systems) to prevent subscribers from receiving programming services for which they have not paid. [9]

> 9    *Id.*, at P 9.

9. The authorized converter-decoders provided by Plaintiff to its subscribers each have the function and feature known as "addressability". An addressable converter-decoder is one which, when attached to the System, can communicate with Plaintiff's central

computer. The feature and function of addressability is essential to the billing of pay-per-view programs. The reception of a pay-per-view program is authorized when a command is sent from the central computer of the System to the [*7] converter-decoder of the purchasing subscriber. This command instructs the converter-decoder to decode the otherwise unscrambled picture of the pay-per-view program to be shown. A charge for the purchased pay-per-view program is documented and generated by the System's central computer only when the corresponding purchase order and authorization command for the viewing of a pay-per-view program is received and acted upon through the addressability function and feature of the subscriber's converter-decoder. [10]

10   *Id.*, at P 10.

10. It is possible for a dishonest individual to install an unauthorized or "pirate" cable television decoding device (one programmed to descramble all programming services) onto Plaintiff's cable system in order to receive all of Plaintiff's scrambled programming, without authorization and without making payment therefor. In most cases, Plaintiff cannot detect or prevent the theft of its programming services from such devices without affirmative permission from a subscriber to conduct [*8] an on-site inspection. [11]

11   *Id.*, at P 11.

11. Defendant Greenleaf is an Illinois corporation, organized on May 7, 1991. Greenleaf's place of business is at 801 Eagle Drive, Bensenville, Illinois. [12]

12   Aff. of Joseph Flaim, P 4 (Oct. 29, 1999); *see also* Plaintiff's Ex. 1.

12. Defendant Christine Alonso is Greenleaf's President and Secretary. [13]

13   *Id.; see also* R. at 28.

13. Defendant Alonso was on Greenleaf's payroll as early as 1991. [14]

14   Plaintiff's Ex. 4.

14. Defendant [*9]  Alonso signed checks on behalf of Greenleaf. [15]

15   Plaintiff's Ex. 5.

15. Defendants Greenleaf and Alonso have engaged in the business of selling for profit unauthorized or "pirate" cable television decoding devices for use on Cablevision's cable systems. [16]

16   *Id.* at PP 5-17.

16. The decoding devices sold by Defendants are not practicably detectable by Plaintiff, meaning that they are capable of defeating or circumventing Plaintiff's software-driven electronic security measures that have as their sole purpose the disabling of "pirate" decoding devices. [17]

17   *Id.* at PP 14, 17.

17. Defendants advertised and marketed their products to Plaintiff's cable [*10] television subscribers *via* publications with national distribution and, in the process of selling their decoding devices, indicated that the devices were for use on Plaintiff's cable television system. [18]

18   *Id.* at PP 2, 5, & 15.

18. In or around March, 1999, Plaintiff commenced its investigation of Greenleaf based on Greenleaf's advertisements in publications with national circulation such as *Nuts & Volts* magazine. [19]

19   Aff. of Donald Kempton, P 15; Aff. of Joseph Flaim, P 2.

19. On March 4, 1999, Flaim called the telephone number listed in Greenleaf's advertisement and purchased a "Storm Plus" descrambling device. During the call, Flaim spoke to someone who identified herself as "Chris". [20]

20   Aff. of Joseph Flaim, P 5.

[*11]  20. On March 10, 1999, Flaim received a Federal Express package from "Chris" at Greenleaf Electronics, 801 Eagle Drive, Bensenville, Illinois, in which he found the decoding device he ordered on March 4, 1999. [21]

21   Aff. of Joseph Flaim, P 6; *see also* Plaintiff's Ex. 2.

21. On March 10, 1999, Flaim tested the device and found it to be inoperable. [22]

22  Aff. of Joseph Flaim, P 7.

22. After attempting with the assistance of a Greenleaf representative to get the device to function, Flaim returned the device to Greenleaf for an exchange. He received a replacement device on April 14, 1999. [23]

23  Aff. of Joseph Flaim, PP 8-13; *see also* Plaintiff's Ex. 2.

[*12] 23. On April 15, 1999, Flaim tested the device and found it to be capable of permitting a television set attached to Plaintiff's Nassau County, New York system to receive all of Plaintiff's scrambled premium and pay-per-view services without authorization. [24]

24  Aff. of Joseph Flaim, P 14.

24. On April 21, 1999, Flaim again called Greenleaf and ordered a descrambling device for use on Plaintiff's Long Island, New York cable system. [25]

25  *Id.* at P 15.

