**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| Yellow Group LLC; Yellow Cab Affiliation Inc.; Taxi Affiliation Services LLC; Taxi Medallion Management, LLC; YC1 LLC; YC2 LLC; YC17 LLC; YC18 LLC, YC19 LLC; YC20 LLC, YC21 LLC; YC22 LLC; YC25 LLC; YC26 LLC; YC29 LLC; YC32 LLC; YC37 LLC; YC49 LLC; YC51 LLC; YC52 LLC; YC56 LLC; 5 Star Flash, Inc.; Chicago Medallion One LLC; Chicago Medallion Five LLC; Chicago Medallion Six LLC; Chicago Medallion Seven LLC; Chicago Medallion Eleven LLC; and Your Private Limousine, Inc., | **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT UBER TECHNOLOGIES, INC.'S MOTION TO DISMISS** <br><br> CIVIL ACTION NO. 12-CV-7967 <br><br> RELATED TO <br> CIVIL ACTION NO. 13-CV-2407 <br> Judge Sara Ellis |
|        Plaintiffs, | |
|    vs. | |
| Uber Technologies, Inc., | |
|        Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT
UBER TECHNOLOGIES, INC.'S MOTION TO DISMISS**

Case: 1:12-cv-07967 Document #: 83 Filed: 12/12/13 Page 2 of 26 PageID #:1371


**TABLE OF CONTENTS**

Page

Introduction ..................................................................................................................1

Argument ......................................................................................................................2

I.     The Medallion Plaintiffs And YPL Lack Standing To Bring False Association Claims Against Uber Under Section 43(a)(1)(A) Of The Lanham Act. ..............................2

II.    All Plaintiffs Lack Standing To Bring False Advertising Claims Against Uber Under Section 43(a)(1)(B) Of The Lanham Act. ..................................................3

III.   Even If All Plaintiffs Have Standing To Sue Uber For False Advertising Under Section 43(a)(1)(B) Of The Lanham Act, Plaintiffs Fail To State A Claim. .....................6

     A.     Uber's Alleged Misrepresentations About The Nature Of Its Business And Its "Premium Services" Are Nonactionable Puffery ................................7

     B.     Uber's Billing/Payment Practices Are Not Illegal And Do Not Give Rise To A False Advertising Claim Under The Lanham Act. ...........................8

     C.     Plaintiffs Fail To State A Claim Based On Uber's Alleged Misrepresentations Regarding Drivers' Licensure And Insurance Coverage ........10

        1.     Plaintiffs Do Not Allege Actual Misrepresentations Regarding Drivers Using The uberX Platform. ..........................................10

        2.     Plaintiffs Do Not Allege Actual Misrepresentations Regarding Taxi Or Livery Drivers. ...........................................................12

        3.     Plaintiffs Do Not Articulate Any Injury Resulting From Uber's Allegedly Misrepresenting Its Insurance And Licensing Practices Relating To Taxi And Livery Services. .......................................13

     D.     The Alleged Illegality Of Uber's Operations Cannot Form The Basis Of A Claim Under Section 43(a)(1)(B) Of The Lanham Act. .........................13

        1.     Use of Uber Does Not Affect Mandatory Data Collection. ......................14

        2.     Plaintiffs Cannot Use The Lanham Act As A Backdoor Method To Have A Federal Court Interpret Local Ordinances. ....................................15

IV.   Yellow And Flash Fail To State A Claim For False Association Under Section 43(a)(1)(A) Of The Lanham Act. .....................................................17

V.     This Court Should Resolve Plaintiffs' Illinois Statutory And Common-Law Claims According To The Same Principles Their Lanham Act Claims. ..........................18

VI.  Plaintiffs Fail To State A Claim For Tortious Interference With Contractual
     Relations Under Illinois Common Law. ............................................................... 19

Conclusion ............................................................................................................................. 20

## <u>TABLE OF AUTHORITIES</u>

Cases

*Abbott Laboratories v. Mead Johnson & Co.*,
    971 F.2d 6 (7th Cir. 1992) ...................................................................................9

*Almblad v. Scotsman Indus., Inc.*,
    13-CV-1297, 2013 WL 4600209 (N.D. Ill. Aug. 28, 2013)....................................5

*BASF Corp. v. Old World Trading Co., Inc.*,
    41 F.3d 1081 (7th Cir. 1994) ...............................................................................9

*BlueStar Mgmt. v. The Annex Club, LLC*,
    09 C 4540, 2010 WL 2802213 (N.D. Ill. July 12, 2010).....................................22

*Cont'l Datalabel, Inc. v. Avery Dennison Corp.*,
    09 C 5980, 2012 WL 5467667 (N.D. Ill. Nov. 9, 2012)........................................8

*Cromeens, Holloman, Sibert, Inc. v. AB Volvo*,
    349 F.3d 376 (7th Cir. 2003) .............................................................................22

*Datalabel, Inc. v. Avery Dennison Corp.*,
    2013 WL 1707945 (N.D. Ill. Apr. 19, 2013)........................................................8

*Dial A Car, Inc. v. Transp., Inc.*,
    82 F.3d 484 (D.C. Cir. 1996).......................................................................17, 18

*Dial A Car, Inc. v. Transp., Inc.*,
    884 F. Supp. 584 (D.D.C. 1995) .......................................................................18

*Dovenmuehle v. Gilldorn Mortgage Midwest Corp.*,
    871 F.2d 697 (7th Cir. 1989) ...............................................................................2

*Flava Works, Inc. v. Gunter*,
    10 C 6517, 2011 WL 1791557 (N.D. Ill. May 10, 2011) ..............................19, 20

*Gail Green Licensing & Design, Ltd. v. Accord, Inc.*,
    No. 05 C 5303, 2006 WL 2873202 (N.D. Ill. Oct. 5, 2006)..................................5

*Goodloe v. Nat'l Wholesale Co., Inc.*,
    No. 03 C 7176, 2004 WL 1631728 (N.D. Ill. July 16, 2004)................................5

*Ho v. Taflove*,
    696 F. Supp. 2d 950 (N.D. Ill. 2010) .................................................................22

*Hot Wax, Inc. v. Turtle Wax, Inc.*,
    191 F.3d 813 (7th Cir. 1999) .........................................................................8, 14

iii

*Johnny Blastoff, Inc. v. Los Angeles Rams Football Co.*,
    188 F.3d 427 (7th Cir. 1999) ................................................................4

*L.S. Heath & Son, Inc. v. AT & T Info. Sys., Inc.*,
    9 F.3d 561 (7th Cir. 1993) ..................................................................4