25. On April 23, 1999, Flaim received a Federal Express package from "Chris" at Greenleaf Electronics, Inc., 801 Eagle Drive, Bensenville, Illinois, which contained the device he ordered on April 21, 1999. [26]

26  Aff. of Joseph Flaim, P 16; Plaintiff's Ex. 3.

[*13] 26. On April 23, 1999, Flaim tested the device and found it to be capable of permitting a television set attached to Plaintiff's Nassau County, New York system to receive all of Plaintiff's scrambled premium and pay-per-view services without authorization. [27]

27  Aff. of Joseph Flaim, P 17.

27. On March 16, 1999, an Illinois private investigator retained by Cablevision conducted initial surveillance at Greenleaf's address. The structure at this address is a one story brick building, approximately 40' x 120' with a loading dock and garage bay door. It is located within an industrial park. The private investigator observed five vehicles outside the location, including one which was leased by a "Timothy Alonso". [28]

28  *Id.* at P 18.

28. On March 18, 1999, Flaim conducted additional surveillance at the Defendants' business location. On [*14] that day, he again observed the vehicle leased by Timothy Alonso parked outside the building. While conducting the surveillance, Flaim also inspected Defendants' trash, which had been left outside for pickup. One item he recovered was a United Parcel Service Tracking Summary, used to determine whether a UPS package had been delivered. This document, a copy of which was attached to his affidavit as Exhibit H, showed that a package delivered to Greenleaf was received on March 12, 1999 by "Alonso". [29]

29  *Id.* at PP 19-20.

29. On May 5, 1999, Flaim returned to Greenleaf's business location to conduct additional surveillance. He observed a Federal Express truck driver enter the building and then return to his truck several minutes later carrying a shipping box that was similar in size and shape to those Flaim had received from Greenleaf when he ordered decoding devices. Flaim also observed that the vehicle leased by "Timothy Alonso" was among the vehicles parked outside the business location. [30]

30  *Id.* at P 21.

[*15] 30. On November 8, 1999, Plaintiff sought an *ex parte* temporary restraining order. A temporary restraining order ("TRO") was entered by the Court. The TRO enjoined Defendants' further sales of cable television decoding devices; provided for a freeze of Defendants' business and personal assets; and allowed expedited discovery. The Court's review of Plaintiff's application indicated that Plaintiff had made out a *prima facie* case for the award of such relief and that the need for each aspect of the relief sought therein was clear. Defendants were subsequently served with copies of the *Summons* and *Complaint*, along with the TRO and Plaintiff's application therefor.

31. After the TRO was entered, Plaintiff learned that Comcast Cablevision ("Comcast"), a cable television operator similar to Plaintiff had been involved in the execution of a search warrant and seizure in 1997 in Las Vegas, Nevada, against a distributor of "pirate" cable television decoding devices known as Teleview Distributors ("Teleview"). Present at the seizure were individuals named Santo LaMantia and Bruce Quacquarini. [31]

31    Supp. Aff. of Joseph Flaim, P 2 (Dec. 8, 1999); Aff. of William Bowyer, PP 2-4 (Nov. 15, 1999).

[*16] 32. As a result, Plaintiff procured an affidavit from William Bowyer, who is employed by Comcast and was present at the search warrant execution and seizure, describing these events. [32]

32    Aff. of Joseph Flaim, P 2.

33. Among the items seized at the search warrant execution and seizure at Teleview were business records, including approximately 8,600 decoding device sales invoices of Defendant Greenleaf Electronics, located at 801 Eagle Drive, Bensenville, Illinois. These invoices cover the time period of December 16, 1996 to September 10, 1997. [33]

33    Supp. Aff. of Joseph Flaim, P 3; *see also* Ex. A to Supp. Aff. of Joseph Flaim; Plaintiff's Ex. 4, 5, & 6.

34. An examination of Plaintiff's exhibits 4, 5, and 6 reveals that in addition to Christine Alonso, the following individuals are among those who were either on the payroll of [*17] Greenleaf, or signed checks on behalf of Greenleaf: Bruce Quacquarini, Tom LaMantia, Santo LaMantia, James Marx, Violet LaMantia, Pamela LaMantia, and Joann LaMantia. [34]