*M. Arthur Gensler, Jr. & Assocs., Inc. v. Strabala*,
    No. 11 C 3945, 2012 WL 600679 (N.D. Ill. Feb. 21, 2012) ................21

*Maremont v. Susan Fredman Design Grp., Ltd.*,
    10 C 7811, 2011 WL 6101949 (N.D. Ill. Dec. 7, 2011) ......................2

*Medallion Prods., Inc. v. McAlister*,
    No. 06 C 2597, 2008 WL 5046055 (N.D. Ill. Nov. 20, 2008) ..............4

*MJ & Partners Rest. Ltd. P'ship v. Zadikoff*,
    10 F. Supp. 2d 922 (N.D. Ill. 1998) ..............................................21, 22

*Muzikowski v. Paramount Pictures Corp.*,
    477 F.3d 899 (7th Cir. 2007) ..............................................................21

*Platinumtel Commc'ns, LLC v. Zefcom, LLC*,
    08-CV-1062, 2008 WL 5423606 (N.D. Ill. Dec. 30, 2008) ..........4, 5, 11

*Procter & Gamble Co. v. Kimberly-Clark Corp.*,
    568 F. Supp. 2d 796 (E.D. Wis. 2008) ............................................9, 10

*Sandoz Pharmaceuticals Corp. v. Richardson–Vicks, Inc.*,
    902 F.2d 222 (3d Cir. 1990) ..............................................................18

*Stayart v. Yahoo! Inc.*,
    623 F.3d 436 (7th Cir. 2010) ..............................................................2

*Waits v. Frito–Lay, Inc.*,
    978 F.2d 1093 (9th Cir. 1992) ............................................................2

## Statutes

15 U.S.C. § 1125(a)(1)(A) ..............................................................................17

15 U.S.C. § 1127 ..........................................................................................17

## INTRODUCTION

As fully discussed below, all counts in the current complaint must be dismissed because Plaintiffs lack standing to maintain the claims at issue and/or have characterized objectively true statements as false advertising and false association.    Plaintiffs' complaint is nothing more than an improper attempt to use this Court system to influence Defendant Uber Technologies, Inc. ("Uber")'s lawful business practices.    This Court should decline Plaintiffs' invitation to create a cause of action where none exists.    Plaintiffs allege that Uber engages in false advertising, falsely associates itself with various Plaintiffs, violates local rules and ordinances, and tortiously interferes with Plaintiffs' contracts.    Not only do Plaintiffs lack standing to maintain these claims in federal Court, but Plaintiffs: cannot plead discernible injury, cannot identify any proprietary interest for which Uber falsely associates itself, mischaracterize true statements as false, and have no private cause of action for the alleged violations of local ordinances.

Plaintiffs are participants at varying levels of the taxi and limousine industry in the Chicago area.    Neither the Medallion Plaintiffs[1] nor YPL[2] own or license any trademarks, trade dress, or any other commercial interest in their identities.    Yellow[3] and Flash[4] claim to own all trademarks, trade dress, and goodwill associated with those taxi brands in Chicago. SAC at ¶ 16, 18.    However, none of these interests have been misappropriated or co-opted in any way by Uber.

_____

[1]    YC1 LLC, YC2 LLC, YC17 LLC, YC18 LLC, YC19 LLC, YC20 LLC, YC21 LLC, YC22 LLC, YC25 LLC, YC26 LLC, YC29 LLC, YC32 LLC, YC37 LLC, YC49 LLC, YC51 LLC, YC52 LLC, YC56 LLC, Chicago Medallion One LLC, Chicago Medallion Five LLC, Chicago Medallion Six LLC, Chicago Medallion Seven LLC, and Chicago Medallion Eleven LLC (the "Medallion Plaintiffs"), all purport to be "licensed medallion owners in the City of Chicago," Second Amended Complaint, Dkt. 77 (hereinafter "SAC") at ¶¶ 14-15.

[2]    Your Private Limousine, Inc.

[3]    Yellow Group LLC, Yellow Cab Affiliation, Inc., Taxi Affiliation Services, LLC, and Taxi Medallion Management, LLC.

[4]    5 Star Flash, Inc.

# ARGUMENT

## I.  The Medallion Plaintiffs And YPL Lack Standing To Bring False Association Claims Against Uber Under Section 43(a)(1)(A) Of The Lanham Act.

Plaintiffs' general allegations that "Uber falsely implies that it is associated with, sponsored, or approved by taxi and livery companies," cannot apply to the Medallion Plaintiffs or YPL.   Indeed, all allegations regarding this claim are limited to Yellow and Flash.   Standing to bring a claim under Section 43(a)(1)(A) of the Lanham Act requires having a commercial interest to protect against the harm alleged.   *See Stayart v. Yahoo! Inc.*, 623 F.3d 436, 440 (7th Cir. 2010) (holding that plaintiff private citizen lacked standing to bring false endorsement suit against defendant Internet search engine because the plaintiff's charitable activities did not create a commercial interest in her name); *Dovenmuehle v. Gilldorn Mortgage Midwest Corp.*, 871 F.2d 697, 700 (7th Cir. 1989) (holding that plaintiff family members did not have a commercial interest to protect in their surname after selling a business that bore that name to defendant).   A "false association claim . . . alleges the misuse of a trademark, . . . which is likely to confuse consumers as to the plaintiff's sponsorship or approval of the product."   *Maremont v. Susan Fredman Design Grp., Ltd.*, 10 C 7811, 2011 WL 6101949, at *4 (N.D. Ill. Dec. 7, 2011) (citing *Waits v. Frito–Lay, Inc.,* 978 F.2d 1093, 1110 (9th Cir. 1992)).   Standing for false association claims "extends to a purported endorser who has an *economic interest akin to that of a trademark holder in controlling the commercial exploitation of his or her identity.*"   *Waits*, 978 F.2d at 1110 (emphasis added).   Neither the Medallion Plaintiffs nor YPL can claim any such interest.[5]

Nothing in the SAC suggests that Uber's alleged activities can cause "confusion as to whether Uber is associated with, sponsored by, connected to, or approved by," SAC at ¶ 59, the Medallion Plaintiffs or YPL.   Plaintiffs cannot allege that, for example, Uber somehow is causing "consumer confusion in the marketplace" as to whether a taxicab is owned by YC56

---

[5]  The SAC does not indicate whether YPL actually owns any vehicles.

LLC or Chicago Medallion Eleven LLC.    The SAC neither contains nor can be amended to contain any allegation that any of the Medallion Plaintiffs own or are exclusive licensees of any trademarks or trade dress, have any commercial interest to protect in their names, or intend to commercialize those names.    Indeed, the names of those companies suggest no affiliation to or any products or services from the Medallion Plaintiffs.    The Medallion Plaintiffs cannot claim that they even directly face or serve "the riding public" that Plaintiffs accuse Uber of confusing.