34    Plaintiff's Ex. 4, 5, & 6.

35. Plaintiff requested from Comcast the Greenleaf invoices and other records. Comcast sent them to Plaintiff. [35]

35    Supp. Aff. of Joseph Flaim, P 4.

36. Flaim analyzed the Greenleaf invoices in order to identify the ones that reflect sales to customers who reside in Plaintiff's franchise areas, and to determine whether those invoices reflect sales of "pirate" cable decoding devices. [36]

36    *Id.* at P 5.

37. Of the invoices Flaim analyzed, 183 of them are Greenleaf [*18] invoices to customers who reside in Plaintiff's franchise areas. Those 183 invoices reflect Greenleaf's sales of 224 "pirate" cable television decoding devices. [37]

37    *Id.* at P 7.

38. The TRO was extended on consent of the parties and a hearing was held on December 9, 1999, at which the parties had the opportunity to offer testimony and evidence and make legal arguments.

39. Due to Defendants' sales of "pirate" decoders, Plaintiff has suffered and will continue a suffer a loss of sales and a loss of goodwill. More specifically, Plaintiff's goodwill loss can be described as damage to the value of its franchise(s) and to the value of Plaintiff's existing customers due to the fact that many of Plaintiff's existing customers can utilize Defendants' "pirate" decoders in order to receive Plaintiff's premium programming without paying for it.

40. The harm done by Defendants' sales of decoders is ongoing and is difficult to stop or ascertain since Plaintiff's ability to detect the use of such devices is limited [*19] at best.

41. There is a substantial likelihood that Defendant will continue its operations absent an injunction.

42. Greenleaf is a carefully planned, fraudulent enterprise that has been in operation for several years.

43. There are significant ties between Greenleaf and Teleview. The ties suggest that Defendants' enterprise is large in scope and that Defendants' may easily be able to continue business by moving its business location.

44. Defendants knew or intended that the "pirate" decoders would be used to fraudulently obtain cable services.

### CONCLUSIONS OF LAW

1. Any finding of fact which may be deemed a conclusion of law shall be deemed a conclusion of law. Any conclusion of law which may be deemed a finding of fact shall be deemed a finding of fact.

2. This action arises under *47 U.S.C. § 553, et seq.*, *17 U.S.C. § 1201, et seq.*, and 720 ILCS 5/16-10, *et seq.* The Court has jurisdiction over this action under *28 U.S.C. § 1331* and has supplemental jurisdiction over the Illinois statute and common law constructive trust claims asserted in the complaint. Venue is properly established [*20] in the Northern District of Illinois pursuant to *28 U.S.C. § 1391 (b).*

Case: 1:12-cv-07967 Document #: 24-2 Filed: 01/28/13 Page 42 of 45 PageID #:401

Page 8
2000 U.S. Dist. LEXIS 7675, *20

### I. Plaintiff's Causes of Action

3. **47 U.S.C. § 553, et seq**: Plaintiff has proprietary rights in the cable programming services offered over its cable systems. It is a "person aggrieved" by violations of the Communications Act and is thereby authorized to institute this action under *47 U.S.C. § 553 (c)(1).* [HN1] *47 U.S.C. § 553(a)(1)* provides:

> No person shall intercept or receive or assist in intercepting or receiving any communications service offered over a cable system, unless specifically authorized to do so by a cable operator or as may otherwise be specifically authorized by law.

[HN2] Subsection 553(a)(2) defines the prohibition against "assisting" in this activity to include the manufacture or distribution of illegal or "pirate" descrambling devices. "Assisting in intercepting or receiving" includes the manufacture or distribution of equipment intended by the manufacturer or distributor of equipment (as the case may be) for unauthorized reception of any communications service offered [*21] over a cable system in violation of subparagraph (1). [38] Legislative history confirms that subsection 553(a)(2) was "primarily aimed at preventing the manufacture and distribution of so-called 'black boxes' and other unauthorized converters which permit reception of cable service without paying for the service." [39]

38   *47 U.S.C. § 553(a)(2).*
39   H.R. Rep. No. 934, 98th Cong., 2d Sess. 84 (1984), reprinted in U.S. Code Cong. & Admin. News 4655, 4721.