The allegations in the SAC are conflicting and cannot support a claim of consumer confusion.    For example, in paragraph 64, Plaintiffs admit that "trademarks and trade dress are not as prevalent on the livery side of transportation services," but Plaintiffs still accuse Uber of confusing consumers "as to whether the livery company which owns the car," notwithstanding the absence of any trademarks, trade dress, or trade names associating it to that livery company, "is associated with, affiliated with, or connected to Uber."    SAC at ¶ 64.    The SAC does not allege that Uber displays its trademarks on those vehicles.    As a consequence, a livery company like YPL cannot maintain a claim that Uber is falsely implying an association with it when it itself does not establish any trademarks or trade dress with which Uber could associate itself. Moreover, YPL has not alleged any "present intention to operate a commercial activity" that involves using any trademarks, trade dress, or trade names on vehicles.

Plaintiffs cannot establish any economic interest in controlling the exploitation of the Medallion Plaintiffs' or YPL's identities and thus have failed to show that the Medallion Plaintiffs and YPL have standing under Section 43(a)(1)(A) of the Lanham Act.    Therefore, this Court should dismiss Count II of the SAC as to the Medallion Plaintiffs and YPL with prejudice.

**II.    All Plaintiffs Lack Standing To Bring False Advertising Claims Against Uber Under Section 43(a)(1)(B) Of The Lanham Act.**

Uber does not own or lease taxicabs, does not provide services to medallion owners, and is not a livery company.    Uber does not compete with any of Plaintiffs and, therefore, Plaintiffs lack standing to bring false advertising claims against Uber under Section 43(a)(1)(B) of the Lanham Act.    *See Johnny Blastoff, Inc. v. Los Angeles Rams Football Co.*, 188 F.3d 427, 438-

39 (7th Cir. 1999) (requiring the assertion of a "discernible competitive injury in a right"); *L.S. Heath & Son, Inc. v. AT & T Info. Sys., Inc.*, 9 F.3d 561, 575 (7th Cir. 1993) (no standing for Lanham Act claim because chocolate company plaintiff was "not in the computer business and thus is not a competitor of AT&T").

"[J]udges within this district have required that the plaintiff and defendant be direct competitors, *i.e.*, that the plaintiff 'show that it competes at the same level of business as the defendant.'" *Platinumtel Commc'ns, LLC v. Zefcom, LLC*, 08-CV-1062, 2008 WL 5423606, at *6 (N.D. Ill. Dec. 30, 2008) (citing *Medallion Prods., Inc. v. McAlister*, No. 06 C 2597, 2008 WL 5046055 (N.D. Ill. Nov. 20, 2008) (Bucklo, J.) (companies engaged in the design, manufacture, and marketing of a pet stain removal product to distributors lacked standing to sue companies engaged in the marketing and selling of pet stain removal products to consumers, suppliers and retailers); *accord Gail Green Licensing & Design, Ltd. v. Accord, Inc.*, No. 05 C 5303, 2006 WL 2873202 (N.D. Ill. Oct. 5, 2006) (St. Eve., J) (companies engaged in developing, acquiring and licensing commercial products lacked standing to sue retailers and manufacturers of pet accessories and clothing); *Goodloe v. Nat'l Wholesale Co., Inc.*, No. 03 C 7176, 2004 WL 1631728 (N.D. Ill. July 16, 2004) (Filip, J.) (customized computer retailer lacked standing to sue a developer of internet businesses and a computer and electronic wholesaler, neither of which sold computer products to consumers)); *see also Almblad v. Scotsman Indus., Inc.*, 13-CV-1297, 2013 WL 4600209, at *4-*5 (N.D. Ill. Aug. 28, 2013) (granting the defendant's motion to dismiss because plaintiff failed to demonstrate that he was a direct competitor of the defendant).

The *Platinumtel* court held that the plaintiff *retailer* of cellular telephone airtime lacked standing to bring a Lanham Act false advertising claim against the defendant *wholesaler* of cellular telephone airtime, regardless of the fact that both were in the cellular telephone airtime business and even purchased cellular telephone airtime from the same supplier. 2008 WL 5423606 at *2, *7. Indeed, the *Platinumtel* court noted the important difference between parties that may operate in the same *line* of business, as the parties in *Platinumtel* did and as Plaintiffs allege the parties to do in this case, and parties that operate at the same *level* of that

business.    2008 WL 5423606 at *6 n. 7.    The cases cited in *Platinumtel* similarly involved parties not necessarily operating at the same *level* of business.    Here, even though Plaintiffs repeatedly label Uber as their "competitor" in the "vehicle-for-hire" or "transportation" industry, they fail to plead how Uber is their competitor.    Plaintiffs allege that "Uber makes all of its revenue from transporting the riding public," (SAC at ¶ 28), but they do not and cannot allege that Uber owns or leases taxicabs to anyone.    The Medallion Plaintiffs lease their taxicabs to taxi drivers.    *See* SAC at ¶¶ 50, 58, 99, 102-03.    Yellow and Flash are "composed of taxi medallion owners."    SAC at ¶ 27.    Plaintiffs do not claim that Uber transacts with medallion owners.    The complaint does provide any information about YPL other than that it "operates livery services that provide luxury limousine, sedan, and SUV transportation."    SAC at ¶ 19.

Uber's revenues are based on a percentage of the fares collected by the third-party transportation providers who use Uber, which Uber collects from the drivers as a licensing fee. *See* SAC at ¶ 28 (describing Uber's alleged pricing scheme as being based on a "portion of the fare" and/or a per-ride "'booking fee'").    The Medallion Plaintiffs' revenues, on the other hand, are not affected by fares collected by drivers, but rather on the "lease rates," SAC at ¶ 58, drivers pay them.    Even if a lessee taxi driver collects no fares, he must pay leasing fees to the Medallion Plaintiffs.    To the extent that both the Medallion Plaintiffs and Uber transact with drivers, they do so for *different* services.    Yellow and Flash transact with and provide services to the Medallion Plaintiffs.    Their revenues, similarly, do not depend upon fares collected by drivers.    Indeed, the SAC contains no allegations that Yellow and/or Flash even transact with drivers.[6]

---

[6]    Some drivers may themselves be medallion owners, but even in this case, Uber only transacts with them in their capacities as drivers, while the Yellow Plaintiffs and/or Flash only transact with them in their capacities as medallion owners.    A medallion owner who is not a driver would not transact with Uber, and a driver who is not a medallion owner would not transact with the Yellow Plaintiffs or Flash.