[HN3] The manufacture or sale of modified converter-decoders with specific knowledge or intent that the device will be used for unauthorized interception and decryption of cable television programming is a violation of *47 U.S.C. § 553(a)(1).* [40]

40   *United States v. Norris, 88 F.3d 462, 466 (7th Cir. 1996)*; *United States v. Gardner, 860 F.2d 1391, 1394 (7th Cir. 1988).*

[*22] 4. **17 U.S.C. § 1201, et seq**: Plaintiff has proprietary rights in technological measures it uses to effectively control access to works protected under the Copyright Act. [HN4] *17 U.S.C. § 1201* prohibits the circumvention of technological measures that control access to a copyrighted work. Plaintiff is a person injured by a violation of *17 U.S.C. § 1201 (a)(2)* and is thereby authorized to bring this action under *17 U.S.C. § 1203 (a).* [41]

41   [HN5] *17 U.S.C. § 1201 (a)(2)* provides that "No person shall manufacture, import, offer to the public, provide, or otherwise traffic in any technology, product, service, device, component, or part thereof, that (A) is primarily designed or produced for the purpose of circumventing a technological measure that effectively controls access to a work protected under [the Copyright Act]".

5. [HN6] **720 ILCS 5/16-10, et seq.**: *720 ILCS 5/16-10(a)(3)* prohibits [*23] the assistance or instruction of another person to obtain cable. Intent to defraud must also be present. [720 ILCS 5/16-12] prohibits knowingly selling or distributing cable decoders with intent to aid a person seeking unauthorized reception of cable services.

### II. Preliminary Injunctive Relief

6. **Plaintiff is entitled to an equitable injunction.** [HN8] A plaintiff seeking a preliminary injunction has the burden of establishing: (1) the plaintiff's likelihood of prevailing on the merits of his claim; (2) that the plaintiff would suffer irreparable harm absent an injunction because the remedy at law would be inadequate; (3) that the harm to the defendant if the injunction were granted is less than the harm to the plaintiff if it were not; and (4) that the injunction is in the public interest. [42] Affidavits and other evidence not admissible at trial may be considered at the preliminary injunction stage. [43] The Court finds that Plaintiff has made the necessary showing with respect to each of these factors.

42   *MacDonald v. Chicago Park Dist., 132 F.3d 355, 357 (7th Cir. 1997)*; *Meridian Mut. Ins. Co. v. Meridian Ins. Group, Inc., 128 F.3d 1111, 1114 (7th Cir. 1997)*; *Erickson v. Trinity Theatre, Inc., 13 F.3d 1061, 1067 (7th Cir. 1994).*

[*24]
43   *Illinois ex rel Hartigan v. Peters, 871 F.2d 1336, 1342 (7th Cir. 1989).*

a. **Plaintiff has clearly demonstrated a likelihood of success on the merits of its claims**, both with respect to

controlling case law and the undisputed facts regarding Defendants' "pirate" decoding device sales operation. First of all, Plaintiff has demonstrated that Defendants are likely in violation of *47 U.S.C. § 553* which prohibits assisting in the unauthorized reception or interception of cable television programming. Additionally, Plaintiff has demonstrated that Defendants are likely in violation of *17 U.S.C. § 1201* which prohibits the circumvention of technological measures which are designed to control access to a copyrighted work. Finally, Plaintiff has demonstrated that Defendants are likely in violation of *720 ILCS 5/16-10* and 5/16-12, which prohibit the fraudulent assistance of another in obtaining cable and prohibit knowing sale or distribution of "pirate" decoders with intent to aid in unauthorized reception.

b. *Plaintiff has* [*25] *shown irreparable injury.* With respect to irreparable injury, Plaintiff has presented evidence describing the loss of revenue and subscribers resulting from the distribution of decoding devices, and the practical inability of Plaintiff to detect the presence of and eliminate the loss of revenue resulting from "pirate" decoder boxes.

Additionally, [HN9] a loss of goodwill [44] or the loss of sales and the opportunity to maintain and develop relationships with existing customers can constitute irreparable injury. [45] Plaintiff has suffered a loss of goodwill and of its ability to maintain sales to certain existing customers. Additionally, without the temporary remedy of an injunction, there is no guarantee that Defendants will not continue to engage in violations of *47 U.S.C. § 553* and *17 U.S.C. § 1201*, causing further irreparable harm.