Conclusory allegations that Uber competes with Plaintiffs do not make it so.   As numerous judges in this District have held, standing to sue under Section 43(a)(1)(B) of the Lanham Act requires a particular relationship between the parties even if the parties are in the same line of business.   Plaintiffs cannot allege that such a relationship exists between any of them and Uber.   Therefore, this Court should dismiss Count I of the SAC with prejudice.

## III.   Even If All Plaintiffs Have Standing To Sue Uber For False Advertising Under Section 43(a)(1)(B) Of The Lanham Act, Plaintiffs Fail To State A Claim.

As a threshold matter, Uber is not the proper party for Plaintiffs' allegations regarding uberX.   Drivers utilizing uberX contract with a separate a separate entity, Raiser, LLC, not named as a defendant in the SAC.[7]   Further, none of the allegations in the SAC are sufficient to state a claim because Plaintiffs cannot allege that Uber has engaged in any conduct that may qualify as false advertising.

First, Plaintiffs make general allegations that "Uber misrepresents the nature of its business to the public" by "market[ing] itself to the public as an elite transportation company," touting its "'Uber fleet,' 'Uber rides,' 'Uber Black cars,' 'UberCab.' and 'Uber taxis,'" SAC at ¶ 28, and allegedly stating that "it is providing a premium service with better drivers than Plaintiffs," SAC at ¶¶ 35-36.   Plaintiffs then accuse Uber of misrepresenting the gratuity associated with taxicab rides, which Plaintiffs conclude also is a violation of the Municipal Code of Chicago, Ill. ("MCC") § 9-112-600, Taxicab Medallion License Holders Rule TX05-07(c)(2), and Public Chauffeurs Rules and Regulations 11.06(a).[8]   SAC at ¶¶ 30-34, 56-58.   Finally, Plaintiffs allege that "Uber misrepresents its drivers' licensure, and taxi rates[9]."   SAC at ¶¶ 37-55.

---

[7]   All uberX rideshare drivers contract with Raiser, LLC and not Uber.   *See* December 12, 2013 Declaration of Andrew Macdonald ("12/12/13 Macdonald Decl.").

[8]   Rules TX05-07(c)(2) and 11.06(a) apply to medallion owners and drivers, respectively. Plaintiffs do not allege that these rules are applicable to Uber's business.   Plaintiffs repeat these gratuity-related allegations in paragraphs 82-83 of the SAC.

[9]   *See supra* note 8.

A claim under Section 43(a)(1)(B) of the Lanham Act requires demonstrating "(1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a loss of goodwill associated with its products. *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 819 (7th Cir. 1999); *see also Cont'l Datalabel, Inc. v. Avery Dennison Corp.*, 09 C 5980, 2012 WL 5467667, at *3-*4 (N.D. Ill. Nov. 9, 2012) *reconsideration denied*, 09 C 5980, 2013 WL 1707945 (N.D. Ill. Apr. 19, 2013) (quoting *Hot Wax*, 191 F.3d at 819). "'The false statement necessary to establish a Lanham Act violation generally falls into one of two categories: (1) commercial claims that are literally false as a factual matter; or (2) claims that may be literally true or ambiguous, but which implicitly convey a false impression, are misleading in context, or likely to deceive consumers.'" *Cont'l Datalabel*, 2012 WL 5467667 at *4 (quoting *Hot Wax*, 191 F.3d at 820). "'[W]hen the statement is literally true or ambiguous, the plaintiff must prove that the statement is misleading in context by demonstrated actual consumer confusion.'" *Cont'l Datalabel*, 2012 WL 5467667 at *4 (quoting *Hot Wax*, 191 F.3d at 820); *see also BASF Corp. v. Old World Trading Co., Inc.*, 41 F.3d 1081, 1089 (7th Cir. 1994) (quoting *Abbott Laboratories v. Mead Johnson & Co.*, 971 F.2d 6, 13 (7th Cir. 1992)). Plaintiffs make abstract allegations of "deceptive" or "misleading" statements, but allege no *actual* confusion. *See, e.g.*, SAC at ¶¶ 33, 37.

### A. Uber's Alleged Misrepresentations About The Nature Of Its Business And Its "Premium Services" Are Nonactionable Puffery

Uber's alleged use of language such as "Uber fleet," "Uber rides," "Uber Black cars," "UberCab," and "Uber taxis," SAC at ¶ 28, and Uber's alleged statements that it provides "a premium service over traditional providers such as Plaintiffs," SAC at ¶¶ 35-36, cannot satisfy the requirements to state a claim for false advertising under the Lanham Act. The "statements"

Plaintiffs allege Uber to have made are, at most, "puffery," which courts routinely reject as a basis for false advertising claims under the Lanham Act. *See, e.g., Procter & Gamble Co. v. Kimberly-Clark Corp.*, 568 F. Supp. 2d 796, 799-802 (E.D. Wis. 2008) (rejecting as bases for a false advertising claim under the Lanham Act alleged statements that "are so vague and subjective that they are neither provable nor disprovable"). Plaintiffs also have not alleged any actual consumer confusion, as the Lanham Act requires for literally true or ambiguous statements, resulting from Uber's alleged use of the "Uber fleet," "Uber rides," "Uber black cars," "UberCab," and "Uber taxis" language that Plaintiffs repeatedly invoke.

Plaintiffs fail to allege (1) anything that would allow the Court to determine whether Plaintiffs can prove their claim or Uber can disprove the claim, and (2) how any of these terms are misleading to consumers other than by pointing to the terms themselves. That is insufficient. *See Procter & Gamble*, 568 F. Supp. 2d at 800. Further, Plaintiffs' allegation that "Uber markets itself as providing a premium taxi and livery service over traditional providers" is a quintessential example of nonactionable puffery. SAC at ¶ 35. General statements of quality or superiority are not actionable. *Procter & Gamble*, 568 F. Supp. 2d at 800.

### B. Uber's Billing/Payment Practices Are Not Illegal And Do Not Give Rise To A False Advertising Claim Under The Lanham Act.

As a threshold matter, the City of Chicago has determined that the payment practices that Plaintiffs describe in the complaint are *not* illegal, and the citations Plaintiffs cite in paragraph 114 regarding MCC § 9-112-600 and alleged "deceptive practices" were dismissed on September 24, 2013, over a month before Plaintiffs sought leave to file the SAC.[10] 12/12/13 Patel Decl. Ex. A. Plaintiffs' "illegal and deceptive" label for these alleged practices simply is inaccurate.