  44 *Meridian Mut. Ins. v. Meridian Ins. Group, Inc., 128 F.3d 1111, 1121 (7th Cir. 1997); Gateway E. Ry. Co. v. Terminal R.R. Ass'n of St. Louis, 35 F.3d 1134, 1139-40 (7th Cir. 1994);see also Abbott Labs. v. Mead Johnson & Co., 971 F.2d 6, 16 (7th Cir. 1992).*
[*26]
  45 *Duct-O-Wire Co. v. U.S. Crane, Inc., 31 F.3d 506, 509-10 (7th Cir. 1994).*

c. *Plaintiff has no adequate remedy at law.* Any adequate remedy for Plaintiff would necessarily have to include equitable relief that would prevent Defendants from selling additional "pirate" decoder boxes in the future.

d. *A balancing of the parties' respective hardships reveals* that the injunction means only that Defendants will be enjoined from conducting a business that is prohibited by federal law. [HN10] Such illegal activities are not worthy of any protection. [46] The mere illegality of the production of "pirate" decoders was insufficient to prevent Defendants from successfully selling such decoders for years. The continued sale of such decoders constitutes continuing, largely unquantifiable, irreparable harm upon Plaintiff's business integrity and revenues. Therefore, the balance of hardships in this case leans strongly towards Plaintiff's request for a preliminary injunction.

  46 *ON/TV of Chicago v. Julien, 763 F.2d 839, 844 (7th Cir. 1985).*

[*27] Defendants' illegal modification or distribution of cable television decoding devices acts against the public interest. Conversely, stopping such behavior promotes the public interest by preventing conduct Congress declared illegal in *47 U.S.C. § 553.* An injunction would be in the public interest since it would promote the enforcement of federal and state law; reduce costs to law-abiding cable subscribers by reducing their subsidization of cable service theft [47]; and would support the protection of intellectual property rights.

  47 *See* H.R. Rep. No. 934, 98th Cong., 2d Sess. 84 (1984), reprinted in U.S. Code Cong. & Admin. News 4655, 4720.

7. *Plaintiff also meets the requirements for a statutory injunction.* Although we are granting the injunction on equitable grounds, we note that Plaintiff would also meet the requirements for a statutory injunction under either federal or state statutes. If we had not concluded that Plaintiff met the requirements for an equitable injunction, [*28] we still would have granted an injunction based on the statutes.

8. *An injunction could be granted on federal statutory grounds.* [HN11] In an action for a statutory injunction, once a violation has been demonstrated, the moving party need only show that there is a reasonable likelihood of future violations in order to obtain relief. [48] [HN12] The federal statutes under which Plaintiff brings its claim explicitly allow the Court to grant a preliminary injunction to the extent reasonable to prevent or restrain a violation. [49] The evidence suggests that there is a reasonable likelihood of future violations, to-wit:

continued sales of "pirate" decoders. If we were not granting the preliminary injunction on equitable grounds, we would do so on federal statutory grounds.

> 48   *SEC v. Holschuh, 694 F.2d 130, 144 (7th Cir. 1982)*; *CFTC v. Hunt, 591 F.2d 1211, 1220 (7th Cir. 1979)*.
> 49   *See* 12 U.S.C. § 1203 (b)(1); *47 U.S.C. § 553 (C)(2)(A)*.

[*29]   9.  ***An injunction could be granted as provided for in the Illinois statutes***. We are granting the preliminary injunction on equitable grounds, but if we were not doing so, we would grant a preliminary injunction as provided for in the Illinois statute, 720 ILCS 5/16-13(c). [HN13] 720 ILCS 5/16-13 provides for an injunction for any violation of *720 ILCS 5/16-10, 5/16-11, or 5/16-12*. Plaintiff has demonstrated a likelihood of success under both 5/16-10 and 5/16-12. Consequently, 720 ILCS 5/16-13 would allow for an injunction ***without*** special damages, irreparable harm, or inadequate legal remedies.