First, with respect to taxicabs as set forth above, the Medallion Plaintiffs' leasing revenues do not vary based upon on either the number of or size of the fares collected by lessee

---

[10]    Plaintiffs mention four citations. SAC ¶¶ 114-15. Three were dismissed on September 24, 2013, and the hearing for the fourth has been continued to 2014. 12/12/13 Patel Decl. Ex. A.

drivers. Regardless of how much or how riders pay drivers, the Medallion Plaintiffs collect the same lease fees. Similarly, Yellow and Flash, which claim to provide dispatching service, collect affiliation dues and other associated fees without regard to how or how much riders pay. Neither the Medallion Plaintiffs nor Yellow nor Flash will experience any decline in their revenues as a result of Uber's alleged payment practices.

Plaintiffs attempt to create a theory of injury under which (1) Uber's allegedly false advertising of "standard taxi rates" "entice[s] consumers into using Uber's taxi service instead of the [Yellow Plaintiffs' or Flash's] competing dispatch services;" (2) "the number of passengers dispatched by Yellow and Flash declines" (not the number of fares collected by drivers of Yellow- and Flash-affiliated taxicabs); and (3) the lease rates medallion owners can charge drivers are adversely affected because the values of the Yellow and Flash dispatch services, which supposedly comprise some portion of the total value of the affiliated medallions, are adversely affected. SAC at ¶ 58. Plaintiffs also complain that "the goodwill associated with" Yellow and Flash is reduced. SAC at ¶ 58. But Plaintiffs cannot establish that any such theoretical decline in medallion values or goodwill that may be attributable to the dispatch services actually has occurred or is likely to occur. Indeed, Plaintiffs initiated this litigation over a year ago, and according to them, Uber has been "deceiving" the riding public in Chicago for at least as long. In any event, any alleged harm under this theory is far too remote or speculative to establish that Uber's operations in Chicago actually caused such harm. Uber's alleged "involvement in that harm," if any, "is remote, indirect, and speculative," and thus cannot comprise the injury or likelihood of injury that the Lanham Act requires for false advertising claims. *Platinumtel*, 2008 WL 5423606, at *6.

Plaintiffs' theory that "YPL is also harmed by Uber's false representations of 'standard taxi rates' because customers may opt for an Uber-dispatched taxi instead of a YPL livery because they believed they were getting a ride at 'standard taxi rates' when in fact, they were not," is also too remote and speculative; it also makes no sense. Plaintiffs describe the harm YPL allegedly suffers as occurring when a customer opts to take a taxi instead of a YPL livery,

based only on a representation that taxi fares are based on "standard taxi rates." Under Plaintiffs' theory, YPL would suffer this so-called harm whenever a customer opted to take a taxi instead of a YPL livery, regardless of whether that customer is then actually charged "standard taxi rates" (whatever those are) or Uber's allegedly illegal and deceptive taxi rates. Therefore, this alleged injury similarly cannot comprise the injury or likelihood of injury to YPL that the Lanham Act requires for a false advertising claim.

> **C.** **Plaintiffs Fail To State A Claim Based On Uber's Alleged Misrepresentations Regarding Drivers' Licensure And Insurance Coverage**
>
>> **1.** **Plaintiffs Do Not Allege Actual Misrepresentations Regarding Drivers Using The uberX Platform.**

Plaintiffs accuse Uber of misrepresenting the licensing status of vehicles and drivers using the uberX platform. They point to (1) an alleged Uber blog post that, as of May 9, 2013, according to Plaintiffs, stated that "all [u]berX vehicles were 'licensed by the city of Chicago, and driven by a licensed chauffeur,'" SAC at ¶ 40, and (2) Uber's "Policy White Paper 1.0," which states that Uber "'works *almost exclusively* with commercially licensed, insured, and regulated entities,'" SAC at ¶ 41. According to Plaintiffs, these comprise a "statement that all of [Uber's] drivers (excluding [those in] California) are commercially licensed and insured," and that that statement is false." SAC at ¶ 41. In order to state a claim regarding uberX, Plaintiffs would create a standard that (1) any statement posted on a blog must remain true forever, and (2) "almost exclusively" must mean the same thing as "all." Not so.

At the time of Uber's blog post announcing the launch of uberX in Chicago, the blog post at issue was true; uberX users did, in fact, get "linked to a [vehicle], licensed by the city of Chicago, and driven by a licensed chauffeur." 12/12/13 Patel Decl. Ex. B. Plaintiffs do not and cannot allege that the statement in the blog post was false at the time it was made. *See* SAC at ¶ 42 ("Uber may have rolled out [u]berX in Chicago with some commercially licensed drivers driving licensed livery vehicles . . . ."). Plaintiffs do not, and cannot, allege that unlicensed drivers and vehicles were on the uberX platform in Chicago on May 9, 2013. There is no misrepresentation here.

Plaintiffs' allegation that Uber claims "all of its drivers" to be "commercially licensed and insured" misstates the facts. Plaintiffs do not allege that Uber's Policy White Paper 1.0, in either version Plaintiffs cite, was in reference to Chicago, and in fact, it was not. It is available on Uber's website for all to review. Uber operates in over 20 countries around the world, and in nearly as many cities outside the United States as within. uberX ridesharing, on the other hand, is and has been available only in select cities. The overwhelming majority of entities that partner with Uber to provide their services are indeed "commercially licensed, insured, and regulated entities," just as stated in the Policy White Paper 1.0. Therefore, there is no misrepresentation here, either. And even if someday this is not the case, again, there is no requirement that a statement made by a company need be true forever.

Plaintiffs also claim that uberX "misrepresents the insurance coverage afforded to uberX riders." SAC at ¶ 43. As with their allegations regarding the licensure of drivers and vehicles on the uberX platform, Plaintiffs mischaracterize Uber's alleged statements. At the core of Plaintiffs' allegations regarding uberX insurance coverage is the alleged statement in the Policy White Paper 1.0 that "At a minimum, there will be a $2,000,000 insurance policy applicable to ridesharing trips," which was later revised to indicate that there would be a $1,000,000 per-incident insurance policy. SAC at ¶¶ 43-44.