10.  ***Continuing the asset freeze is appropriate***. [HN14] A court has no authority to issue a preliminary injunction preventing a party from disposing its assets pending adjudication of a claim ***for money damages***. [50] However, a court still has the equitable power to freeze a party's assets where injunctive relief is sought. [51] The power to freeze assets includes cases where a combination of monetary and equitable relief is sought. [52] Plaintiff's *Amended Complaint* includes claims for both monetary damages and equitable relief. Plaintiff seeks equitable relief which [*30] includes an injunction to prevent Defendants' sale or distribution of "pirate" decoders; impoundment and destruction of existing illegal decoders; and a constructive trust on the illicit revenue from the sales of such decoders. [53] Plaintiff seeks monetary relief which includes actual or statutory damages and punitive damages. [54]

> 50   *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc., 527 U.S. 308, 333, 144 L. Ed. 2d 319, 119 S. Ct. 1961 (1999)*.
> 51   *Deckert v. Independence Shares Corp., 311 U.S. 282, 289-90, 85 L. Ed. 189, 61 S. Ct. 229 (1940)*; *United States ex rel Rahman v. Oncology Assoc., P.C., 198 F.3d 489, 496-97 (4th Cir. 1999)*.
> 52   *Rahman, 198 F.3d at 498* (*citing Deckert, 311 U.S. at 289-90*).

> 53   Plaintiff's *Amended Complaint*, at 15-17.
> 54   *Id.*

Continuing the asset freeze is appropriate because it would preserve the availability of a constructive trust as a remedy; make it easier [*31] to impound and destroy existing illegal decoders; and facilitate further equitable relief preventing future sales of "pirate" decoders by making it more difficult for Defendants to simply pick up and move their enterprise to a new location.

***III.  Christine Alonso's Motion To Partially Dissolve The Preliminary Injunction is denied***.

11. We are granting leave to intervene in the motion to partially dissolve the preliminary injunction to non-parties Timothy L. Alonso and Anthony Serra. It appears that Timothy L. Alonso and Anthony Serra hold joint accounts (with Christine Alonso) which have been affected by the asset freeze portion of the TRO. Therefore, they should be allowed to intervene in the motion.

12. ***Christine Alonso's Motion To Partially Dissolve The Preliminary Injunction*** is denied. As detailed throughout the body of this *Order*, the facts and applicable case law support the issuance of a preliminary injunction and a continued asset freeze. Christine Alonso's affidavit and the extremely limited showing by Ms. Alonso at the preliminary injunction hearing do not suggest otherwise.

Additionally, the interveners present no persuasive arguments. The only [*32] case cited by the interveners, *United States v. Gotti*, is completely inapplicable to the current case because it specifically addresses whether a post-indictment, pre-trial restraint of substitute assets is allowed ***under the RICO statutes***. [55] Timothy L. Alonso and Anthony Serra have not cited any case law to support their assertions that the bank accounts that they jointly hold with Defendant Christine Alonso should not be subject to an asset freeze.

> 55   *155 F.3d 144, 147 (2d. Cir. 1998)*.

***Accordingly, it is adjudged and recommended as follows:***

1. Plaintiff's *Motion For Preliminary Injunction* is granted.

2. *Motion By Timothy L. Alonso & Anthony Serra To*

*Intervene In The Motion To Partially Dissolve Preliminary Injunction* is granted.

3. *Christine Alonso's Motion To Partially Dissolve Preliminary Injunction* is denied.

4. The relief ordered by the District Judge in the November 8, 1999 *Temporary Restraining Order* is hereby continued until the entry of judgment [*33] or dismissal.

5. Pursuant to *Rule 72(b) of the Federal Rules of Civil Procedure*, the parties must file their objections to the ***Report and Recommendation*** with The Honorable James F. Holderman within 10 days after being served with a copy of the Report. Failure to file objections within the specified time period waives the right to appeal the Magistrate Judge's Report. 56

56 *Video Views, Inc. v. Studio 21, Ltd., 797 F.2d 538 (7th Cir. 1986). See also, The Provident Bank v. Manor Steel Corp., 882 F.2d 258, 261 (7th Cir. 1989)* [HN15] (when a matter has been referred to a Magistrate Judge, acting as a special master or § 636(b)(2) jurist, a party waives his right to appeal if he has not preserved the issues for appeal by first presenting them to the District Judge as objections to the Magistrate Judge's Report).

***So Recommended.***

Dated: June 1, 2000

W. Thomas Rosemond, [*34] Jr.

United States Magistrate Judge