First, whether Uber revised the amount of coverage it intended to procure from $2,000,000 to $1,000,000 per-incident is irrelevant to any of Plaintiffs' allegations. Plaintiffs do not dispute that Uber has a $1,000,000 per-incident insurance policy applicable to ridesharing trips. *See* SAC at ¶ 45 ("Uber has produced certificates of insurance to the California Public Utilities [Commission] . . . ."). Their only dispute is that this insurance is not of the character that they believe is required. *See* SAC at ¶ 45 (emphasis added) ("Uber does not have insurance *that covers [u]berX passengers or drivers* . . . . In fact, Uber has no commercial insurance *that will cover an [u]berX passenger or driver in an accident*." "The certificates show that Uber does not provide *primary coverage* for [u]berX rides."). Nowhere does Uber make any claims about "primary coverage" or coverage for "passengers *or drivers*." Even if, as Plaintiffs allege,

Uber has only "insurance to cover Uber's potential liability in the case of an [u]berX driver getting into an accident" (which is not the case), Plaintiffs do not claim that this coverage excludes Uber's potential liability to any particular party in the case of a driver getting into an accident.   Just as with Plaintiffs' allegations regarding licensing, there is no allegation here of Uber claiming to have insurance coverage of one amount and having a different amount in reality.   All Plaintiffs allege is that Uber's representations of its insurance, as Plaintiffs construe them, do not meet the standard Plaintiffs believe should apply to this insurance.

> **2.     Plaintiffs Do Not Allege Actual Misrepresentations Regarding Taxi Or Livery Drivers.**

Plaintiffs allege that two of Uber's statements: (1) "Do you trust your transportation? You should," and (2) "all our driver partners are fully licensed w/ commercial insurance," amount to false promises.   Here Plaintiffs create their own standard they would have this Court impose upon Uber in the form of a misrepresentation claim.   Specifically, Plaintiffs would have this Court regulate licensing and insurance by requiring (through a misrepresentation claim) that Uber "regularly check whether an active Uber driver has had his or her license suspended or revoked after they started driving for Uber" or "recheck that any licensing or insurance is maintained" for livery vehicles and by livery drivers SAC at ¶¶ 48, 52, 54.   Plaintiffs themselves admit that (1) Uber checks the licensing status of every driver at least at the time that driver begins using Uber;[11]  (2) that taxicab drivers do not carry their own insurance because they do not own their vehicles; and (3) that Uber *does* check the insurance and licensing status of livery vehicles and drivers.   Under these circumstances, Plaintiffs cannot allege that either of the two statements they attribute to Uber are, in fact, false or misleading.

---

[11]     The status of every chauffeur's license in the City of Chicago is publicly available as well, so Uber (and anyone else) can verify the licensing status of a driver at any time.   *See* 12/12/13 Patel Decl. at Ex. C.

3.    **Plaintiffs Do Not Articulate Any Injury Resulting From Uber's Allegedly Misrepresenting Its Insurance And Licensing Practices Relating To Taxi And Livery Services.**

To set forth a false advertising claim under the Lanham Act, it is necessary for a plaintiff to demonstrate that it "has been or is likely to be injured as a result of the false statement." *Hot Wax*, 191 F.3d at 819. Here, in the section of the complaint wherein Plaintiffs allege that Uber misrepresents its insurance and licensing practices relating to taxi and livery services, Plaintiffs make no statement whatsoever regarding any injury that they suffered or are likely to suffer as a result. *See* SAC at ¶¶ 48-55. Even if Uber's alleged statements were false (which they are not), no injury is alleged and no injury could be alleged. As Plaintiffs note, Uber's taxi and black-car request options "use[] the same drivers as Plaintiffs while these drivers are operating Plaintiffs' vehicles." SAC at ¶ 35. Plaintiffs do not allege that either of the two statements are causing the loss of any goodwill or the diversion of any sales or revenue away from them.

D.    **The Alleged Illegality Of Uber's Operations Cannot Form The Basis Of A Claim Under Section 43(a)(1)(B) Of The Lanham Act.**

The remainder of Plaintiffs' Lanham Act false advertising claims are based on allegations that "Uber's business practices . . . do not comply with numerous laws and regulations." SAC at ¶ 69. First, the City of Chicago determined on September 24, 2013 that Uber did not illegally obtain its dispatch license as Plaintiffs allege in paragraphs 84-89 of the SAC. 12/12/13 Patel Decl. Ex. A. Therefore, allegations that Uber "illegally charges taxi rates in excess of the statutory rates" or that Uber "illegally and fraudulently obtained its dispatch license" cannot form the basis of any claim, as they are, in fact, false.

Futher, enforcement actions by Chicago's Department of Business Affairs and Consumer Protection ("BACP") cannot and should not form the basis of a claim under the Lanham Act. Plaintiffs, for their part, have received numerous citations and enforcement actions from the BACP in the past two years, including at least (1) seven citations against Plaintiffs Yellow Affiliation, Inc. and/or Chicago Medallion One LLC for violations relating to taxicab lease agreements and taxi driver licensure; and (2) actions against each of YC46 LLC, YC48 LLC,

CLMH 15 LLC, CLMH 16 LLC,[12] and Plaintiff YC56 LLC, for charging drivers illegally high lease rates, consumer fraud, unfair competition, and/or deceptive business practices, and violations relating to driver licensure.    12/12/13 Patel Decl. at Ex. D.    According to Plaintiffs, Uber, because it "competes" with them in the "transportation industry," would have causes of action under the Lanham Act for these violations.    These citations are not and should not be actionable as a private cause of action under the Lanham Act.

### 1.    Use of Uber Does Not Affect Mandatory Data Collection.

The Medallion Plaintiffs claim to be subject to certain mandates, requiring them to "have the capability to collect data from each taxi, including the driver's name and number, whether the fare was a street hail or a dispatched fare, the meter amount without any extras or tips, all meter extras, the tip amount, the total amount paid, and the form of payment."    SAC at ¶¶ 90-93.    Plaintiffs blame Uber for allegedly preventing compliance with these mandates ██████

██████████████████████████████████    ████████████████████████

Though Plaintiffs claim that "Uber's system bypasses" these data collection systems and therefore prevents them from collecting the required data, they do not allege how it does so. Plaintiffs themselves admit that, at the start of an Uber-requested taxi trip, "the driver starts the taximeter when the passenger enters the taxi and runs the standard taximeter throughout the ride," SAC at ¶¶ 30, just as with a street hail or a ride arranged through another dispatch service or directly with the taxi driver.    Upon the conclusion of that ride, the driver stops the meter and ensures any meter extras, such as airport taxes or additional-passenger fees, are entered into the meter just as with any other ride.    Medallion licensees do not need "access to Uber's charges," SAC at ¶ 91, to collect any of that information.    For any other information not automatically

---

[12]    YC46 LLC, YC48 LLC, CLMH 15 LLC, and CLMH 16 LLC are not among the Medallion Plaintiffs, but at the time BACP initiated its enforcement actions against then, they all had principal places of business at 2230 S. Michigan Ave., Chicago, Illinois.    Plaintiff YC1 LLC had its principal place of business at this same address at least as recently as when Plaintiffs filed their First Amended Complaint on December 20, 2012, Dkt. 17.

recorded by the standard taximeter for any trip, nothing in Uber's system prevents a driver from recording that information using whatever systems the Medallion Plaintiffs have in place to collect information from drivers and provide BACP with access to that information.

### 2. Plaintiffs Cannot Use The Lanham Act As A Backdoor Method To Have A Federal Court Interpret Local Ordinances.

Courts repeatedly have disallowed the use of unfair competition claims as a backdoor method of private enforcement of laws, rules, or regulations that do not themselves provide for private causes of action. *Dial A Car, Inc. v. Transp., Inc.*, 82 F.3d 484 (D.C. Cir. 1996), which involves similar claims for deceptive practices under the Lanham Act, is directly on point. In that case, the plaintiff livery service possessed a valid license from the District of Columbia and attempted to bring suit against two taxicab companies licensed in neighboring Maryland and Virginia counties, alleging, *inter alia*, violations of Section 43(a) of the Lanham Act. *Dial A Car*, 82 F.3d at 485-86. The plaintiff's claims in that case were based on the defendants' alleged violations of an "administrative order" from the D.C. Taxicab Commission. *Dial A Car*, 82 F.3d at 488. The federal appellate court rejected the plaintiff's argument, holding that the plaintiff had failed to state a claim and instead was "simply using the Lanham Act to try to enforce its preferred interpretation of [the administrative order]." *Dial A Car*, 82 F.3d at 488. Because the court saw "no reason to reach out and apply federal law to [a] quintessentially local dispute," it affirmed the district court's dismissal of the plaintiff's claim. *Dial A Car*, 82 F.3d at 488-89. "Not surprisingly, although the [Lanham] Act has been interpreted in literally hundreds of appellate cases since its enactment in 1946," the court in *Dial A Car* could not "find a single case that purports to extend the Act to allow federal judges to interpret and *enforce* municipal regulations, thereby affording plaintiffs remedies over and above those provided by local law." *Dial A Car*, 82 F.3d at 490. After affirming the dismissal of the complaint, the court advised the plaintiff "to take its argument to the D.C. Taxicab Commission and lobby the Commission to crack down on [the defendants'] activities" rather than using "the Lanham Act as a backdoor method of prosecuting [the] case in federal court . . . ." *Dial A Car*, 82 F.3d at 488.

The MCC does not contain any private cause of action.   Further, Plaintiffs do not purport to assert any private cause of action under the MCC or any of its regulations.   As a consequence, whatever complaints Plaintiffs may have regarding Uber's compliance or non-compliance with local ordinances and regulations should be resolved through the City of Chicago, not through a federal court.   "It is generally inappropriate for a court . . . . 'to determine preemptively how [an administrative agency] will interpret and enforce its own regulations' and thereby to usurp the agency's responsibility for interpreting and enforcing potentially ambiguous regulations."   *Dial A Car, Inc. v. Transp., Inc.*, 884 F. Supp. 584, 593 (D.D.C. 1995) (quoting *Sandoz Pharmaceuticals Corp. v. Richardson–Vicks, Inc.*, 902 F.2d 222, 231 (3d Cir. 1990)).   Plaintiffs cannot unilaterally conclude that Uber uses "illegal" meters in its black-car or uberX services or that that Uber "illegally" discriminates against certain classes of people through its payment methods,[13] and Plaintiffs do not allege that the entities responsible for interpreting and enforcing regulations regarding taximeters, payment methods, or any other regulations Plaintiffs invoke, have adopted Plaintiffs' own interpretations.   And in some cases, those entities have adopted interpretations that contradict those of Plaintiffs.

Here, BACP and the City of Chicago are responsible for enforcing the relevant regulations and taking whatever action they deem appropriate, whether against Plaintiffs, Uber, or any other entity.   They have taken and continue to take such action, and allowing Plaintiffs' action to proceed while an administrative agency is adapting its rules to a changing marketplace introduces the risk of inconsistent outcomes.   Plaintiffs' apparent dissatisfaction with BACP and the City's enforcement mechanisms does not give rise to a private cause of action.

For all the reasons set forth above, Plaintiffs fail to state a claim under Section 43(a)(1)(B) of the Lanham Act, and this Court should dismiss Count I of the SAC with prejudice.

---

[13] ████████████████████████████   ████████████████████████████

**IV.    Yellow And Flash Fail To State A Claim For False Association Under Section 43(a)(1)(A) Of The Lanham Act.**

Under Section 43(a)(1)(A) of the Lanham Act, liability extends to "'[a]ny person who, on or in connection with any goods or services . . . *uses in commerce any word*, term, name, symbol, or device, or any combination thereof, or any false designation of origin . . . which . . . is likely to cause confusion . . . as to the origin, sponsorship, or approval of . . . goods, services, or commercial activities by another person.'" *Flava Works, Inc. v. Gunter*, 10 C 6517, 2011 WL 1791557, at *6 (N.D. Ill. May 10, 2011) (modification in original) (quoting 15 U.S.C. § 1125(a)(1)(A)).    "A mark is 'deemed to be in use in commerce' for services when 'it is used or displayed in the sale or advertising of services and the services are rendered in commerce . . . .'" *Flava Works*, 2011 WL 1791557 at *7 (quoting 15 U.S.C. § 1127).

Plaintiffs first allege that, because one of Yellow's or Flash's taxicabs, bearing those companies' trademarks, may appear in response to a request for a taxi submitted using Uber, Uber is purporting to be associated with those companies.    SAC at ¶¶ 59-61.    This, however, does not constitute a "use in commerce" as required by the Lanham Act, or even a "use" in any sense of the word.    Thousands of taxis, bearing many different trademarks, exist in Chicago, and drivers who drive any one of those taxis may choose to use Uber.    Uber itself does not display any trademarks other than its own in its app during the taxi request process, and Plaintiffs make no allegation that it does.    The only "use" of Yellow's or Flash's trademarks that occurs in this process is that when the taxi shows up for the rider, it may display a trademark on the vehicle itself.    In *Flava Works*, the court granted the defendant's motion to dismiss where the plaintiff alleged that videos posted on the defendant's website "often contained" the plaintiff's trademarks, causing confusion about the origin of the material bearing those trademarks.    2011 WL 1791557 at *7.    The court held that that was not an allegation of a use in commerce. *Flava Works*, 2011 WL 1791557 at *7.    Similarly here, the fact that a taxi bearing one of Yellow's or Flash's trademarks may "often appear" in response to a request made through Uber does not constitute use in commerce of that mark by Uber.

In addition, Plaintiffs apparently attempt to characterize Uber's recent website redesign, which includes a generic image of a yellow-colored vehicle (and *not* bearing the Yellow Affiliation trademark) in its section regarding the Uber's taxi request option, as an act targeted specifically to Chicago's taxi consumers. *See* SAC at ¶¶ 62-63. First, the same exact image appears on Uber's main webpage and on pages for many other cities in which Uber operates. Second, Plaintiffs do not, and cannot, claim any proprietary right to the color yellow as displayed on taxicabs.[14] Plaintiffs' registered *trademarks* do not appear anywhere on Uber's website or smartphone application. Further, that the number "1317" appearing on the image may be the medallion number of a Yellow-affiliated taxicab is a mere coincidence.[15]

Moreover, the City of Chicago must approve the color schemes that taxicab affiliations may use on affiliated vehicles. MCC § 9-112-360 ("All color schemes and logos must be approved by the commissioner before being painted and displayed on the vehicles."). Even if taxicabs associated with Yellow are the only yellow-colored taxis in Chicago, that does not establish or even suggest that they are so because of their "distinctiveness." BACP, in its sole discretion and based on its regulatory authority, determines what taxicabs can be yellow.

Therefore, because Plaintiffs have not demonstrated that Uber engages in any use in commerce of Yellow's or Flash's trademarks, and because Yellow do not have any proprietary right in an image of an unmarked yellow vehicle, this Court should dismiss Count II of the SAC.

## V. This Court Should Resolve Plaintiffs' Illinois Statutory And Common-Law Claims According To The Same Principles Their Lanham Act Claims.

Claims arising under the ICFA and IUDTPA, which are the state-law equivalents of Plaintiffs' Lanham Act claims, are subject to the same analysis as those Lanham Act claims. *See Muzikowski v. Paramount Pictures Corp.*, 477 F.3d 899, 907 (7th Cir. 2007); *see also M.*

---

[14] None of the Yellow Plaintiffs own any trademark registration for this so-called distinctive yellow trade dress.

[15] At least as recently as January of 2013, medallion #1317 was not a member of Yellow Affiliation. *See* 12/12/13 Patel Decl. Ex. F.

*Arthur Gensler, Jr. & Assocs., Inc. v. Strabala*, No. 11 C 3945, 2012 WL 600679 (N.D. Ill. Feb. 21, 2012); *MJ & Partners Rest. Ltd. P'ship v. Zadikoff,* 10 F. Supp. 2d 922, 929 (N.D. Ill. 1998). "Common law unfair competition claims [also] 'rise or fall' based on the Lanham Act." *Ho v. Taflove*, 696 F. Supp. 2d 950, 956 (N.D. Ill. 2010) (quoting *MJ*, 10 F. Supp. 2d at 929). "Therefore, because plaintiffs' Lanham Act claim[s] fail, their unfair competition claim fails too." Moreover, Plaintiffs' "allegations underlying [Counts III and IV] are identical to those of [Count VI], and [Plaintiff] has not explained why its common law claim for unfair competition is still viable given the codification of [IUDTPA]." *See BlueStar Mgmt. v. The Annex Club, LLC*, 09 C 4540, 2010 WL 2802213, at *9 (N.D. Ill. July 12, 2010). Therefore, this Court should dismiss Counts III, IV, and VI of the SAC. *Ho*, 696 F. Supp. 2d at 956.

## VI.   Plaintiffs Fail To State A Claim For Tortious Interference With Contractual Relations Under Illinois Common Law.

Under Illinois law, stating a claim for tortious interference with contractual relations requires pleading five elements: "(1) the existence of a valid and enforceable contract; (2) the defendant's awareness of the contractual relation; (3) the defendant's intentional and unjustified inducement of breach of the contract; (4) a subsequent breach by the other contracting party caused by the defendant's wrongful conduct; and (5) damages resulting from the breach." *Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 398 (7th Cir. 2003).

Plaintiffs argue that Uber induces drivers to breach alleged contracts those drivers have with Plaintiffs by (1) inducing drivers to use Yellow's and Flash's trademarks in a manner that violates those contracts and (2) inducing drivers to violate local rules and regulations, including by using mobile devices. This claim does not apply to YPL. For the first of these two sets of allegations, Plaintiffs fail to identify any kind of harm that they suffer as a result of these alleged breaches. In paragraphs 104-09, Plaintiffs describe contractual provisions requiring limiting the ways in which they can use Yellow's and/or Flash's trademarks, along with how Uber allegedly induces drivers to breach those agreements, and nothing else. Without even pleading an essential element of the claim, Plaintiffs cannot state a claim based on these allegations.

As for the remaining allegations, the alleged breaches are based entirely on taxi drivers' alleged violations of local and state laws.    As discussed above, Plaintiffs cannot presuppose violations of the MCC and/or any regulations in order to create a private cause of action. Moreover, the ████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ██████████   ████████████████████████  It is thus impossible for Plaintiffs to allege any breach based on taxi drivers' (or any other parties') violations of local and/or state laws.    Moreover, though Plaintiffs allege that "the City of Chicago has also issued citations to Uber drivers for violations of City transportation laws" on information and belief, SAC at ¶ 115, they do not allege that these violations actually resulted in any breaches of contract or that these violations actually caused Plaintiffs any of the theoretical harm they describe in paragraph 99.

Therefore, because Plaintiffs have failed to allege any damages or any actual breach of contract, this Court should dismiss Count V of the SAC with prejudice.

## CONCLUSION

For all the reasons set forth above, this Court should dismiss the Complaint in its entirety.

DATED: December 12, 2013       QUINN EMANUEL URQUHART &
SULLIVAN, LLP


By    /s/ Stephen A. Swedlow
Stephen A. Swedlow
Attorney for Uber Technologies, Inc.

Stephen A. Swedlow (ARDC No. 6234550)
Andrew H. Schapiro (ARDC No. 6209041)
Amit B. Patel (ARDC No. 6309876)
Quinn Emanuel Urquhart & Sullivan, LLP
500 W. Madison St., Suite 2450
Chicago, IL 60661
Telephone:  (312) 705-7400
Facsimile:  (312) 705-7401
Email:  stephenswedlow@quinnemanuel.com
        andrewschapiro@quinnemanuel.com
        amitbpatel@quinnemanuel.com

John B. Quinn*
Quinn Emanuel Urquhart & Sullivan, LLP
865 S. Figueroa St., 10th Floor
Los Angeles, CA 90017
Telephone:  (213) 443-3000
Facsimile:  (312) 443-3100
Email:  johnquinn@quinnemanuel.com

* *pro hac vice* admitted